## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* EDWARD ALLEN<br><br>Plaintiff,<br><br>v.<br><br>STERLING CAPITAL PARTNERS, L.P.; STERLING CAPITAL PARTNERS GMBH & CO. KH, and STERLING FUND MANAGEMENT, LLC; ARIZONA SUMMIT LAW SCHOOL, LLC; FLORIDA COASTAL SCHOOL OF LAW, INC.; CHARLOTTE SCHOOL OF LAW, LLC; INFILAW CORPORATION; INFILAW HOLDING, LLC; BARBRI, INC.; and KAPLAN, INC.<br><br>Defendants. | Case No. 1:19-cv-07289<br><br>Honorable Ronald A. Guzman |

## DECLARATION OF JAMES L. ZELENAY, JR., IN SUPPORT OF DEFENDANT KAPLAN, INC.'S REQUEST FOR JUDICIAL NOTICE

I, James L. Zelenay, Jr., hereby declare and state:

1.      I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, and am one of the attorneys of record for Defendant Kaplan, Inc. ("Kaplan") in the above-entitled action.  I offer this declaration in support of Kaplan's Request for Judicial Notice and Motion to Dismiss.  I have personal knowledge of the matters stated herein, and if asked to testify thereto, I would do so competently.

2.      Attached hereto as **Exhibit A** is a copy of the complaint filed in *United States ex rel. O'Connor v. Arizona Summit Law School, LLC, et al.*, 3:15-cv-1351 (M.D. Fla. 2015) [ECF 4] ("*O'Connor* Complaint").

3.      Attached hereto as **Exhibit B** is a copy of the order dismissing *United States ex rel. O'Connor v. Arizona Summit Law School, LLC, et al.*, 3:15-cv-1351 (M.D. Fla. 2015) [ECF 27].

4.      Attached hereto as **Exhibit C** is a redline comparing allegations from the *O'Connor* Complaint, from pages 26 through 34 of that complaint, against paragraphs 146 through 174 of the complaint in the instant matter, *United States ex rel. Allen v. Sterling Capital Partners, L.P.*, 1:19-cv-07289 (N.D. Ill., filed Nov. 5, 2019) (ECF 1).  Exhibit C was prepared by my office via our office's electronic comparison tools.

5.      Attached hereto as **Exhibit D** is a copy of the Third Amended Complaint filed in *United States ex rel. Lorona v. InfiLaw Corp., et al.*, 3:15-cv-959-J-34JRK (M.D. Fla. 2018) (ECF 36).

6.      Attached hereto as **Exhibit E** is a copy of the order dismissing with prejudice *United States ex rel. Lorona v. InfiLaw Corp., et al.*, 3:15-cv-959-J-34JRK (M.D. Fla. Aug. 12, 2019) (ECF 72).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 19, 2021, in Pasadena, California.

By: _____
        James L. Zelenay, Jr.

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA
*ex rel.* MICHAEL O'CONNOR and
CELIA RUMANN,

        Plaintiffs,

v.

ARIZONA SUMMIT LAW SCHOOL,
LLC, FLORIDA COASTAL SCHOOL OF
LAW, INC., CHARLOTTE SCHOOL OF
LAW, LLC, INFILAW CORPORATION,
INFILAW HOLDING, LLC, STERLING
CAPITAL PARTNERS, BARBRI, INC.,
and KAPLAN, INC.

        Defendants.

Case No. 3:15-CV-1351-J-39JBT

**FILED IN CAMERA AND**
**UNDER SEAL**

JURY TRIAL DEMANDED

## COMPLAINT

On behalf of the United States of America and themselves, Relators Michael
O'Connor and Celia Rumann ("Relators") file this *qui tam* complaint against
Arizona Summit Law School, LLC, Florida Coastal School of Law, Inc., Charlotte
School of Law, InfiLaw Corporation, InfiLaw Holdings, LLC, Sterling Capital
Partners, BarBri, Inc., and Kaplan, Inc. ("Defendants"), and allege as follows:

## INTRODUCTION

This is a civil action to recover damages and penalties on behalf of the United
States of America arising from false claims and statements made, caused and/or

S-4

presented by the Defendants in violation of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*

The FCA allows an individual known as the relator, or whistleblower, to file an action on behalf of the government for violations of the FCA and receive a portion of any recovery as an award to the *qui tam* plaintiff. 31 U.S.C. § 3730. Under the FCA, the Complaint must be filed under seal (without service on the defendants) to enable the government to conduct its own investigation without the defendants' knowledge and to allow the government an opportunity to intervene in the action.

Defendants have violated the FCA by engaging in a scheme to submit, or cause to be submitted, false claims for student loans from the federal student aid programs administered by the U.S. Department of Education (ED). Specifically, Defendants knowingly engaged in a scheme to falsify three for-profit law schools' compliance with the regulations governing the schools' eligibility to participate in the federally-subsidized student loan programs created under Title IV of the Higher Education Act, 20 U.S.C. §§ 1070 et seq. ("Title IV"). Defendants' misconduct has resulted in millions of dollars in false claims that were submitted to and paid by the federal government.

## JURISDICTION AND VENUE

1. Relators bring this action on behalf of themselves and the United States of America pursuant to 31 U.S.C. § 3730(b)(1).

2

This Court has subject matter jurisdiction over Plaintiffs' claims arising under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. § 1331 and 1345. The Court has supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, and/or have transacted business within the United States.

Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because at least one Defendant resides in this district and because alleged violations of the FCA occurred in this district.

## DEFENDANTS

Defendant Arizona Summit Law School, LLC, formerly known as Phoenix School of Law, operates a for-profit law school located in Phoenix, Arizona ("Summit Law"). Summit Law is registered as a Delaware limited liability company. Prior to November 2013, Summit Law was named the Phoenix School of Law.

Defendant Florida Coastal School of Law, Inc. operates a for-profit law school located in Jacksonville, Florida ("Florida Coastal"). Florida Coastal is registered as a Delaware Corporation.

Defendant Charlotte School of Law, LLC operates a for-profit law school located in Charlotte, North Carolina ("Charlotte Law"). Charlotte Law is registered as a Delaware limited liability company.

3

Defendants Summit Law, Florida Coastal and Charlotte Law are all owned by Defendant InfiLaw, a for-profit consortium of law schools, and collectively referred to herein as the "InfiLaw Schools."

Defendant InfiLaw Corporation is a Delaware corporation with its primary place of business located at 8625 Tamiami Trail North, Suite 500, Naples, Florida 34108. Defendant InfiLaw Holdings, LLC is a Delaware limited liability company with its primary place of business in Naples, Florida. The Defendants in this paragraph are collectively referred to herein as "InfiLaw."

InfiLaw owns, operates and manages the InfiLaw Schools. InfiLaw dictates or approves all major management decisions, policies, and business arrangements at the InfiLaw Schools.

Defendant Sterling Capital Partners, LLC, d/b/a Sterling Partners, is a Chicago-based private equity firm that is registered as a Delaware limited liability company ("Sterling Partners"). Sterling Partners purchased Florida Coastal School of Law in 2004 and formed InfiLaw as a holding and management company for Florida Coastal. Sterling continues to hold an approximate 88% interest in InfiLaw and directly controls the management and policy decisions made by InfiLaw and the InfiLaw Schools.

Defendant Barbri, Inc. is a Delaware corporation with its primary place of business located at 9400 North Central Expressway, Ste. 613, Dallas, Texas 75231 ("Barbri"). Barbri provides preparation courses and materials for individuals taking state bar exams, most of whom are recent law school graduates.

4

Defendant Kaplan, Inc. is a Delaware corporation with its primary place of business located Fort Lauderdale, Florida ("Kaplan"). Kaplan provides preparation courses and materials for individuals taking state bar exams and is a competitor with Barbri in the bar exam preparation course market.

## THE RELATORS

Relator Michael O'Connor was formerly employed by the Summit Law as an Associate Professor of Law with tenure.

Relator Celia Rumann was formerly employed by the Summit Law as an Associate Professor of Law with tenure.

As defined in 31 U.S.C. § 3730(e)(4)(B), Relators qualify as the "original source" of the allegations made herein. Specifically, the violations alleged herein are based upon Relators' personal knowledge, expertise in the legal education field, and non-public information obtained by Relators during and after their employment at Summit Law. Relators provided the information that forms the basis of the allegations made herein to the federal government prior to the filing of this Complaint and prior to any public disclosure of the violations alleged herein.

## THE GOVERNMENT PROGRAMS

### A.    Title IV of the Higher Education Act

Under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 et seq., Congress established various student loan and grant programs, including but not limited to the Federal Family Education Loan Program ("FFELP"), and the Federal

Direct Loan Program ("FDLP") (collectively "Title IV programs") in order to financially assist eligible students in obtaining a post-secondary education.

Although the mechanism by which funding is disbursed to eligible students under the Title IV programs varies, each Title IV program requires compliance with specific conditions as a prerequisite to obtaining federal funds.

In order to become eligible to receive Title IV funding under programs such as FFELP or FDLP, or to have its students receive Title IV funding, a post-secondary educational institution must first enter into a program participation agreement ("PPA") with the Department of Education. 20 U.S.C. § 1094(a); 34 C.F.R. §668.14.

Each PPA expressly conditions a school's initial and continuing eligibility to receive funds under Title IV programs on compliance with specific statutory requirements, including 20 U.S.C. § 1094 and 34 C.F.R. §§ 668.14 and 668.22.

In addition to the requirements set forth by statute or regulation, the ED publishes annually the Federal Student Aid Handbook (referred to herein as the "FSA Handbook"), which provides additional guidance for institutions that participate in Title IV programs. Each time an institution submits data or requests or disburses funding from a Title IV funding source, it is implicitly and explicitly representing that the data, request, or disbursement is compliant with the instructions set forth in the FSA Handbook.

### B. Title IV Loan Programs

Under the FFELP loan programs, which include subsidized and un-

6

subsidized Stafford Loans, a guaranty agency makes the eventual claim for payment by the United States for many loans prior to July 2010. No new loans were made under FFELP after July 1, 2010. Prior to that date, the school and student submitted an application to a private lender for a loan on behalf of the student. If a student defaults in repaying a loan under the FFELP program, a state or private guaranty agency reimburses the lender or the subsequent holder of the loan for the outstanding balance and takes assignment of the loan for collection action. 34 C.F.R. § 682.401(b)(14). If the guaranty agency is unable to collect from the borrower, the ED reimburses the guaranty agency for the loss it incurred in honoring the defaulted claims, 20 U.S.C. § 1078(c)(1)(A), and the ED may, in its discretion, take assignment of the loan. 20 U.S.C. § 1078(c)(8). In this way, the government is ultimately called upon to satisfy claims for payment.

In order to participate in the FFELP or any other Title IV loan, as opposed to grant, program, a student completes a Master Promissory Note ("MPN") and submits the MPN to the educational institution. The institution, in turn, completes a "School Certification," in which it certifies the accuracy of the information it provided to the ED and the student's eligibility for the loan. 34 C.F.R. § 682.102. While the MPN itself is valid for ten years, the educational institution determines the student's ongoing eligibility for aid and completes the School Certification annually.

Under FFELP, the educational institution then submits the MPN to the lender. Upon approval by the lender, the lender obtains a loan guarantee from a

7

guarantee agency. 34 C.F.R. § 682.102. The loan is made in reliance upon the accuracy of the information provided by the educational institution.

The lender transfers the FFELP funds directly into the educational institution's account. Upon receiving the FFELP funds, the educational institution credits a student's account for education-related expenses, such as tuition, fees, books, and supplies.

For subsidized Stafford loans, the government pays the interest on the student's behalf during the time the student is enrolled in school on at least a half-time basis, and during the student's grace period before repayment commences. 34 C.F.R. § 682.102(d)(2).

In the event that a student defaults on his or her loan, the ED pays to the guarantee agency all or part of the unpaid principal and accrued interest, as well as a variety of administrative costs. 34 C.F.R. § 682.404.

After July 2010, the Direct Loan program replaced the FFELP program as the primary source of Title IV student loans. Under the direct loan program, the federal government directly provides eligible students with subsidized and unsubsidized Stafford loans. Again, these loans disbursements are made directly to an institution, and the institution is responsible for disbursing or "drawing down" funding for tuition and related education expenses. Once tuition and other expenses owned to the school have been paid, students may be eligible to receive disbursements of their remaining eligible funds to cover living expenses and other indirect education costs.

Federal Direct Loans are available to students who meet eligibility requirements including being matriculated into a degree program, enrolling at least half time, and meeting Satisfactory Academic Progress requirements.

Title IV grant and loan funding is only available if both the student and school meet the eligibility requirements set forth in Title IV statute, regulations promulgated under Title IV, and other guidance issued by the Department of Education.

The loans made by the United States through the Title IV programs are subsidized United States taxpayers in that the government pays a portion of the interest on the loans and covers the cost of loan defaults and student loan forgiveness programs for which many students are or will be eligible.

### C. The 90/10 Rule

For-profit or proprietary institutions, such as the InfiLaw Schools, must derive at least 10 percent of their revenues for each fiscal year from sources other than Title IV, HEA program funds. 34 C.F.R. § 668.28. This is referred to as the "90/10 Rule."

Compliance with the 90/10 Rule is a requirement for institutions to continue participation in Title IV Student Aid Programs. 34 C.F.R. § 668.14(b)(16).

The methodology for calculating the percentage of a school's revenue that is derived from Title IV sources is set forth in 34 C.F.R. § 668.28. "90/10 Revenue" is defined as funds generated from:

9

     (i)     Tuition, fees, and other institutional charges for students enrolled in eligible programs as defined in §668.8;

     (ii)    Activities conducted by the institution that are necessary for the education and training of its students provided those activities are—

         (A) Conducted on campus or at a facility under the institution's control;

         (B) Performed under the supervision of a member of the institution's faculty; and

         (C) Required to be performed by all students in a specific educational program at the institution; and

     (iii)   Funds paid by a student, or on behalf of a student by a party other than the institution, for an education or training program that is not eligible under §668.8 if the program—

         (A) Is approved or licensed by the appropriate State agency;

         (B) Is accredited by an accrediting agency recognized by the Secretary under 34 CFR part 602;

         (C) Provides an industry-recognized credential or certification, or prepares students to take an examination for an industry-recognized credential or certification issued by an independent third party;

         (D) Provides training needed for students to maintain State licensing requirements; or

         (E) Provides training needed for students to meet additional licensing requirements for specialized training for practitioners that already meet the general licensing requirements in that field.

34 C.F.R. § 668.28(a)(3).

     Revenue does not include "[t]he amount the student is charged for books,

supplies, and equipment unless the institution includes that amount as tuition, fees, or other institutional charges." 34 C.F.R. § 668.28(a)(7)(v).

Every proprietary institution must report the percentage of revenue it receives from Title IV sources on an annual basis. This ratio is reported in a footnote to the schools' financial statement audit, which is submitted to the ED. The revenue percentage must be calculated in accordance with 34 C.F.R §668.28. The institution must also report in the footnote the dollar amount of the numerator and denominator of its 90/10 ratio as well as the individual revenue amounts identified in section 2 of appendix C to subpart B of part 668. 34 C.F.R. § 668.28.

If an institution does not derive at least 10 percent of its revenue from sources other than Title IV, HEA program funds:

> (1)   For two consecutive fiscal years, it loses its eligibility to participate in the Title IV, HEA programs for at least two fiscal years. To regain eligibility, the institution must demonstrate that it complied with the State licensure and accreditation requirements under 34 CFR 600.5(a)(4) and (a)(6), and the financial responsibility requirements under subpart L of this part, for a minimum of two fiscal years after the fiscal year it became ineligible; or

> (2)   For any fiscal year, it becomes provisionally certified under §668.13(c)(1)(ii) for the two fiscal years after the fiscal year it failed to satisfy the revenue requirement. However, the institution's provisional certification terminates on—

>> (i) The expiration date of the institution's program participation agreement that was in effect on the date the Secretary determined the institution failed this requirement; or

>> (ii) The date the institution loses its eligibility to participate under paragraph (c)(1) of this section; and

11

(3)    It must notify the Secretary no later than 45 days after the end of its fiscal year that it failed to meet this requirement.

34 C.F.R. § 668.28(c).

## D. Federal Proprietary Institution Requirements

To be considered an eligible program, a proprietary institution must meet the requirements set forth in 34 C.F.R. § 668.8, which covers programs that prepare students for gainful employment in a recognized occupation. 34 C.F.R. § 600.5(a)(5). It is also required that the school be accredited by an accrediting agency recognized by the U.S. Secretary of Education. 34 C.F.R. § 600.5(a)(6).

As proprietary institutions, the InfiLaw Schools are also required to report the employment status of their graduates. 34 C.F.R. §668.6 states, in relevant part, that the institutions must disclose to prospective students:

> (iv) The placement rate for students completing the program, as determined under a methodology developed by the National Center for Education Statistics (NCES) when that rate is available. In the meantime, beginning on July 1, 2011, if the institution is required by its accrediting agency or State to calculate a placement rate on a program basis, it must disclose the rate under this section and identify the accrediting agency or State agency under whose requirements the rate was calculated. If the accrediting agency or State requires an institution to calculate a placement rate at the institutional level or other than a program basis, the institution must use the accrediting agency or State methodology to calculate a placement rate for the program and disclose that rate;

34 C.F.R. §668.6(b)(iv).

## E. Accrediting Agency Requirements

In order to be eligible to participate in the Title IV programs, an institution must be accredited by an accreditation agency recognized by the United States

12

Secretary of Education. 34 C.F.R. § 600.5. Loss of accreditation results in an automatic 24-month loss of the institution's Title IV eligibility. 34 C.F.R. § 600.11(c).

The InfiLaw Schools' accrediting agency is the American Bar Association ("ABA").

### i.   ABA Required Disclosures

ABA Standard 509 requires that:

> (a) All information that a law school reports, publicizes, or distributes shall be complete, accurate and not misleading to a reasonable law school student or applicant. A law school shall use due diligence in obtaining and verifying such information. Violations of these obligations may result in sanctions under Rule 16 of the Rules of Procedure for Approval of Law Schools.
>
> (b) A law school shall publicly disclose on its website, in the form and manner and for the time frame designated by the Council, the following information: (1) admissions data; (2) tuition and fees, living costs, and financial aid; (3) conditional scholarships; (4) enrollment data, including academic, transfer, and other attrition; (5) numbers of full-time and part-time faculty, professional librarians, and administrators; (6) class sizes for first-year and upper-class courses; number of seminar, clinical and co-curricular offerings; (7) employment outcomes; and (8) bar passage data.

The information that its member law schools are required to report under Standard 509 is material to the schools' ABA accreditation and, hence, material to the schools' eligibility to participate in the Title IV programs.

### ii.   ABA Bar Passage Requirements

13

ABA Standard 316 sets out the minimum state bar exam passage rates that a schools' graduate must achieve in order for the school to remain accredited by the ABA. Standard 316 states that:

> A.   A law school's bar passage rate shall be sufficient, for purposes of Standard 301(a), if the school demonstrates that it meets any one of the following tests:
>
> 1) That for students who graduated from the law school within the five most recently completed calendar years:
>
> > (a) 75 percent or more of these graduates who sat for the bar passed a bar examination, or
>
> > (b) in at least three of these calendar years, 75 percent of the students graduating in those years and sitting for the bar have passed a bar examination. In demonstrating compliance under sections (1)(a) and (b), the school must report bar passage results from as many jurisdictions as necessary to account for at least 70% of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency.
>
> 2) That in three or more of the five most recently completed calendar years, the school's annual first time bar passage rate in the jurisdictions reported by the school is no more than 15 points below the average first-time bar passage rates for graduates of ABA-approved law schools taking the bar examination in these same jurisdictions. In demonstrating compliance under section (2), the school must report first-time bar passage data from as many jurisdictions as necessary to account for at least 70 percent of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency. When more than one jurisdiction is reported, the weighted average of the results in each of the reported jurisdictions shall be used to determine compliance.
>
> B.   A school shall be out of compliance with the bar passage portion of 301(a) if it is unable to demonstrate that it meets the

14

requirements of paragraph A (1) or (2).

C.    A school found out of compliance under paragraph B and that has not been able to come into compliance within the two year period specified in Rule 13(b) of the Rules of Procedure for Approval of Law 21 ABA Standards for Approval of Law Schools 2013-2014 Schools, may seek to demonstrate good cause for extending the period the school has to demonstrate compliance by submitting evidence of:

(i)    The school's trend in bar passage rates for both first-time and subsequent takers: a clear trend of improvement will be considered in the school's favor, a declining or flat trend against it.

(ii)    The length of time the school's bar passage rates have been below the first-time and ultimate rates established in paragraph A: a shorter time period will be considered in the school's favor, a longer period against it.

(iii)    Actions by the school to address bar passage, particularly the school's academic rigor and the demonstrated value and effectiveness of the school's academic support and bar preparation programs: value-added, effective, sustained and pervasive actions to address bar passage problems will be considered in the school's favor; ineffective or only marginally effective programs or limited action by the school against it.

(iv)    Efforts by the school to facilitate bar passage for its graduates who did not pass the bar on prior attempts: effective and sustained efforts by the school will be considered in the school's favor; ineffective or limited efforts by the school against it.

(v)    Efforts by the school to provide broader access to legal education while maintaining academic rigor: sustained meaningful efforts will be viewed in the school's favor; intermittent or limited efforts against it.

(vi)    The demonstrated likelihood that the school's students who transfer to other ABA-approved schools will pass the bar examination: transfers by students with a strong likelihood of passing the bar will be considered in the school's

15

favor, providing the school has undertaken counseling and other appropriate efforts to retain its well-performing students.

(vii)  Temporary circumstances beyond the control of the school, but which the school is addressing: for example, a natural disaster that disrupts the school's operations or a significant increase in the standard for passing the relevant bar examination(s).

(viii)  Other factors, consistent with a school's demonstrated and sustained mission, which the school considers relevant in explaining its deficient bar passage results and in explaining the school's efforts to improve them.

### ii.  Admission of Qualified Students

ABA Standard 501 (b) states: "[a] law school shall not admit applicants who do not appear capable of satisfactorily completing its educational program and being admitted to the bar." Importantly, Interpretation 501-4 states:

A law school may not permit financial considerations detrimentally to affect its admission and retention policies and their administration. A law school may face a conflict of interest whenever the exercise of sound judgment in the application of admission policies or academic standards and retention policies might reduce enrollment below the level necessary to support the program.

### F.  Title IV Reporting and Certification Requirements

In order to maintain its eligibility to receive Title IV funding, a for-profit educational institution that participates in any Title IV program must provide the ED with an annual compliance audit of its administration of Title IV programs, and an audit of the institution's financial statements, prepared by independent auditors. 20 U.S.C. § 1094(c)(1)(A); 34 C.F.R. §§ 668.23 (a)(2) & (a)(4). For-profit educational institutions, such as the InfiLaw Schools, must conduct their annual financial

statements and compliance audits in accordance with the ED Office of Inspector General's Audit Guide. The ED uses the results of the compliance and financial audits to determine whether schools are adhering to applicable requirements for Title IV funding, including the 90/10 requirement. As part of the annual audits, the InfiLaw Schools were required to certify, in the form of written "Required Management Assertions," that, among other things, it complies with the requirements for eligibility to participate in Title IV programs.

After a school becomes eligible to receive Title IV funding by entering into a PPA, claims for payment of those funds can be made in various ways. Under FDLP, for example, students submit requests for funding directly to the ED, or to the ED with the assistance of schools. Under the FFELP, students and schools jointly submit requests to private lenders for loans that are then guaranteed by state agencies and are, in turn, insured by the ED and paid in the event of a default.

With respect to all Title IV, HEA programs, the disbursement of federal funds rests on required statements of eligibility made by schools that are necessary for requests for payment to be considered. A student cannot be eligible to receive Title IV funding unless he or she is enrolled in a school that is ineligible to receive Title IV funding.

34 C.F.R. § 600.40 sets forth the criteria, process and consequences for an institution's loss of Title IV eligibility. An education institution loses eligibility to participate in Title IV programs on the date that the institution fails to meet any of the eligibility requirements set forth in Part 600 of Title 34 of the Code of Federal

17

Regulations. 34 C.F.R. § 600.40 (a)(1). An institution must notify the Secretary (ED) within 30 days of the date that it ceases to satisfy a requirement for eligibility.

By entering into a Program Participation Agreement with the ED, each of the InfiLaw Schools agreed to act as a fiduciary. 34 C.F.R. § 668.82. Specifically, "A participating institution or a third-party servicer that contracts with that institution acts in the nature of a fiduciary in the administration of the Title IV, HEA programs. To participate in any Title IV, HEA program, the institution or servicer must at all times act with the competency and integrity necessary to qualify as a fiduciary." 34 C.F.R. § 668.82(a). "A participating institution is subject to the highest standard of care and diligence in administering the programs and in accounting to the Secretary for the funds received under those programs." 34 C.F.R. § 668.82(b)(1).

The Program Participation Agreements that were agreed to by the InfiLaw Schools required the schools to certify that, among other things, the schools would comply with the program statutes, regulations, and policies governing the federal student aid programs.

The InfiLaw Schools also explicitly certified in their program participation agreements that they would comply with Title VI of the Civil Rights Act of 1964, as amended, and Title IX of the Education Amendments of 1972. These federal statutes prohibit discrimination on the basis of race, color, national origin, or sex.

Each time a Title IV institution disburses or "draws down" Title IV funding, it must certify its compliance with Title IV regulations.

18

Both the Title IV regulations and ABA Standards prohibit the InfiLaw Schools from publishing any false or misleading information regarding their programs.

## DEFENDANTS' MISCONDUCT

The InfiLaw Schools, under the direction and control of InfiLaw and Sterling Partners, submitted or caused to be submitted false claims for Title IV funding and false statements that were material to the federal student aid funds that were disbursed to, or on behalf of, the InfiLaw Schools' students.

The InfiLaw Schools, with the assistance of the other Defendants, have violated the False Claims Act by creating programs and schemes that were designed to manipulate and falsify the information that the InfiLaw Schools are required to report to the ABA, ED, and prospective and current students.

The false information submitted by the InfiLaw Schools includes false 90/10 Rule data, bar passage rates, and graduate employment data.

These false statements were knowing and material to the InfiLaw Schools' eligibility to participate in Title IV programs.

In addition to the factually false claims and material statements made by the InfiLaw Schools, the InfiLaw Schools also expressly and impliedly certified that they were in compliance with the conditions set forth in their Program Participation Agreements, the federal regulations governing the Title IV program, and the accreditation standards promulgated by the ABA. These certifications were knowingly false.

19

The United States disbursed or guaranteed over $865 million in students loans for approximately 16,000 students that attended the InfiLaw Schools from 2010 through the third quarter of the 2014-2015 school year. The InfiLaw schools disbursed the majority of this money to themselves in the form of tuition revenue. The amounts paid on behalf of students at each of the InfiLaw Schools by year and federal program are set forth in **Exhibit A**.

### A. InfiLaw's Business Model Relies upon Fraud and Deceit to Retain Its Title IV Eligibility

To satisfy InfiLaw's profit goals, the InfiLaw Schools admitted as many students as possible, without regard as to whether those students could become practicing attorneys. This lack of meaningful admission standards required the InfiLaw Schools to engage in schemes to knowingly manipulate the Title IV revenue, bar passage and graduate placement data that the Schools were required to report in order to remain enrolled in the Title IV program.

ABA Standard 501 (b) states: "[a] law school shall not admit applicants who do not appear capable of satisfactorily completing its educational program and being admitted to the bar." Importantly, Interpretation 501-4 states:

> A law school may not permit financial considerations detrimentally to affect its admission and retention policies and their administration. A law school may face a conflict of interest whenever the exercise of sound judgment in the application of admission policies or academic standards and retention policies might reduce enrollment below the level necessary to support the program.

The InfiLaw Schools are all accredited by the ABA and accreditation is

20

required for the schools to be eligible to participate in the Title IV Programs. Many States also require that prospective lawyers graduate from ABA-accredited law schools before taking the state's bar exam or obtaining a license to practice law as an attorney of that state.

Admission to law school is typically selective in that there are more applications by prospective students than available seats and that students must display a level of academic skill that will allow them to complete the rigorous law school curriculum, pass a bar exam, and competently represent clients as practicing attorneys.

The InfiLaw Schools knowingly admit students that do not appear capable of satisfactorily completing its educational program and being admitted to the bar. The InfiLaw Schools, at the direction of InfiLaw, have allowed financial interests to detrimentally affect its admission, retention policies and law school administration.

Students admitted to ABA-accredited law schools must complete an assessment test prior to applying for admission that gauges the student's attitude for legal study and ability to provide competent legal services as an attorney. The test used by virtually every ABA-accredited law school is the Law School Admission Test or LSAT. Prospective law students that take the LSAT are given a score that ranges from 120 to 180 and scores from each test administration are curved to account for test-to-test variation in difficulty. The median LSAT score is between a 151 and 152, meaning that 50% of students scored 152 and above while approximately 50% score 151 or below. An LSAT score of 140 corresponds to the

21

13.4 percentile, meaning that only 13.4% of test takers scored 140 or below. An LSAT score of 135 corresponds to approximately the bottom 5% of all test takers.

LSAT scores are highly correlated with bar passage. At least one analysis concluded that students that score below 144 on the LSAT have less than a 25% chance of passing a bar exam on their first try.

The InfiLaw Schools knowingly recruit and admit students that do not have a reasonable chance of academic and professional success in the legal profession. For example, at Florida Coastal, the LSAT scores for the 75th, 50th, and 25th percentiles of students starting law school in 2014, were 147, 143, and 140, respectively. This means that 25% of Florida Coastal's starting class, 106 students, was in the bottom 13.7% of all LSAT takers. The median undergraduate GPA for Florida Coastal's 2014 starting class was 2.93.

In 2014, the InfiLaw Schools enrolled more than 283 students that did not score better than the bottom 13.7% of all LSAT takers and 25% of Charlotte Law's entering class were in the bottom 10% of LSAT scores. More than 50% of the 1,132 students that InfiLaw enrolled in 2014 had an undergraduate GPA of less than 2.94.

In comparison, looking at every medical school in the United States, only 5 applicants nationwide were accepted to *any* medical school with Medical College Admission Test (MCAT) scores in the bottom 13% percentile and an undergraduate GPA below a 3.0 for the academic years 2012-2014, *combined.* See https://www.aamc.org/download/ 321508/data/factstable24.pdf (aggregating

22

admissions data from accredited M.D. programs).

Overall, only 35% of InfiLaw's 2013 graduates found permanent full-time jobs that required a law license. To compound the lack of quality job prospects, the median federal student loan debts for graduates of the InfiLaw Schools was $184,792, $174,844, and $159,208 for Summit Law, Florida Coastal, and Charlotte Law, respectively. These amounts do not include private or undergraduate student loans.

InfiLaw and the InfiLaw Schools knew that admitting unqualified students would put their ABA accreditation and Title IV eligibility at risk due to low graduate employment and bar passage rates. Yet, instead of not admitting these students, which would decrease InfiLaw's revenue, the InfiLaw Schools, at the direction of InfiLaw, have instead opted to continue admitting unqualified students and engage in a widespread scheme to manipulate and conceal the negative data that would otherwise be generated by these unscrupulous practices. Without this manipulation, the InfiLaw Schools would not be able to maintain ABA accreditation and Title IV eligibility.

### B.    The InfiLaw "Trap"

The InfiLaw "System" has directed its schools to operate as a taxpayer-funded trap for unwitting students. The Dean of Summit Law has even referred to "building a better mousetrap" when addressing the faculty about ways to keep

23

students at the school.[1] This trap is baited with the demonstrably false representation that a legal education from the InfiLaw Schools, financed with hundreds of thousands of dollars in non-dischargeable student loan debt, is an economically-sound decision. This illusion is purposefully manufactured and maintained by various InfiLaw initiatives that are designed to deceive the next generation of potential students, as well as the ABA and ED.

First, the InfiLaw Schools spend a disproportionate amount of their students' tuition on marketing and recruitment efforts designed to solicit potential students. This includes employing admissions representatives that sell potential students on applying to the InfiLaw Schools and special admission programs designed to identify and admit students that would not be admitted to any other ABA-accredited law schools. One such marketing program is InfiLaw's Alternative Admissions Model Program for Legal Education (AAMPLE) Program. AAMPLE is a "conditional admit" program that is typically targeted at recruiting students who score poorly on the LSAT. AAMPLE's stated purpose is "to provide a path of admission to InfiLaw schools for individuals whose academic indicators (i.e., LSAT scores, GPAs), may not reflect their potential to succeed in law school." AAMPLE consists of a 6-7 week program of two classes, which is promoted as giving students an introduction to law school while providing an alternate mode of entry into the InfiLaw Schools for students with exceptionally low LSAT and GPA scores. The

---

[1] This idiom generally refers to improving upon a commonly-used device, but was used by Dean Shirley Mays to literally convey the intent of trapping students at Summit Law.

program costs $500 and can either be taken online or at the InfiLaw Schools' campuses. InfiLaw paid for the creation of a separate website, also known as a landing page, www.lawcareernow.com, as a means of recruiting students into the AAMPLE Program.

Second, from the outset, InfiLaw begins collecting data on its students with the goal of predicting which students are likely to fail the bar exam. This includes data generated by the AAMPLE Program, MBE Assessment tests administered by Kaplan, students' law school grades, LSAT scores, and data from the internal bar preparation courses administered by Barbri. This data is used by InfiLaw's statisticians to generate Excel spreadsheets that calculate the probability that a student will fail the bar exam. Students' sex and race are used as quantitative factors to identify students at risk of failing the bar in the statistical "models" employed by the InfiLaw Schools.

Third, InfiLaw attempts to keep the students enrolled in the InfiLaw Schools even after it becomes apparent that the students are unlikely to pass the bar or be able benefit from a legal education. Students that have less than a 2.5 law school GPA, or even students with less than a 2.0 GPA, are allowed to continue taking courses—even though the InfiLaw schools own internal grading systems indicate the students are poor-performing and likely to fail the bar. This insures that InfiLaw can continue collecting Title IV money for these students. At the same time, the InfiLaw Schools have implemented policies designed to undermine high performing students' attempts to transfer to better law schools.

25

Fourth, near the end of their legal educations, InfiLaw students are forced to enroll in InfiLaw's internal bar exam programs that are designed to further identify students that are at risk of failing the bar and to artificially and illegally manufacture non-Title IV 90/10 Revenue for the InfiLaw Schools.

Last, the schools actively try to prevent students at risk of failing the bar from taking a bar exam until those students no longer need to be reported as part of the schools' bar passage rates or will take a later exam that has a historically lower passage rate. These students are encouraged to participate in extended bar preparation programs that allow the InfiLaw Schools to falsely count the students as being "employed" in full-time positions on the InfiLaw Schools' job placement disclosures, which are required by the ABA and 34 C.F.R. § 668.

### C. In-house Bar Preparation Courses

Barbri and Kaplan are the two largest bar exam test preparation providers in the United States. Both companies begin soliciting law students to sign up for their bar exam preparation courses during the first year of law school. Students that enroll in Barbri's or Kaplan's courses are required to pay a deposit in exchange for "locking in" the bar exam preparation course price. Law students that sign up earlier, i.e., during their first year, supposedly pay less in deposit than students that sign-up later. The deposit is typically between $99 and $500. However, students that wait to sign up can often obtain discounts or other incentives as Barbri and Kaplan compete to provide the students' bar review courses.

Barbri and Kaplan both hire student representatives to recruit other

26

students for their bar preparation courses. These representatives are often current law students and receive a free or discounted bar exam preparation course in exchange for recruiting students. The cost of a test preparation course varies significantly by state, but is often between $2000 and $4500 for the 6-8 week course.

Both Barbri's and Kaplan's bar preparation courses include a series of live or recorded lectures, study materials, and practice exams. A significant portion of the courses' cost is attributable to Barbri's and Kaplan's copyrighted bar preparation books, outlines, and practice exams, which are tailored to each state's bar exam.

Typically, if Barbri or Kaplan offers a bar preparation course in a particular state, they offer live or pre-recorded lectures in a physical classroom staffed by Barbri or Kaplan employees (the "live" courses). The live courses are offered at almost every ABA-accredited law school in the state or, if there are two law school in the same city, at least one live course in that city. Barbri and Kaplan offer bar exam preparation courses at every non-InfiLaw law school in Arizona, Florida, and North Carolina.

In 2011 or 2012, InfiLaw and the InfiLaw Schools approached Barbri and Kaplan about creating an internal bar exam preparation program that would be offered at the InfiLaw Schools.

The program, which was implemented at all three InfiLaw Schools, utilized the written materials and lectures developed by Barbri and Kaplan for their bar exam preparation courses.

The Summit Law internal bar preparation course is referred to as the Multi-

27

Year Bar Accelerated Review or "MyBar" program.

Florida Coastal's internal bar preparation course is called the Coastal Enhanced Bar Pass Program.

Charlotte Law's internal bar preparation course is call the Bar Exam Advanced Review or "BEAR" program.

In or around 2012, InfiLaw and the InfiLaw Schools entered into agreements with Barbri and Kaplan that provide that Barbri and Kaplan would stop offering their own courses at the InfiLaw Schools in exchange for the InfiLaw Schools' purchase of Barbri and Kaplan materials for their internal programs.

The only other in-house bar preparation program offered by a law school is a purely optional course offered by the University of Missouri in Kansas City (UMKC). The UMKC program was actually developed by the law school, as opposed to simply relabeling Barbri and Kaplan's materials, and only costs $600. Students at UMKC are allowed to take Barbri and Kaplan bar preparation courses, and neither Barbri nor Kaplan was excluded from UMKC's campus in order to prevent students from signing up for those competing courses.

The agreements between InfiLaw and Barbri and Kaplan prohibit Barbri and Kaplan from soliciting the InfiLaw Schools' students, setting up recruiting tables at the InfiLaw Schools, or offering discounts to InfiLaw students.

The student representatives at Summit Law (and the other InfiLaw Schools), with whom Barbri and Kaplan had entered into agreements to recruit other students in exchange for a free bar preparations courses, were converted into

28

InfiLaw internal bar review student representatives.

Attempting to sign up for a "live" Barbri or Kaplan bar preparation course through their websites directs students to Barbri or Kaplan employees that, by agreement with InfiLaw, direct the students back to the InfiLaw Schools' internal bar preparation courses. For example, on the Barbri website, students from the InfiLaw Schools who are attempting to inquire about a bar preparation course are told to contact Karen Hundley, who is actually a Vice President at Barbri. Ms. Hundley is not a Barbri representative for any other law schools and instead redirects the students back to the InfiLaw internal bar review programs. InfiLaw's agreements with Barbri and Kaplan illegally fixed the price of the "live" bar preparation courses offered to Summit Law students, eliminated competition from Barbri and Kaplan, and resulted in large payments from InfiLaw to Barbri and Kaplan to ensure that the InfiLaw Schools' in-house bar review courses were the only option available to the InfiLaw students.

As another example, there was a student that graduated from Summit Law and then enrolled in a master's program at the Sorbonne in Paris, France. After completing the master's program, the student attempted to take a bar review course provided by BarBri to prepare for the New York bar exam. BarBri informed the individual that the only way the student could take BarBri's preparation course was to enroll in Summit Law's internal bar preparation course in Phoenix, Arizona.

Although the InfiLaw Schools' bar preparation courses were touted as an honest attempt to increase the InfiLaw Schools' bar passage rates and as an

29

"individualized bar preparation program designed specifically for [Summit Law students]" that "comprises the best features of Barbri and Kaplan," one of the primary reasons that InfiLaw created the program was to inflate the portion of revenue at the InfiLaw Schools that could be counted as non-Title IV or "10" revenue. Prior to the creation of the MyBar program, the InfiLaw Schools, and in particular Summit Law, were in danger of violating the 90/10 Rule because the vast majority of their revenue was paid from Title IV sources.

For 2010-2012, the InfiLaw Schools were all within 5 percentage points of violating the 90/10 rule. As an example, for the 2010-2011 academic year, Summit Law reported receiving 87.94 percent of its qualifying revenue from Title IV sources.

The falsely reported 90/10 Rule data, which the InfiLaw Schools submitted at the end of each year to the ED, and which the ED is required by statute to report to Congress, is set forth in **Exhibit B** hereto. The InfiLaw Schools began reporting false 90/10 Rule data at least by 2012, when the internal bar preparation course was first launched.

Another primary reason for the development of its internal bar review programs is so that InfiLaw could gather data on and identify students that were unlikely to pass the bar exam. The goal of identifying students who were at high risk of failing the bar exam was to persuade the students to delay or forgo the bar exam and, thereby, falsely inflate the InfiLaw Schools' bar passage and employment rates as set forth in greater detail below.

Barbri and Kaplan entered into agreements with InfiLaw in connection with

30

the InfiLaw Schools' internal bar exam programs knowing full well that one of the purposes of the program was to inflate and falsify the Schools' non-Title IV revenue to avoid having the schools become automatically ineligible for Title IV funding.

In order to immediately begin recognizing the money paid by the InfiLaw Schools' students as non-Title IV revenue, the InfiLaw and the InfiLaw Schools, with assistance from Barbri and Kaplan, concocted a plan to make the students who had already paid deposits or tuition to Barbri or Kaplan switch their enrollment to the InfiLaw bar preparation programs for the July 2012 through July 2013 bar exams. InfiLaw required students to make payments to the InfiLaw schools instead of Barbri or Kaplan, and improperly counted this income as non-Title IV income in their 90/10 calculations for 2012 through the present.

The purpose of the internal bar review programs was to knowingly misstate the InfiLaw Schools' 90/10 revenue calculation. For example, on September 15, 2011, the Dean of Summit Law (then called the Phoenix School of Law) informed the Director of Academic Services at Summit Law that Defendant InfiLaw had "tasked" Summit Law with "operating our own bar prep course as a real solution for 90/10." The Dean further described "this important initiative for our 90/10" as a "top, top priority for both the school and the consortium." The Dean also insisted that this "90/10 program" begin in December 2011 for those taking the February 2012 bar exam. After the Summit Law Director of Academic Services raised ethical objections to forcing students to use an internal bar preparation course, Summit Law terminated the Director's employment.

31

The $2500 each student paid to Summit Law for the MyBar course was entirely for the use of the same Barbri materials and lectures that were used for Barbri courses offered at the other law schools in Arizona. On information and belief, the same materials used for the internal bar preparation courses at the other InfiLaw Schools were merely Barbri and Kaplan materials used at other law schools in those states that had been relabeled for InfiLaw's internal review program.

In addition to the anti-competitive and sham nature of the internal bar preparation course revenue, the entire amount of the internal bar preparation course fees paid to the InfiLaw Schools was really for "books and materials" provided by Barbri and/or Kaplan. As a result, the InfiLaw Schools were prohibited from counting this money as non-Title IV 90/10 revenue since this amount was not included or disclosed as tuition, fees, or other institutional charges. 34 C.F.R. § 668.28(a)(7)(v).

InfiLaw and the InfiLaw Schools' arrangements with Barbri and Kaplan included agreements that prohibit Barbri and Kaplan from engaging in the recruitment activities that Barbri and Kaplan engage in on other law school campuses. This includes prohibitions against hosting informational sessions or setting up recruitment "tables" on campus, sending emails to students regarding Barbri and Kaplan's bar preparation programs, offering tuition assistance and discounts to students or otherwise competing with InfiLaw in pricing or advertising to InfiLaw Students for bar preparation courses.

InfiLaw, the InfiLaw Schools, Barbri and Kaplan conspired to manipulate

32

and falsify the InfiLaw Schools' 90/10 Rule data by entering into an illegal price fixing and anti-competitive arrangement that limited students' ability to choose between multiple competing live bar preparation programs, as well as eliminating discounts and other incentives that would typically be offered to students by Barbri and Kaplan. Specifically, the InfiLaw Schools' non-Title IV revenue was inflated by approximately $2500 for each graduate that took the internal bar preparation program.

By requiring its graduates to take the InfiLaw Schools' internal bar review course and actively preventing the students from purchasing other bar preparation courses, the InfiLaw Schools reported false information to the ED and prospective students regarding the InfiLaw Schools' institutional charges. A Policy Bulletin issued by the ED on January 7, 1999, states that all tuition, fees, room and board, and other charges an institution assesses a student are institutional costs, unless demonstrated otherwise. Specifically, the ED guidance states that

> expenses for required course materials are institutional costs, if the student does not have a real and reasonable opportunity to purchase the required course materials from any place but the institution he or she is attending.
>
> * * *
>
> If an institution wishes to classify the cost of required course materials as non-institutional costs, it must be able to substantiate that: 1) the required course materials were available for purchase at a relatively convenient location unaffiliated with the school; and 2) the institution made financial aid funds available to students in a timely manner, so its students could exercise the option to purchase the required course materials from alternative sources.

33

Fraudulently omitting the cost of the internal bar preparation courses from the InfiLaw Schools' institutional charges resulted in inaccurate information being submitted on every single student's Title IV student aid application. This adversely affected students that were forced to take out private loans to complete the internal bar preparation courses, and misstated the cost of attending the InfiLaw Schools.

### D.    Extended Bar Review Program

In 2013, InfiLaw and the InfiLaw Schools developed an extended bar preparation course that was designed to delay the bar exam for students that were identified as being at high risk for failing the bar. The InfiLaw Schools named this program the Unlock Potential or "UP" Program.

The UP Program, which is provided in addition to the schools' internal bar preparation course, is an extended, 6-month bar preparation program. During the six-month UP Program, students are paid a monthly stipend of $1200 for living expenses and placed in a part-time (20 hours per week), short-term, low-pay job. Both the stipend and hourly pay are funded by the InfiLaw Schools.

Even though the UP Program paid a stipend to the students, the InfiLaw Schools still required students to pay the $2500 bar review preparation course fee so that the schools could falsely include the fee as non-Title IV revenue while also counting the UP Program stipend as institutional aid in their 90/10 calculation.

Beginning in the first year of law school, the InfiLaw Schools begin gathering extensive data on students' academic performance. Specifically, InfiLaw began administering Multi-State Bar Exam (MBE) questions to students as part of

34

assessments that begin in the students' first year of law school. The InfiLaw Schools use the data collected on their students, including the students' undergraduate GPA, LSAT score and law school GPA to calculate the probability that a given student will fail the bar exam.

Based on the data collected on the law students, the InfiLaw Schools then identify and recruit students that are considered likely to fail the bar exam for the UP Program.

Although technically any InfiLaw student could apply for the UP Program, only those that are identified as being at high risk for failing the bar or were at risk of being counted as unemployed were actually accepted into the UP Program.

The UP Program was intentionally designed to, and has, artificially inflated the employment statistics reported by the InfiLaw Schools to the ABA, ED, and prospective students.

For example, Summit Law identified targeted and enrolled students at high risk of bar failure to delay the July 2014 bar exam through participation in the UP Program. These students did not sit for a bar exam in 2014, which artificially inflated Summit Law's first-time taker bar passage rate for 2014.

Another purpose of the UP Program is to identify students that are unlikely to pass the bar and incentivize them to delay taking a bar exam or dissuade them from ever taking the bar exam. In either case, the InfiLaw Schools have manipulated and falsified their bar passage data, which is used by the ABA in evaluating whether to continue accrediting the law schools.

35

The InfiLaw Schools knowingly misreported the employment status of the students participating in the UP Program. Specifically, the InfiLaw Schools, at the direction of InfiLaw, mischaracterized the UP Program participants as being employed in full-time "bar passage required" or "J.D. Advantage" positions. This characterization of the UP Program participants' employment status is false because the InfiLaw-funded positions provided to the students during the UP Program were part-time (less than 35 hours per week) and short-term (less than 1 year). Furthermore, it is false and misleading to count students whose primary "job" is to continue studying for the bar as "employed." Last, the part-time (20 hours per week) positions that were provided to students in the UP Program did not meet the ABA definitions of "bar passage required" or "J.D. Advantage" positions.

For example, for its 2013 and 2014 ABA employment reports, Summit Law listed 7 (6 "bar passage required" and 1 "J.D. advantage" position) graduates as employed in full-time, long-term positions funded by the law school and 26 (25 "J.D. advantage" and 1 "bar passage required" positions) graduates employed in full-time, short-term positions. Summit Law reported no graduates as having part-time positions funded by the law school, which is the most generous characterization of the UP Program participants allowed by the ABA regulations. The UP Program participants were falsely classified as having full-time, long-term positions.

Florida Coastal listed zero graduates employed in part-time positions funded by the law school in its 2013 and 2014 ABA disclosures. The UP Program participants were falsely classified in other categories.

36

Charlotte Law listed zero graduates employed in part-time positions funded by the law school in its 2014 ABA disclosure. The UP Program participants were falsely classified in other categories.

### E. Summit Law Falsely Reported Its Bar Passage Numbers to the ABA

ABA Standard 301 for the 2013-2014 ABA Standards and Rules of Procedures (now ABA Standard 316) requires that accredited law schools prepare students for admission to the bar. Interpretation 301-6 states that a school may satisfy Standard 301 by either (1) having 75% of its graduates from the last five years pass the bar exam that year, (2) in at least 3 of the last 5 years, having 75 percent of the students graduating in those years and sitting for a bar exam pass the exam, or (3) in 3 of the last 5 years, having a first-time bar passage rate that is no more than 15 percentage points below the average first-time passage rates for graduates of ABA-approved schools taking the exam in the same jurisdiction. For options 1 and 2, the school must report bar passage results for as many jurisdictions as necessary to account for at least 70% of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency. For option 3, the school must report first-time bar passage data

> from as many jurisdictions as necessary to account for at least 70 percent of its graduates each year, *starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency.* When more than one jurisdiction is reported, the weighted average of the results in each of the reported jurisdictions shall be used to

determine compliance.

ABA Standards and Rules of Procedure for Approval of Law Schools 2013-2014, Interpretation 301-6, available at http://www.americanbar.org/content/dam/aba/ publications/misc/legal_education/Standards/2013_2014_standards_chapter3.authc heckdam.pdf (emphasis added).

Similarly, Appendix 3: Guidance on Interpretation 301-6 from the ABA reiterates that:

> The school must account for a minimum of 70% of first-time takers in each of the five most recently completed calendar years. It does this by starting with the jurisdiction in which the largest number of its graduates sit for the bar for the first time and *proceeding in descending order of frequency* until a minimum of 70% of first-time takers in each calendar year is accounted for.

*Id.*, available at http://www.americanbar.org/content/dam/aba/publications/ misc/legal_education/Standards/2013_2014_standards_appendix3_301_6.authcheck dam.pdf (emphasis added).

For its 2014 ABA Standard 509 report, Summit Law reported that it had 299 first-time bar takers, and disclosed its average school pass rate as 69.09% for a sample comprised of 73.58% these students. This rate included graduates taking the February and July 2013 bar exam in Arizona (207 takers), Texas (5), Washington (5), New Mexico (2) and Wisconsin (1). This rate was reported as 9.54% below other first time takers from ABA-accredited law schools in those states.

Summit Law knowingly misreported its bar passage data for the February and July 2013 bar exams by failing to include bar passage data from California. For the February and July 2013 California bar exams, 12 of 27 (44.4%) first-time takers and 1 of 11 (9.1%) repeat takers from Summit Law passed the California bar exam. The overall passage rate on the 2013 California bar exams for first-time takers from

38

ABA-accredited law schools was 71.09%. Had Summit Law followed the methodology required by the ABA and included California as the jurisdiction with the next largest population of bar exam takers, it would have reported a first-time taker bar passage rate of 67.09% and that its students passed at a rate 10.31% less than first-time takers from other ABA-accredited schools.

For the February and July 2014 California bar exams, there were 23 first time takers from Summit Law. None of these students passed the bar. For the February and July 2014 Arizona bar, Summit Law had 131 of 239 or 54.8% of first-time takers pass the exam compared with a 73.8% passage rate for all ABA accredited first-time takers. These dismal bar passage rates, which fall below ABA requirements and threaten the schools' accreditation, indicate why Summit Law and the other InfiLaw Schools have resorted to manipulating their bar passage rates.

### F.    Bar Passage Assurance Programs

In addition to the mandatory internal bar preparation courses and UP Program, InfiLaw and the InfiLaw Schools offer a "bar passage assurance" program that provides students with a $10,000 payment if they complete both the internal bar preparation course, UP Program, and still fail the bar twice.

The conditions for the $10,000 Bar Passage Assurance—i.e., failing the bar twice, completing the internal bar preparation course, and completing the UP Program—are activities that occur after students graduate (and are no longer enrolled) in the InfiLaw Schools. The internal bar preparation course and UP

39

Programs are not licensed by the InfiLaw Schools' states as higher education programs. As a result, it is contrary to the Title IV regulations and ED guidance to count the Bar Passage Assurance payment as institutional aid or fail to deduct the UP Program payments or Bar Passage Assurance payments as refunds for the internal bar preparation course fee.

### G.    The Combined Effect on InfiLaw's 90/10 Rule Calculation

InfiLaw and the InfiLaw Schools created and implemented the internal bar preparation course and UP program with the express goal of materially falsifying the Schools' 90/10 Rule calculation. The effect on the 90/10 Rule data was magnified, without impacting InfiLaw's profits, because the Schools reduced the "90" (Title IV revenue) by amounts it paid to students through the UP and Bar Passage Assurance Programs while also inflating the "10" (non-Title IV revenue) by the amounts it collected for the internal bar review courses and AAMPLE Programs. This manipulation was material in that the InfiLaw Schools would have been ineligible to receive Title IV funding had the government known about the intentional falsification of the 90/10 Rule data each school is required to provide annually to the ED.

### COUNT I:   PRESENTMENT OF CLAIMS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(A))

Relators re-allege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the United States Government false or fraudulent claims.

Such claims were false or fraudulent because the Defendants falsely submitted, or caused to be submitted, claims for Title IV funding that were not eligible for payment under the federal regulations governing the Title IV Programs. The United States, unaware of the falsity of the claims made by the Defendants, paid Defendants for claims that would otherwise not have been allowed.

By knowingly failing to comply with requirements upon which payment was contingent, each claim presented or caused to be presented by Defendants was false. As a result of these false claims, the United States paid over $533 million in federal student aid funding during the 2012-2013, 2013-2014, and 2014-2015 school years.

By knowingly, willfully or recklessly presenting, or causing other to present, false claims for payment to the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendant has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

## COUNT II: FALSE STATEMENTS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(B))

2. Relators re-allege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

By virtue of the acts described above, Defendant made, used, and caused to be made and used, false records and statements that were material and caused or contributed to improper payments of federal funding to Defendants. Specifically, Defendants knowingly expressly and impliedly made false statements and certifications to the ABA, ED, and prospective students that were material to the InfiLaw Schools' Title IV eligibility, which is a condition of payment for the Title IV aid disbursed to the students attending the InfiLaw Schools.

42

The United States, unaware of the falsity of the records, statements, and certifications paid for claims that would otherwise not have been allowed.

By knowingly, willfully or recklessly making, or causing others to make, false statements and certifications material to the United States' decision to pay on false claims, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly false claims that it would not otherwise have paid.

Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

## COUNT III: RETENTION OF OVERPAYMENTS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(G))

Relators re-allege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

By virtue of the acts described above, Defendants have knowingly concealed and/or knowingly and improperly avoided an obligation to transmit money to the federal government. Specifically, Defendants knew or should have known that they received millions of dollars in payments from TRICARE for claims that were prohibited by the Anti-Kickback Statute.

Once known, even if the improper payments were not fixed or clearly defined, Defendants had an obligation to remit or report such funds to the government within sixty (60) days. Defendants have not reported or returned the improper payments described herein.

By knowingly concealing and/or knowingly and improperly avoiding its obligation to transmit money recovered to the federal government, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), to the damage of the treasury of the United States of America, by causing the United States to be deprived of funds that rightfully belong to the government.

As a direct and proximate result of Defendants' fraudulent and/or illegal actions and fraudulent conduct, the United States has been deprived of funds to which it is lawfully entitled and which were improperly paid to Defendants.

Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five-thousand five-hundred to eleven-thousand dollars ($5,500 - $11,000).

## COUNT IV: CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT
### (31 U.S.C. § 3729 (a)(1)(C))

Relators re-allege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1)(C), as amended.

By virtue of the acts described above, Defendants have knowingly conspired to violate 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

Specifically, InfiLaw and the InfiLaw Schools entered into agreements with Barbri and Kaplan to manipulate and misstate the InfiLaw Schools' 90/10 Revenue and bar passage rates. Barbri and Kaplan entered into these agreements knowing that the purpose and effect of the agreements was to manipulate the 90/10 Rule data to retain Title IV eligibility in violation of 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

Defendants knowingly, recklessly, or with deliberate indifference agreed to perpetuate a fraudulent scheme to obtain and retain ineligible Title IV funding in violation of 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

The United States paid claims that would otherwise not have been allowed as a result of the actions taken by Defendants in furtherance of a conspiracy to violate

31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

Defendants are jointly and severally liable for every violation of the False Claims Act identified herein because these violations were committed in furtherance of a scheme to violate the False Claims Act, which was undertaken with the mutual agreement of each Defendant and knowledge of, or reckless indifference toward, the scheme's illegality.

Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500-$11,000).

WHEREFORE, Relators request that judgment be entered against Defendants, ordering that:

a.   Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

b.   Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

c.   Relators are awarded the maximum amounts allowed pursuant to 31 U.S.C. § 3730(d);

d.   Relators are awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

e. Defendants are enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f. Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

g. The United States and Relators recover such other relief as the Court deems just and proper.

47

## JURY DEMAND

A trial by jury is hereby demanded.

Dated: November 10, 2015

By:

JESSE L. HOYER
FL Bar No.: 076934
jlhoyer@jameshoyer.com
ELAINE STROMGREN
FL Bar No.: 0417610
estromgren@jameshoyer.com
JAMES HOYER, P.A.
One Urban Centre, Suite 550
4830 West Kennedy Blvd.
Tampa, FL 33609-2589
Phone: (813) 397-2300
Fax: (813) 397-2310

LEVY KONIGSBERG LLP
Alan J. Konigsberg
*akonigsberg@levylaw.com*
Brendan E. Little
*blittle@levylaw.com*
(seeking admission *pro hac vice*)
800 Third Ave., 11th Floor
New York, NY 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

*Attorneys for the Relators*

# Exhibit A - Title IV Direct Loan Program Disbursements

### Summit Law

| Year | DL SUBSIDIZED | | DL UNSUBSIDIZED- GRADUATE | | DL GRAD PLUS | | TOTAL TITLE IV FUNDS |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Recipients | Disbursements | Recipients | Disbursements | Recipients | Disbursements | |
| 2010-11 | 688 | $ 6,648,809.00 | 695 | $ 9,347,734.00 | 637 | $ 20,228,972.00 | $ 36,225,515.00 |
| 2011-12 | 939 | $ 8,705,991.00 | 931 | $ 12,185,057.00 | 838 | $ 29,140,739.00 | $ 50,031,787.00 |
| 2012-13 | - | $ - | 1,100 | $ 24,447,066.00 | 951 | $ 36,034,752.00 | $ 60,481,818.00 |
| 2013-14 | - | $ - | 923 | $ 23,336,787.00 | 804 | $ 36,291,749.00 | $ 59,628,536.00 |
| 2014-15 | - | $ - | 619 | $ 9,616,407.00 | 544 | $ 15,222,019.00 | $ 24,838,426.00 |
| | | | | | | Total | $ 231,206,082.00 |

### Florida Coastal

| Year | DL SUBSIDIZED | | DL UNSUBSIDIZED- GRADUATE | | DL GRAD PLUS | | TOTAL TITLE IV FUNDS |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Recipients | Disbursements | Recipients | Disbursements | Recipients | Disbursements | |
| 2010-11 | 1,626 | $ 16,078,184.00 | 1,608 | $ 22,438,531.00 | 1,423 | $ 38,523,107.00 | $ 77,039,822.00 |
| 2011-12 | 1,656 | $ 16,650,877.00 | 1,643 | $ 23,274,491.00 | 1,466 | $ 42,187,315.00 | $ 82,112,683.00 |
| 2012-13 | - | $ - | 1,516 | $ 36,027,732.00 | 1,339 | $ 42,626,359.00 | $ 78,654,091.00 |
| 2013-14 | - | $ - | 1,219 | $ 28,050,917.00 | 1,102 | $ 39,511,278.00 | $ 67,562,195.00 |
| 2014-15 | - | $ - | 1,044 | $ 19,265,458.00 | 937 | $ 30,163,957.00 | $ 49,429,415.00 |
| | | | | | | Total | $ 354,798,206.00 |

### Charlotte Law

| Year | DL SUBSIDIZED | | DL UNSUBSIDIZED- GRADUATE | | DL GRAD PLUS | | TOTAL TITLE IV FUNDS |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Recipients | Disbursements | Recipients | Disbursements | Recipients | Disbursements | |
| 2010-11 | 772 | $ 7,401,143.00 | 764 | $ 10,495,676.00 | 659 | $ 19,358,737.00 | $ 37,255,556.00 |
| 2011-12 | 1,097 | $ 9,396,522.00 | 1,091 | $ 13,367,772.00 | 971 | $ 25,818,793.00 | $ 48,583,087.00 |
| 2012-13 | - | $ - | 1,361 | $ 30,371,484.00 | 1,169 | $ 35,966,172.00 | $ 66,337,656.00 |
| 2013-14 | - | $ - | 1,365 | $ 30,441,481.00 | 1,226 | $ 40,858,102.00 | $ 71,299,583.00 |
| 2014-15 | - | $ - | 1,202 | $ 21,556,067.00 | 1,088 | $ 34,124,667.00 | $ 55,680,734.00 |
| | | | | | | Total | $ 279,156,616.00 |

## Exhibit B

| School Name | Fiscal Year Ending Date | 90/10 Revenue Percentage |
|---|---|---|
| Arizona Summit Law School | 07/31/2012 | 87.70 |
| Florida Coastal School of Law | 07/31/2012 | 86.63 |
| Charlotte School of Law | 07/31/2012 | 87.20 |

| | | |
|---|---|---|
| Arizona Summit Law School | 07/31/2011 | 87.49 |
| Florida Coastal School of Law | 07/31/2011 | 85.60 |
| Charlotte School of Law | 07/31/2011 | 86.53 |

| | | |
|---|---|---|
| Arizona Summit Law School | 07/31/2010 | 87.94 |
| Florida Coastal School of Law | 07/31/2010 | 85.88 |
| Charlotte School of Law | 07/31/2010 | 85.19 |

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States ex rel. MICHAEL O'CONNOR and CELIA RUMANN

## DEFENDANTS
ARIZONA SUMMIT LAW SCHOOL, LLC; ET AL.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **MARICOPA COUNTY, AZ**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
(SEE ATTACHED)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 367 Health Care/ Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. Sec. 3729-3732
Brief description of cause:
Federal Civil False Claims Act

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE 11/10/2015

SIGNATURE OF ATTORNEY OF RECORD
JESSE L. HOYER
FL BAR NO. 076934

**FOR OFFICE USE ONLY**
RECEIPT # TAX018257 AMOUNT $400.00 APPLYING IFP _____ JUDGE 39 MAG. JUDGE JBT

LEVY KONIGSBERG, LLP
Alan J. Konigsberg
akonigsberg@levylaw.com
Brendan E. Little
blittle@levylaw.com
800 Third Ave., 11th Floor
New York, NY 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

**Lead Counsel for the Relators**


JAMES HOYER, P.A.
Jesse L. Hoyer
FL Bar No.: 076934
jlhoyer@jameshoyer.com
Elaine Stromgren
FL Bar No.: 417610
estromgren@jameshoyer.com
One Urban Centre, Suite 550
4830 West Kennedy Blvd.
Tampa, FL 33609-2589
Phone: (813) 397-2300
Fax: (813) 397-2310

**Local Counsel for the Relators**

# EXHIBIT B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA <u>ex</u>
<u>rel.</u>, MICHAEL O'CONNOR, and CELIA
RUMANN,

        Plaintiffs,

vs.

        Case No. 3:15-cv-1351-J-39JBT

ARIZONA SUMMIT LAW SCHOOL,
LLC, <u>et al.</u>,

        Defendants.

_____

**ORDER**

This <u>qui</u> <u>tam</u> case is before the Court on the United States of America's Notice of Consent to Dismissal Without Prejudice, filed under seal on March 21, 2018. (Doc. S-26; Notice). On February 20, 2018, the Relators filed under seal a Notice of Voluntary Dismissal. (Doc. S-25). In the Notice, pursuant to 31 U.S.C. § 3730(b)(1), the United States of America consents to the dismissal of this case without prejudice as to the United States. Notice at 1.

Accordingly, it is hereby

**ORDERED**:

1.    This case is **DISMISSED without prejudice**.

2.    The Clerk of the Court is **directed** to lift the seal on the Relators' Complaint (Doc. S-4), Relators' Notice of Voluntary Dismissal (Doc. S-25), the United States of America's Notice of Consent to Dismissal Without Prejudice (Doc. S-26), this Order, and

any subsequent filings in this case. The Clerk of the Court is further directed to terminate

all pending motions and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 26ᵗʰ day of March, 2018.

BRIAN J. DAVIS
United States District Judge

va
Copies furnished to:

Counsel of Record

EXHIBIT C

Redline Comparing Relator's Complaint, Paragraphs 146–174 with Complaint in *U.S. ex. rel. O'Connor, et al. v. Arizona Summit Law School, et al.*, No. 3-15-CV-1351-J-39JBT (M.D. Fla. 2015) at pp. 26–34.

### C. In-house Bar Preparation Courses

146. Barbri and Kaplan are the two largest bar exam test preparation providers in the United States. Both companies begin soliciting law students to sign up for their bar exam preparation courses during the first year of law school. Students that enroll in Barbri's or Kaplan's courses are required to pay a deposit in exchange for "locking in" the bar exam preparation course price. Law students that sign up earlier, i.e., during their first year, supposedly pay less in deposit than students that sign-up later. The deposit is typically between $99 and $500. However, students that wait to sign up can often obtain discounts or other incentives as Barbri and Kaplan compete to provide the students' bar review courses.

147. Barbri and Kaplan both hire student representatives to recruit other students for their bar preparation courses. These representatives are often current law students and receive a free or discounted bar exam preparation course in exchange for recruiting students. The cost of a test preparation course varies significantly by state, but is often between $2000 and $4500 for the 6-8 week course.

148. Both Barbri's and Kaplan's bar preparation courses include a series of live or recorded lectures, study materials, and practice exams. A significant portion of the courses' cost is attributable to Barbri's and Kaplan's copyrighted bar preparation books, outlines, and practice exams, which are tailored to each state's bar exam.

149. Typically, if Barbri or Kaplan offers a bar preparation course in a particular state, they offer live or pre-recorded lectures in a physical classroom staffed by Barbri or Kaplan employees (the "live" courses). The live courses are offered at almost every ABA-accredited law school in the state or, if there are two law school in the same city, at least one live course in that city. Barbri and Kaplan offer bar exam preparation courses at every non-InfiLaw law school in Arizona, Florida, and North Carolina.

150.     In 2011 or 2012, InfiLaw and the InfiLaw Schools approached Barbri and Kaplan about creating an internal bar exam preparation program that would be offered at the InfiLaw Schools. The program, which was implemented at all three InfiLaw Schools, utilized the written materials and lectures developed by Barbri and Kaplan for their bar exam preparation courses.

151.     The Summit Law internal bar preparation course ~~is~~was referred to as the Multi-Year Bar Accelerated Review or "MyBar" program. Florida Coastal's internal bar preparation course is called the Coastal Enhanced Bar Pass Program. Charlotte Law's internal bar preparation course ~~is~~was call~~ed~~ the Bar Exam Advanced Review or "BEAR" program.

152.     In or around 2012, InfiLaw and the InfiLaw Schools entered into agreements with Barbri and Kaplan that provide that Barbri and Kaplan would stop offering their own courses at the InfiLaw Schools in exchange for the InfiLaw Schools' purchase of Barbri and Kaplan materials for their internal programs. The only other in-house bar preparation program offered by a law school is a purely optional course offered by the University of Missouri in Kansas City (UMKC). The UMKC program was actually developed by the law school, as opposed to simply relabeling Barbri and Kaplan's materials, and only costs $600. Students at UMKC are allowed to take Barbri and Kaplan bar preparation courses, and neither Barbri nor Kaplan was excluded from UMKC's campus in order to prevent students from signing up for those competing courses.

153.     The agreements between InfiLaw and Barbri and Kaplan prohibit Barbri and Kaplan from soliciting the InfiLaw Schools' students, setting up recruiting tables at the InfiLaw Schools, or offering discounts to InfiLaw students.

154.     The student representatives at Summit Law (and the other InfiLaw Schools), with whom Barbri and Kaplan had entered into agreements to recruit other students in exchange for a free bar preparations courses, were converted into InfiLaw internal bar review student representatives.

2

155.     Attempting to sign up for a "live" Barbri or Kaplan bar preparation course through their websites directs students to Barbri or Kaplan employees that, by agreement with InfiLaw, direct the students back to the InfiLaw Schools' internal bar preparation courses. For example, on the Barbri website, students from the InfiLaw Schools who are attempting to inquire about a bar preparation course are told to contact Karen Hundley, who is actually a Vice President at Barbri. Ms. Hundley is not a Barbri representative for any other law schools and instead redirects the students back to the InfiLaw internal bar review programs.

156.     InfiLaw's agreements with Barbri and Kaplan illegally fixed the price of the "live" bar preparation courses offered to Summit Law students, eliminated competition from Barbri and Kaplan, and resulted in large payments from InfiLaw to Barbri and Kaplan to ensure that the InfiLaw Schools' in-house bar review courses were the only option available to the InfiLaw students.

157.     As another example, there was a student that graduated from Summit Law and then enrolled in a master's program at the Sorbonne in Paris, France. After completing the master's program, the student attempted to take a bar review course provided by BarBri to prepare for the New York bar exam. BarBri informed the individual that the only way the student could take BarBri's preparation course was to enroll in Summit Law's internal bar preparation course in Phoenix, Arizona.

158.     Although the InfiLaw Schools' bar preparation courses were touted as an honest attempt to increase the InfiLaw Schools' bar passage rates and as an "individualized bar preparation program designed specifically for [Summit Law students]" that "comprises the best features of Barbri and Kaplan," one of the primary reasons that InfiLaw created the program was to inflate the portion of revenue at the InfiLaw Schools that could be counted as non-Title IV or "10" revenue.

3

159.    Prior to the creation of the MyBar program, the InfiLaw Schools, and in particular Summit Law, were in danger of violating the 90/10 Rule because the vast majority of their revenue was paid from Title IV sources.

160.    For 2010-2012, the InfiLaw Schools were all within 5 percentage points of violating the 90/10 rule. As an example, for the 2010-2011 academic year, Summit Law reported receiving 87.94 percent of its qualifying revenue from Title IV sources.

161.    The falsely reported 90/10 Rule data, which the InfiLaw Schools submitted at the end of each year to the ED, and which the ED is required by statute to report to Congress, is set forth in Exhibit ~~B~~A hereto. The InfiLaw Schools began reporting false 90/10 Rule data at least by 2012, when the internal bar preparation course was first launched.

162.    Another primary reason for the development of its internal bar review programs is so that InfiLaw could gather data on and identify students that were unlikely to pass the bar exam. The goal of identifying students who were at high risk of failing the bar exam was to persuade the students to delay or forgo the bar exam and, thereby, falsely inflate the InfiLaw Schools' bar passage and employment rates as set forth in greater detail below.

163.    Barbri and Kaplan entered into agreements with InfiLaw in connection with the InfiLaw Schools' internal bar exam programs knowing full well that one of the purposes of the program was to inflate and falsify the Schools' non-Title IV revenue to avoid having the schools become automatically ineligible for Title IV funding.

164.    In order to immediately begin recognizing the money paid by the InfiLaw Schools' students as non-Title IV revenue, the InfiLaw and the InfiLaw Schools, with assistance from Barbri and Kaplan, concocted a plan to make the students who had already paid deposits or tuition to Barbri or Kaplan switch their enrollment to the InfiLaw bar preparation programs ~~for the July 2012 through July 2013 bar exams~~. InfiLaw required students to make payments to the

InfiLaw schools instead of Barbri or Kaplan, and improperly counted this income as non-Title IV income in their 90/10 calculations for 2012 through the present.

165.     The purpose of the internal bar review programs was to knowingly misstate the InfiLaw Schools' 90/10 revenue calculation. For example, on September 15, 2011, the Dean of Summit Law (then called the Phoenix School of Law) informed the Director of Academic Services at Summit Law that Defendant InfiLaw had "tasked" Summit Law with "operating our own bar prep course as a real solution for 90/10." The Dean further described "this important initiative for our 90/10" as a "top, top priority for both the school and the consortium." The Dean also insisted that this "90/10 program" begin in December 2011 for those taking the February 2012 bar exam. After the Summit Law Director of Academic Services raised ethical objections to forcing students to use an internal bar preparation course, Summit Law terminated the Director's employment.

166.     The $2500 each student paid to Summit Law for the MyBar course was entirely for the use of the same Barbri materials and lectures that were used for Barbri courses offered at the other law schools in Arizona.

167.     On information and belief, the same materials used for the internal bar preparation courses at the other InfiLaw Schools were merely Barbri and Kaplan materials used at other law schools in those states that had been relabeled for InfiLaw's internal review program.

168.     In addition to the anti-competitive and sham nature of the internal bar preparation course revenue, the entire amount of the internal bar preparation course fees paid to the InfiLaw Schools was really for "books and materials" provided by Barbri and/or Kaplan. As a result, the InfiLaw Schools were prohibited from counting this money as non-Title IV 90/10 revenue since this amount was not included or disclosed as tuition, fees, or other institutional charges. 34 C.F.R. § 668.28(a)(7)(v).

5

169. InfiLaw and the InfiLaw Schools' arrangements with Barbri and Kaplan included agreements that prohibit Barbri and Kaplan from engaging in the recruitment activities ~~that Barbri and Kaplan engage in~~ on other law school campuses. This includes prohibitions against hosting informational sessions or setting up recruitment "tables" on campus, sending emails to students regarding Barbri and Kaplan's bar preparation programs, ~~offering tuition assistance and discounts to students~~ or otherwise competing with InfiLaw ~~in pricing or advertising to InfiLaw Students~~ for bar preparation courses.

170. InfiLaw, the InfiLaw Schools, Barbri and Kaplan conspired to manipulate and falsify the InfiLaw Schools' 90/10 Rule data by entering into an illegal price fixing and anti-competitive arrangement that limited students' ability to choose between multiple competing live bar preparation programs, as well as eliminating discounts and other incentives that would typically be offered to students by Barbri and Kaplan.

171. Specifically, the InfiLaw Schools' non-Title IV revenue was inflated by approximately $2500 for each graduate that took the internal bar preparation program.

172. By requiring its graduates to take the InfiLaw Schools' internal bar review course and actively preventing the students from purchasing other bar preparation courses, the InfiLaw Schools reported false information to the ~~ED~~DoE and prospective students regarding the InfiLaw Schools' institutional charges. A Policy Bulletin issued by the ~~ED~~DoE on January 7, 1999, states that all tuition, fees, room and board, and other charges an institution assesses a student are institutional costs, unless demonstrated otherwise. Specifically, the ~~ED~~DoE guidance states that expenses for required course materials are institutional costs, if the student does not have a real and reasonable opportunity to purchase the required course materials from any place but the institution he or she is attending.

* * *

6

173.    If an institution wishes to classify the cost of required course materials as non-institutional costs, it must be able to substantiate that: 1) the required course materials were available for purchase at a relatively convenient location unaffiliated with the school; and 2) the institution made financial aid funds available to students in a timely manner, so its students could exercise the option to purchase the required course materials from alternative sources.

174.    Fraudulently omitting the cost of the internal bar preparation courses from the InfiLaw Schools' institutional charges resulted in inaccurate information being submitted on every single student's Title IV student aid application. This adversely affected students that were forced to take out private loans to complete the internal bar preparation courses, and misstated the cost of attending the InfiLaw Schools.

7

Document comparison by Workshare 9.5 on Friday, April 16, 2021 8:43:02 PM

| Input: | |
|---|---|
| Document 1 ID | file://\\gibsondunn\gdcip\Client Files_GDCIP Projects - Phoenix\2021\04. April\15\B59660\2. DRAFT\QC\2015.11.12_O'Connor Compl.docx |
| Description | 2015.11.12_O'Connor Compl |
| Document 2 ID | file://\\gibsondunn\gdcip\Client Files_GDCIP Projects - Phoenix\2021\04. April\15\B59660\2. DRAFT\QC\United States of America ex re. Edward Allen_KINC_ 3.29.2021.docx |
| Description | United States of America ex re. Edward Allen_KINC_ 3.29.2021 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 36 |
| Deletions | 13 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |

| Total changes | 49 |
|---|---|

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA
*ex rel.* PAULA C. LORONA, and
REID POTTER,

      Plaintiff,

                        Case No. 3:15-cv-959-J-34JRK

v.

INFILAW CORPORATION,        **Pursuant to 31 U.S.C. § 3730(b)(2)**
ARIZONA SUMMIT LAW SCHOOL, LLC,  **and Court Order (Doc. S-7)**
FLORIDA COASTAL SCHOOL OF LAW,
CHARLOTTE SCHOOL OF LAW, and
BARBRI, INC.,

      Defendants.

_____/

**THIRD AMENDED COMPLAINT**
**OF QUI TAM PLAINTIFFS PAULA C. LORONA AND REID POTTER**

      Plaintiffs/Relators Paula C. Lorona, and Reid Potter by their undersigned attorneys

and on behalf of the United States of America, state the following as their Third Amended

Complaint based upon their non-public, indirect, and independent knowledge:

**I.    INTRODUCTION**

      1.      This action is brought by Plaintiff/Relator Paula C. Lorona ("Lorona") and

Plaintiff/Relator Reid Potter ("Potter") (collectively referred to as "Relators") on behalf of

the United States of America to recover compensatory and punitive damages and civil

penalties pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*

1

## II.   PARTIES

2.      Lorona is a resident of Maricopa County, Arizona, and all times pertinent to this Complaint, Lorona was either employed by or enrolled as a student at Arizona Summit Law School ("ASLS"), formerly known as Phoenix School of Law ("PSL"), in Phoenix, Arizona.

3.      Potter is a resident of Pima County, Arizona, and at all times pertinent to this Complaint, Potter was either employed by or enrolled as a student at ASLS in Phoenix, Arizona.

4.      Defendant ASLS is a for-profit Delaware limited liability company with its primary place of business in Phoenix, Arizona.

5.      Defendant Charlotte School of Law ("CSL") is a for-profit Delaware limited liability company with its primary place of business in Charlotte, North Carolina.

6.      Defendant Florida Coastal School of Law ("FCSL") is a for-profit Florida corporation with its primary place of business in Jacksonville, Florida.

7.      Defendant Infilaw Corporation ("Infilaw") is a Delaware corporation with its primary place of business in Naples, Florida. Infilaw is the parent company of ASLS, CSL, and FCSL (collectively, the "Defendant Schools"), and controls and dominates the business activities of ASLS, CSL, and FCSL. Infilaw therefore conducts business activities in the states in which those schools are located: Arizona, North Carolina, and Florida.

8.      Infilaw made and directed all significant business decisions of ASLS. For example, when certain members of the ASLS faculty and staff expressed concern about the caliber of students being admitted to ASLS, ASLS President Scott Thompson responded in a

meeting attended by Lorona that he had been "instructed to put asses in seats," presumably by Infilaw. Upon information and belief, Infilaw made and directed all significant business decisions of CSL and FCSL, as well.

9.      Infilaw controlled the finances of ASLS by (a) controlling and managing the budget and budgeting process; (b) requiring Infilaw approval of all promotions, raises, performance review, and any other financial incentives for faculty and staff at ASLS; (c) processing and maintaining control over the ASLS payroll; (d) managing the 401(k) plan and other financial benefits of ASLS employees, including tuition waivers for employees who were also students; and (e) approving and disapproving reimbursement for credit cards and expenses for ASLS employees traveling on ASLS business.

10.      On information and belief, Infilaw also controlled the finances of CSL and FCSL by (a) controlling and managing the budget and budgeting process; (b) requiring Infilaw approval of all promotions, raises, performance review, and any other financial incentives for faculty and staff at CSL and FCSL; (c) processing and maintaining control over the CSL and FCSL payroll; (d) managing the 401(k) plan and other financial benefits of CSL and FCSL employees, including tuition waivers for employees who were also students; and (e) approving and disapproving reimbursement for credit cards and expenses for CSL and FCSL employees traveling on business.

11.      Accordingly, Infilaw is liable not only for its own misconduct, but also for the misconduct of the Defendant Schools as alleged herein.

12.     Defendant Barbri, Inc. ("Barbri") is a Delaware corporation with its primary place of business in Dallas, Texas. Barbri provides preparation courses and materials for individuals taking state bar exams, most of whom are recent law school graduates.

## III.   JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

14.     This Court also may exercise subject-matter jurisdiction over this action because, pursuant to 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the allegations or transactions alleged in this Third Amended Complaint. Even if a statutorily relevant disclosure has occurred, both Potter and Lorona qualify as an "original source" of the allegations in the Third Amended Complaint, as that term is defined by 31 U.S.C. §§ 3730(e)(4)(A) and 3730(e)(4)(B) because they have voluntarily disclosed to the Government information on which the allegations in this action are based, and because they have independent knowledge that materially adds to the publicly disclosed transactions.

15.     On or about July 31, 2012, Potter provided information regarding this Third Amended Complaint to the United States Department of Justice ("DOJ") through the DOJ's whistleblower hotline.

16.     On December 12, 2012, Potter provided documentation relating to this Third Amended Complaint to the United States Department of Education ("DOE").

17.     On June 3, 2015, Lorona provided documentation relating to this Third Amended Complaint to the Inspector General's Hotline – Office of Inspector General ("OIG"), DOE.

18.     On July 17, 2015, Lorona met with an Assistant United States Attorney from the United States Attorney's Office, Middle District of Florida, to discuss the allegations herein. At the same time, Lorona provided to the AUSA a draft of the initial Complaint and a disclosure statement summarizing and supported by all known material evidence in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

19.     On August 5, 2015, Lorona provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a copy of the initial Complaint and a disclosure statement summarizing and supported by all known material evidence in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

20.     On March 3, 2016, Potter and Lorona provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a copy of the Third Amended Complaint and a supplemental disclosure statement summarizing and supported by all known material evidence in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

21.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because one or more of the Defendants can be found, resides, transacts business, and committed violations of the False Claims Act within this District. Venue is likewise proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) for the same reasons.

## IV.   EMPLOYMENT OF LORONA BY ASLS AND INFILAW

22.    Lorona was hired by ASLS in November 2009 as an administrative assistant to the General Counsel of ASLS, and later received promotions to financial aid representative in 2010, assistant director of financial aid in 2011, and student accounts/accounting manager in 2011.

23.    In those capacities, Lorona observed and participated in ASLS' application for accreditation from the American Bar Association and the financial inner-workings of ASLS and Infilaw, including student loan disbursement, the application for and receipt of Title IV funds, and the certification of compliance with all DOE and Title IV regulations and requirements. More specifically, Lorona's responsibilities as an employee of ASLS included submission of requests for federal funds through the Common Origination and Disbursement System (COD), used by the DOE to create, deliver, and report Federal Pell Grants, TEACH Grants, and Federal Direct Loans.

24.    Upon Lorona's submission of COD requests on behalf of ASLS and Infilaw, the DOE deposited the requested funds in the ASLS bank account at SunTrust Bank. Each night, SunTrust would then 'sweep' those funds into bank accounts maintained by Infilaw. Once funds were swept into accounts maintained by Infilaw, Lorona would make disbursements to individual students by creating and uploading a file to SunTrust's website, which would cause SunTrust to transfer the Title IV funds from Infilaw's account to an ASLS account. ASLS would then directly distribute the funds to the student who applied for Title IV funds.

25.     Before her employment with ASLS, Lorona reviewed materials, statistics, and bar passage rates published by ASLS and decided to work at ASLS because it would help her attend law school. Indeed, as an employee, Lorona was given a full tuition waiver and a pro rata early tuition waiver to attend ASLS.

## V.     EMPLOYMENT OF POTTER BY ASLS AND INFILAW

26.     Potter is a former student of ASLS. After graduating from law school, Potter was hired by ASLS in 2011 and continued to work for ASLS until September 2014 in ASLS' Academic Services department.

27.     In his role, Potter was directly involved with guiding students through their bar exam preparation.

28.     Potter was also involved in meetings with ASLS and Infilaw officials regarding academic success programs including without limitation ASLS' bar exam preparation programs, and ASLS' use of those programs to secure and maintain federal funds as discussed herein.

29.     Additionally, Potter, in all cases directed by his superiors, collected funds from students for bar exam preparation fees in exchange for refunds given to the students by Barbri. Potter was involved in discussions with representatives of Infilaw, ASLS and Barbri who devised this exchange, and knew that its purpose was to disguise funds ASLS received from federal student loan programs so that ASLS could continue to receive such funds.

## VI.     ELIGIBILITY FOR TITLE IV FUNDS -- SUBMISSION OF PROGRAM PARTICIPATION AGREEMENTS

30.     To be eligible for Title IV/ Higher Education Act ("HEA") funds, institutions such as the Defendant Schools must comply with HEA and DOE requirements by executing a Program Participation Agreement ("PPA") under 34 C.F.R. § 668.14(a)(1).

31.     By submitting a PPA, institutions certify that they will "comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program."

32.     At ASLS, PPAs were completed and executed in the financial aid department and the President's Office, giving Relator Lorona unparalleled access to the documents and the process under which they were certified. The PPAs were executed by Thompson, but they were prepared by other employees within the President's Office and financial aid department.

33.     The ASLS' PPAs certified compliance with all regulations and requirements, despite full knowledge of ASLS and Infilaw leadership and staff that the regulations and requirements were regularly being violated as alleged herein. The submission of those PPAs caused the federal government to distribute Title IV/HEA funds to ASLS, in violation of the False Claims Act.

34.     Upon information and belief, the other Defendant Schools prepared, executed, and submitted similar PPAs, in conjunction with Infilaw, to certify compliance with all Title IV/HEA regulations and requirements, despite full knowledge of Defendant Schools and

Infilaw leadership and staff that the regulations and requirements were regularly being violated. The submission of those PPAs caused the federal government to distribute Title IV/HEA funds to Defendant Schools and Infilaw, in violation of the False Claims Act.

35.     Virtually all of Defendant Schools' income is derived from Title IV, HEA program funds. The Defendant Schools' survival is dependent on their ability to maintain the appearance that they are in compliance with Title IV, HEA program rules and regulations.

VII.   **DEFENDANTS' SCHEMES TO CIRCUMVENT THE 90/10 RULE**

36.     In order to participate in any Title IV, HEA program, for-profit institutions must enter into a written program participation agreement with DOE, which conditions participation in Title IV on compliance with Title IV and DOE rules and regulations.

37.     Under one of those regulations, Title IV and the HEA require that a for-profit institution "derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV, HEA program funds." 34 C.F.R. § 668.14(b)(16). This is commonly known as the "90/10 Rule." To calculate revenue under the 90/10 Rule, institutions must use the cash basis of accounting, counting only revenue actually received. 34 C.F.R. § 668.28(a)(2).

38.     DOE rules / regulations under 34 C.F.R. § 668.1 *et seq.* require that for-profit institutions participating in any Title IV, HEA program, report to the DOE annually the amount and percentage of its income derived from Title IV, HEA program funds, and the amount and percentage of its income derived from other sources.

39.     In or about early 2010, Defendants became concerned that they would not satisfy the 90/10 Rule because a large proportion of the students attending ASLS, FCSL, and CSL were receiving substantial Title IV/HEA funding through loans. Because tuition and

fees charged by the Defendant Schools is among the highest in the nation, students attending those schools typically borrowed well over $100,000 to fund their educations.

40.     Publicly available reports found on the DOE website demonstrate why it was crucially important for Defendants to keep the Title IV/HEA funding stream alive. For example, in the 2009-2010 funding year, ASLS reported an 84.25%/15.75% split between Title IV/HEA revenue and non-Title IV revenue and reported Title IV/HEA revenue of $22,111,393.00; FCSL reported 82.94% Title IV/HEA revenue of $65,758,846.00; and CSL reported revenue of $19,224,762.00, without reporting a 90/10 Rule split.

41.     In the public data available for the 2012-2013 funding year, ASLS reported an 87.70%/12.30% split with Title IV/HEA revenue of $60,030,378.00; FCSL reported an 86.63%/13.37% split with Title IV/HEA revenue of $78,751,382.00; and CSL reported an 87.20%/12.80% split with Title IV/HEA revenue of $63,134,358.00.

42.     In the most recent public data available covering the 2013-2014 funding year, ASLS reported an 88.04%/11.96% split with Title IV/HEA revenue of $53,281,915.00; FCSL reported an 84.95%/15.05% split with Title IV/HEA revenue of $67,556,056.00; and CSL reported an 87.87%/12.13% split with Title IV/HEA revenue of $74,954,327.00.

43.     In fact, the numbers for ASLS were so precarious that Potter was told by a CSL representative, Odessa Alm, in or about July 2012 that ASLS had a "90/10 Problem."

**A.     INSTITUTIONAL LOANS**

44.     From 2010 through and including 2013, Lorona participated in weekly meetings with other Defendants Schools and Infilaw employees, including Alicia Togno, Debbie Richards, Shirley Mays, Penny Willrich, Scott Thompson, Jim Lemire, Denise

Barlow, CSL representatives (via phone), FCSL representatives (via phone), and Infilaw employees and representatives (via phone). The central topic of discussion at each of those weekly meetings was how to create the appearance that Defendants were complying with the 90/10 Rule. Infilaw leadership and representatives consistently represented at those meetings that it would be beneficial for the statistics to appear as though the revenue was split 80/20, so that the government would not become suspicious and begin an investigation into actual compliance.

45.     During one of the Friday meetings in 2011 Scott Thompson, the President of ASLS and former Chief Financial Officer for Infilaw, introduced and proposed to Lorona and the other participants the concept of offering Institutional Loans ("ILs") to students as a solution to the 90/10 Rule. Thompson stated that from Infilaw's perspective the sole reason to offer ILs was to give the appearance that the Defendant Schools were in compliance with the 90/10 Rule.

46.     Infilaw viewed the ILs as a potential solution to the 90/10 Rule because revenue generated from institutional aid may be counted as non-Title IV/HEA revenue under 34 C.F.R. § 668.28(a)(5), as long as the institutions offering the loans meet certain guidelines and requirements. Among these requirements is that the ILs be subject to regular loan repayment and collection.

47.     Infilaw and the Defendant Schools marketed the ILs in the same manner as Title IV/HEA or GradPlus loans, even though they did not have the same benefits. Unlike Title IV/HEA and GradPlus loans, ILs are not deferrable by students after graduation, nor may students apply for financial hardships or forbearances of the ILs.

11

48.     Despite never having been in the lending business, Infilaw and the Defendant Schools began to roll out ILs in 2012 for the Fall 2011 – Spring 2012 financial aid year. As part of this process, Infilaw required the Defendant Schools to obtain credit reports on all students and report the top credit scores. Once the reports had been run, the Defendant Schools, under Infilaw's direction, began contacting students with the top credit scores in an attempt to convince them to sign up for ILs. This effort was immediately successful, and students began signing up.

49.     Once that limited rollout ended, Infilaw and the Defendant Schools decided to then offer the ILs to students who could not get approved for private loans elsewhere.

50.     The Defendant Schools began soliciting and providing ILs to almost any student without regard to creditworthiness or ability to repay, including students with bankruptcies and foreclosures ("Low Credit ILs").

51.     After a year of funding Low Credit ILs with no prospect of repayment, the Defendant Schools counted and reported to the DOE the amount of the corresponding receivables from these loans as income "from sources other that Title IV, HEA program funds." This created the illusion that the Defendant Schools derived a much higher percentage of their income from non-Title IV sources so that the Defendant Schools appeared to be well in compliance with the 90/10 Rule.

52.     In reality, neither Infilaw nor the Defendant Schools ever made any serious attempts to collect from the Low Credit IL students. From the perspective of Infilaw and the Defendant Schools, all that mattered was the ability to count and report the loan as income. Even more nefariously, the Defendant Schools began withdrawing future IL support for the

Low Credit ILs students who had accrued tremendous amounts of debt and had been determined by Defendants Schools to have a low chance to pass the bar exam, thereby destroying their ability to continue to attend school.

53.       Defendants knew, and ignored, the fact that most of the students receiving ILs could not and would not repay the loans. In fact, because Defendants had so much Title IV money, they were able to purposefully shun collection efforts in order to avoid calling attention to the fact that the loans were not in fact collectible and because they had discovered they could, in effect, use the uncollectible ILs as a way to create fake income and trump up their "10" money to avoid the appearance of violating the guidelines and the 90/10 Rule and continue to receive the large amount of "90" money they were receiving.

54.       For example, certain students could not make payments on their ILs and ASLS upon information and belief never collected a dollar from them. But Scott Thompson forced Lorona to continue to allow them to attend school so that he could count the students' receivables towards the "10" money of the 90/10 Rule. Obviously ASLS could not legally or ethically count such non-existent revenue in determining compliance with the 90/10 Rule. Upon information and belief, IL default rates exceeded 40% in the 2013 fiscal reporting year.

55.       Under the cash basis of accounting, revenue can be recorded only when cash is received, rather than when it is earned. Thus, counting future payment of ILs (which Defendants knew they would not collect) as revenue under the 90/10 Rule violated Title IV/HEA and created the false impression that Defendants were complying with the 90/10 Rule. In substance, the ILs were mostly a sham designed solely to make it appear that Defendants were complying with the 90/10 Rule.

56.     There is no principle of accounting that permits an individual or entity to credit as income a debt or receivable that cannot or will not be collected.

57.     Lorona was privy to this scheme and its mechanics during her time at ASLS due to her position and employment, and was instructed to complete the financial transactions necessary to fund ILs. Once a student was convinced to sign up for an IL, the Defendant Schools would "refund" the Title IV/HEA funds previously received from DOE and replace those loan funds with IL funds from the institution, most of which was previously received Title IV/HEA funds from other students' financial aid submissions. This allowed the Defendants Schools to transfer funds from the 90% side to the 10% side in a dollar-for-dollar manner, making it appear they were complying with the 90/10 Rule. Checks were kept to a certain maximum value, as to prevent undue attention from governmental and regulatory bodies.

58.     Lorona was aware of and viewed internal calculations of revenue under the 90/10 Rule (as opposed to the publicly reported data), most of which demonstrated that ASLS was consistently in violation of the 90/10 Rule. In fact, Lorona was provided documents demonstrating a violation of the 90/10 Rule and instructed to convert some Title IV/HEA loans into ILs for the sole purpose of converting revenue to create the appearance of compliance with the 90/10 Rule. Upon information and belief, the same documents existed at the other Defendants Schools.

59.     Knowing that the ILs were not going to be as helpful to students as Thompson attempted to market them, and further knowing that the ILs were just a way to create the false impression that the Defendant Schools were complying with the 90/10 Rule, Debbie Barlow,

14

an Infilaw employee or contractor, commented that "if it looks like a duck and quacks like a duck, it must be a duck."

60.     At some point after the first year of the ILs, Infilaw and the Defendant Schools realized that the ILs alone were insufficient to maintain the continuing illusion of 90/10 Rule compliance. Infilaw and the Defendant Schools searched for other, additional ways to boost their reported income "from sources other than Title IV, HEA program funds."

### B.     MYBAR AND INADEQUATE BAR PREPARATION

61.     In or about late 2011, as another solution to satisfying the 90/10 Rule, Infilaw tasked the Defendant Schools – beginning with ASLS – with creating and implementing their own bar exam preparation programs to compete with established programs from Barbri and other providers. The Dean of ASLS, Shirley Mays, sent an email on or about September 15, 2011, stating that she had an insightful 90/10 meeting and that ASLS's own bar prep course "has bubbled to the top as a real solution for 90/10."

62.     ASLS undertook to form a bar preparation program, and tasked the Director of Critical Legal Skills Program ("DCLSP") to implement it. The DCLSP was not receptive to the implementation of a new bar course in less than 3 months in order to prepare December 2011 graduates to take the February 2012 bar examination. Additionally, the DCLSP expressed concerns with relying on a February 2012 pilot program for myriad other reasons, including an impending switch to the Uniform Bar Exam in Arizona.

63.     Undeterred, in October 2011 Dean Mays stated that regardless of the DCLSP's legitimate concerns, the bar preparation program was an important initiative for satisfying the 90/10 Rule. The DCLSP faced extreme pressure from Infilaw and ASLS

15

leadership, putting her in an untenable situation – sacrifice education quality and quality bar preparation, or be forced out.

64.     As pressure and time mounted, and ASLS could not definitively state its plan regarding bar preparation, students began enrolling in other bar preparation courses and inquiring as to scholarships for established bar courses like Barbri. In prior years, ASLS maintained a fund of $50,000 to assist students in dire financial need to enroll in established bar preparation courses. In late 2011, however, Dean Mays informed the DCLSP that the $50,000 usually available for students in dire need was no longer available, thus attempting to close avenues to bar preparation programs other than their new program.

65.     In other attempts to derive non-Title IV/HEA funding to satisfy the 90/10 Rule, Penny Willrich suggested that ASLS **force** its students to take its bar preparation program, provide no bar preparation materials to the students unless they sign up for ASLS bar preparation program, and even charge students parking fees during the bar preparation program to count toward non-Title IV/HEA funds.

66.     As ASLS formalized its new program, it named the program "myBAR" which stood for Multi-Year Bar Advanced Review.

67.     ASLS began **paying** students who participated in myBAR thousands of dollars as "bonuses" for completing mini-courses called modules, thus effectively refunding the students' myBAR fees. This cleverly-packaged arrangement allowed ASLS to claim tuition received from myBAR fees as non-Title IV/HEA revenue, while hiding the fact that the revenue was refunded Title IV/HEA funds.

68.     Upon information and belief, all Defendant Schools have counted myBAR program fees as non-Title IV/HEA revenue toward satisfying the 90/10 Rule.

69.     Due to the restrictions and restraints imposed by Infilaw and ASLS leadership, myBAR was woefully inadequate as a bar preparation course. As such, the program does not meet the requirements of 34 C.F.R. § 668.28, as it does not prepare ASLS students to take the bar. ASLS admitted this in an email on December 23, 2014, indicating that the anticipated bar passage rate for an ASLS student on the February 2015 bar exam was **47%**, compared to a state average of 70%. Nevertheless, ASLS continues to falsely market the 'efficacy' of its bar preparation programs, including sending emails to students touting higher bar passage rates for myBAR, as opposed to established bar preparation courses.

70.     The Defendant Schools' bar preparation programs incomes are not income from school activities necessary and required for students enrolled in their programs, nor do the programs actually prepare their students properly to take an examination for an industry-recognized credential or certification issued by an independent third party. The funds received from the bar preparation programs of the Defendant Schools therefore cannot be considered non-Title IV/HEA revenue to apply towards the 90/10 Rule.

71.     Recognizing that the bar preparation for its students was dismal and students were unlikely to pass the bar, ASLS and Infilaw leadership decided to "game" the bar passage requirements imposed by the American Bar Association ("ABA") by requesting that students defer taking the bar exam in exchange for a monetary payment or stipend. For students the ASLS leadership could not convince to defer taking the bar exam, ASLS

leadership began telling students to enroll in myBAR, rather than Barbri or other established providers.

72. For the February 2015 bar exam, ASLS tracked 197 students who were ready to take the bar exam for the first-time. Of those students, ASLS targeted 37 students who they believed could not pass the bar. Additionally, of those 197 students, 39 of them had been previously paid to defer taking the July 2014 bar exam. In fact, Dean Mays said that ASLS does not care about students who have already failed. Instead ASLS was only concerned about first-time bar exam sitters, who look better in ASLS statistics.

73. As of January 14, 2015, ASLS predicted only a 50.9 percent anticipated passage rate for first-time bar test takers and had some students marked as a less than ten percent chance of passing – including students with a less than 6% chance of passing.

74. Additionally, ASLS all but ignored any students who were preparing to take the bar exam for a second time or more as discussed herein.

75. The actual pass rate for ASLS graduates taking the July 2015 Arizona bar examination was a woeful 26.4% - despite ASLS continuing to market the efficacy of their myBAR program.

## C. THE CHECK EXCHANGE WITH BARBRI AND DEFENDANT SCHOOLS

76. Barbri begins soliciting law students to sign up for their bar exam preparation courses during the first year of law school. Students that enroll in Barbri's courses are required to pay a deposit in exchange for ensuring that the student is given the best possible bar exam preparation course price as the cost increases for each year a student waits to pay the deposit. Additionally, Barbri typically hires student representatives to recruit other

students for their bar preparation courses. These representatives are often current law students and receive a free or discounted bar exam preparation course in exchange for recruiting and soliciting students.

77.     Barbri's bar preparation courses include a series of live or recorded lectures, study materials, and practice exams. A significant portion of the courses' cost is attributable to Barbri's copyrighted bar preparation books, outlines, and practice exams, which are tailored to each state's bar exam. These live or pre-recorded lectures are offered in a physical classroom staffed by Barbri employees. Barbri offers their bar exam preparation courses at every non-Infilaw law school in Arizona, Florida, and North Carolina.

78.     In 2011 or 2012, Infilaw and the Defendant Schools approached Barbri about creating an internal bar exam preparation program that would be offered at the Defendant Schools.

79.     The program implemented at all three Defendant Schools, utilized the written materials and lectures developed by Barbri for their bar exam preparation courses.

80.     The ASLS internal bar preparation course is called the myBAR program (formerly "IBPP"); FCSL's internal bar preparation course is called the Coastal Enhanced Bar Pass Program; and CSL's internal bar preparation course is called the Bar Exam Advanced Review or "BEAR" program.

81.     In or around 2012, Infilaw and the Defendant Schools entered into agreements with Barbri that provide that Barbri would stop offering their own courses at the Defendant Schools in exchange for the Defendant Schools' purchase of Barbri materials for their internal programs.

82.     The contract between Infilaw and Barbri prohibits Barbri from soliciting the Defendant Schools' students, setting up recruiting tables at the Defendant Schools, or offering discounts to Infilaw students.

83.     The student representatives at the Defendant Schools, with whom Barbri had entered into agreements to recruit other students in exchange for free bar preparations courses, were upon information and belief converted into Infilaw internal bar review student representatives.

84.     Barbri and Infilaw entered into an agreement (the "Barbri Agreement"), dated July 2, 2012, that provides that Barbri will provide all the materials for the Defendant Schools' internal bar review programs. The contract was stated to cover a term from July 2, 2012 until July 31, 2015 (the "Barbri Initial Term"). Stephen Fredette, the chairman and CEO of Barbri, signed the contract on behalf of Barbri. Chidi Ogene, general counsel for Infilaw, signed the contract on behalf of Infilaw. Infilaw was required under the agreement to report various student data to Barbri, including the results of diagnostic testing administered in connection with the bar preparation courses. Infilaw agreed to pay Barbri a fixed fee for Barbri's materials and instruction services. The total sum payable to Barbri over the Barbri Initial Term amounted to more than twelve million dollars ($12,000,000).

85.     Scott Thompson told Potter in or about July 2012 that ASLS needed to create "10" revenue with the check exchange program and that a paper trail needed to be created for it in order to mask the fact that the majority of students were using their Title IV distributions to pay for bar preparation.

86.     Tellingly, at the time of the Barbri Agreement's execution, the Defendant Schools' students taking the Summer 2012 bar review course had already paid or contracted directly with Barbri to take Barbri's bar review course and the Barbri course was already half over.

87.     A substantial and material amount of the funds the Defendant Schools' students paid to Barbri for Barbri's Summer 2012 bar review came from Title IV funds which had been previously distributed to students who then paid Barbri from those funds.

88.     After the Barbri Agreement was signed, students who navigated to the Barbri bar preparation course through Barbri's website were then told by Barbri employees that due to an agreement with Infilaw they must register in the Defendant Schools' internal bar preparation courses. Infilaw's agreements with Barbri fixed the price of the "live" bar preparation courses offered to Defendant Schools' students, eliminated any competition by Barbri, and resulted in large payments from Infilaw to Barbri to ensure that the Defendant Schools' in-house bar review courses were the only option available to the Infilaw students.

89.     Although the Defendant Schools' bar preparation courses were touted as an honest attempt to increase the Defendant Schools' bar passage rates and as an "individualized bar preparation program designed specifically for [ASLS students]" that "comprises the best features of Barbri and Kaplan," the real reason that Infilaw created the program was to inflate the portion of revenue at the Defendant Schools that could be counted as non-Title IV or "10" revenue. Prior to the creation of the myBAR program, the Defendant Schools, and in particular ASLS, were in danger of violating the 90/10 Rule because the vast majority of their revenue was paid from Title IV sources.

90.     In order for Defendant Schools to immediately begin recognizing the money already paid by the Defendant Schools' students to Barbri as non-Title IV "10" money revenue, Infilaw and the Defendant Schools (with assistance from Barbri) concocted a plan to make the students who had already paid deposits and contracted with Barbri switch their enrollment to the Infilaw bar preparation programs for the July 2012 through July 2013 bar exams.

91.     As part of this plan, Barbri, Infilaw and the Defendant Schools came up with an elaborate scheme to falsely count the full amount of the internal bar review course cost as non-Title IV revenue, the Defendant Schools required students that had already made payments to Barbri for the summer 2012 course, or as deposits for future courses, to engage in a "check exchange" program with the law schools. Barbri agreed to refund each student's past payments by sending the checks *directly* to the Defendant Schools. The Defendant Schools would then distribute the checks to the students in exchange for the student writing a personal check payable to the school for the same amount.

92.     Even though the July 2012 bar preparation course students had already paid Barbri; had already attended Barbri-led classes; and were nearly complete with the Barbri program, Barbri nevertheless – in the initial check exchange with ASLS – sent refund checks to ASLS to perform a check exchange for these students so that ASLS could count the revenue as "10" money – and never provide any services for the money.

93.     During this time, Relator Potter had multiple conversations with representatives of CSL and FCSL to discuss the check exchange for their respective schools

and was consistently told that ASLS had a 90/10 problem and the check exchange was a solution to ASLS' 90/10 problem.

94.    Scott Thompson told Reid Potter and Glenys Spence in an email dated July 29, 2012 that "It is important we get the $ deposited as 90/10 is a cash basis calculation, so the $ need to be in our account by 7/31."

95.    In an email sent by ASLS' employee Glenys Spence on August 21, 2012 she wrote that she had a lot of questions regarding marketing the internal bar review program as she believed that Barbri was still marketing their program to ASLS students "which does not bode well for 90/10."

96.    Another primary reason for the development of its internal bar review programs is so that Infilaw could gather data on and identify students that were unlikely to pass the bar exam. The Barbri Agreement provided for assessment tests to be administered to the Infilaw students and for this data to be reported to Infilaw. The goal of identifying students who were at high risk of failing the bar exam was to persuade the students to delay or forego the bar exam and, thereby, falsely inflate the Defendant Schools' bar passage and employment rates as set forth in greater detail in the next section. Barbri entered into its agreement with Infilaw in connection with the Defendant Schools' internal bar exam programs knowing full well that the purpose of the program was to inflate and falsify the Schools' non-Title IV revenue to avoid having the schools become automatically ineligible for Title IV funding.

97.    Relator Reid Potter was present during discussions with Barbri employees where this purpose (and its potential illegality) was discussed.

23

98.     For example, on or around September 6, 2012, Relator Potter and another employee of ASLS, Glenys Spence, held a telephone call with Barbri employee Mary Goza. During the call, the participants discussed rebranding Barbri's bar preparation materials as being affiliated with ASLS's bar exam preparation course. The ASLS and Barbri employees also discussed how to transition Barbri's law student representatives, who recruited law students to sign up for Barbri's course in exchange for a free bar preparation course, to recruit students for ASLS's internal program. Mary Goza was aware that inflating ASLS's non-Title IV revenue was the main purpose of the MyBar Program.

99.     ASLS' Dean, Shirley Mays sent an email to Glenys Spence on September 19, 2012 stating that ASLS cannot accept deposits for the internal review program "due to 90/10 presumptions" and instead requested that students sign a contract or letter of intent.

100.    This was because ASLS had decided that to better hide the sham nature of the "10" revenue from students paid for the myBAR program, they would not collect fees for myBAR until after students had graduated and received a change of status from "enrolled" to "graduated" in ASLS' student management database.

101.    This was confirmed in another email – this one sent on May 9, 2013 by Nina Segovia to Scott Thompson, Glenys Spence, Shirley Mays, and Reid Potter stating in reference to a myBAR Frequently Asked Questions (the "myBAR FAQ") document attached to the email: "SCOTT – The question about 'deposits' for myBAR is listed in question #4. If we opt to ask for a deposit, this will mean that we can't use the money as '10' money (on average $250 per 100 sign-ups = $25,000). Please let us know if you'd like to go with option 'a' or option–'b' This is a critical question."

102.    Question 4 of the myBAR FAQ stated:

**When do I have to pay for myBAR?**
a) Recommended: You will pay for your **myBAR** program after you graduate and before the course starts. Unlike with BARBRI, you do not need to pay a deposit to obtain your books.
b) You will need to provide a $100 deposit as a 1L and $150 as a 2L at the time of registration.

103.    In fact, students attempted to pre-pay their myBAR fees prior to graduation, but were rebuffed and told that ASLS could not collect money for myBAR until after they had graduated.

104.    Students at Defendant Schools were repeatedly told that they would only be invoiced for the bar preparation programs once they graduate and not prior.

105.    In an email dated August 18, 2013 with a subject of "myBAR Policies," the procedure was documented as: "Students will pay $250 ($100 as a 1L and $150 as a 2L). That money is refunded after graduation. Once the student graduates, he or she will pay the full $2,550 and get the $250 back."

106.    Barbri's incentive to help implement the scheme was to realize an increase in revenue that they normally would not have seen. As detailed herein, Barbri would realize more revenue from the Barbri Agreement with Infilaw during the Barbri Initial Term than they would actually realize if they had signed up individual students – as they do with all other law schools.

107.    Scott Thompson stated in an email dated January 8, 2013 that ASLS had paid Barbri based upon the Barbri Agreement and that he was expecting student refunds within a week so that the check exchange process could start with students who were now listed as "graduated" in the student database.

108.     An email sent from Mary Goza to ASLS' employees on or about January 18, 2013 details that Barbri not only knew about the scheme to move money to the "10" side of the 90/10 equation, but that they were instrumental in designing and deploying the scheme. In that email, Ms. Goza lays out the "CHECK EXCHANGE PROCESS" as:

CHECK EXCHANGE PROCESS:

1) A spreadsheet was sent to each school showing the amount each student paid to BARBRI. When we get confirmation on those lists we will process checks (FCSL is still outstanding).

2) A check made payable to each student will be issued and sent to each school. We cannot do a lump sum check because the students are enrolled in the BARBRI system and therefore the account is in the student's name.

3) Each school will be responsible for notifying the impacted students and completing the check exchange.

4) Each school will distribute the checks to each student, and in return the student will provide a personal check payable to the school for the same amount. ***To ensure compliance with 90/10, the student should not merely sign over the check to the school, but instead provide direct funds***. The process will include out of state students, thus the school must notify and complete the exchange with the out of state students. (Emphasis added).

109.     A memo distributed by Infilaw to the Defendant Schools even detailed and copied the check exchange program narrative nearly verbatim from Mary Goza's email, stating:

MyBar CHECK EXCHANGE PROCESS:

A spreadsheet was sent to each school showing the amount each student paid to BARBRI. When we get confirmation on those lists we will process checks (FCSL is still outstanding).

A check made payable to each student will be issued and sent to each school. We cannot do a lump sum check because the students are enrolled in the BARBRI system and therefore the account is in the student's name.

Each school will be responsible for notifying the impacted students and completing the check exchange.

Each school will distribute the checks to each student, and in return the student will provide a personal check payable to the school for the same amount. To ensure compliance with 90/10, the student should not merely sign over the check to the school, but instead provide direct funds. The process will include out of state students, thus the school must notify and complete the exchange with the out of state students.

110.    For the summer 2012 bar review course, ASLS received checks for approximately 70 graduates representing approximately $184,000. This was income that was owed and had already been paid to Barbri based on the students' agreements with Barbri. Through the check exchange program ASLS illegally counted a large and material amount of this money as non-Title IV income in its 2012 annual audit submitted to the DOE.

111.    In an email dated January 30, 2013, Mary Goza stated that both CSL and ASLS will receive student refund checks from Barbri on February 4, 2013.

112.    ASLS obtained from Barbri lists of students that had made payments to Barbri for summer 2013 bar review courses. These students had already taken a Barbri bar preparation course and already taken the summer 2013 bar exam. But in its efforts to falsify its 90/10 Revenue calculation, ASLS contacted these students, attempted to make them cash a "refund" check from Barbri, and then immediately write a check in the same amount to ASLS for its myBAR program. Students that would not comply with this obvious charade were threatened that ASLS would withhold their character and fitness certification for those students who had passed their bar exams and were applying for bar admission. Barbri sent refund checks for approximately 63 former students to ASLS and ASLS was successful in convincing many of these students to participate in the check exchange process. The checks

from these students were falsely reported by Infilaw as non-Title IV revenue on its 2013 annual audit submitted to the DOE.

113.    In order to force students to enter into the check exchange process, i.e., to enter into a sham transaction with Barbri and the Defendant Schools, the schools resorted to making threats to students and recent graduates, including that the school would withhold transcripts required for the students' bar admission (assuming they passed the bar) or would report any unpaid debt to character and fitness.

114.    In fact, the Defendant Schools' were so concerned with ensuring the funds were collected to knowingly inflate and misstate the 90/10 revenue calculations, that they even resorted to sending threatening emails to students the night *prior* to bar exams to inform them that the payment must be made to Defendant Schools as the Defendant Schools "would like to avoid any questions during Character and Fitness review."

115.    The purpose of the internal bar exchange programs and check exchange process was to knowingly misstate the Defendant Schools' 90/10 revenue calculation. For example, on September 15, 2011, the Dean of ASLS (then called the Phoenix School of Law) informed the Director of Academic Services at ASLS that Defendant Infilaw had "tasked" ASLS with "operating our own bar prep course as a real solution for 90/10." The Dean further described "this important initiative for our 90/10" as a "top, top priority for both the school and the consortium." The Dean also insisted that this "90/10 program" begin in December 2011 for those taking the February 2012 bar exam. After the ASLS' Director of Academic Services raised ethical objections to forcing students to use an internal bar preparation course, ASLS terminated the Director's employment.

116.    The sham nature of the revenue recognized by the Defendant Schools in 2011 through 2013 for the Schools' internal bar preparation course is evidenced by the conversations that occurred between Barbri, Infilaw and the Defendant Schools regarding rebranding or reprinting Barbri's materials with Infilaw or the Defendant Schools' branding. When Barbri informed employees of ASLS that the bar exam course materials had already been printed for 2012 with the Barbri logo and branding, it was suggested that ASLS print stickers and manually attach them to the Barbri books to make them look as if ASLS and Infilaw had a role in developing the materials. In reality, the $2500 each student paid to ASLS for the myBAR course was entirely for the use of the same Barbri materials and lectures that were used for Barbri courses offered at the other law schools in Arizona.

117.    In addition to the anti-competitive and sham nature of the internal bar preparation course revenue, the entire amount of the internal bar preparation course fees paid to the Defendant Schools was really for "books and materials" provided by Barbri. As a result, the Defendant Schools were prohibited from counting this money as non-Title IV 90/10 revenue since this amount was not included or disclosed as tuition, fees, or other institutional charges. 34 C.F.R. § 668.28(a)(7)(v).

118.    Infilaw and the Defendant Schools' arrangements with Barbri contained unwritten agreements that prohibited Barbri from hosting informational sessions or setting up recruitment "tables" on campus, sending emails to students regarding Barbri's bar preparation programs, offering tuition assistance and discounts to students or otherwise competing with Infilaw in pricing or advertising to Infilaw students for bar preparation

courses. ASLS prevented any other bar review programs from marketing to students on campus.

119.    The Defendant Schools' were so committed to the scheme, that even when students who got wind of the scheme requested to not be a part of it, Scott Thompson tasked Relator Reid Potter to "reach out to the student and explain the situation and correct the inaccuracies."

120.    Scott Thompson further requested Relator Potter go "door-to-door" to students' households to perform the check exchange with students who had not done already exchanged checks.

121.    Scott Thompson demanded that Relator Potter setup a table in front of bar study classrooms and not allow individual students to attend who had not participated in the check exchange – until after they had successfully exchanged checks with the student.

122.    The urgency to collect the checks reached a fever pitch when Scott Thompson sent an email on March 5, 2013 stating that he was "very concerned about the status of our collections" on the internal bar review program, as "this is a very important piece of '10 money'."

123.    Thompson sent another email on March 16, 2013 again stating that collecting the money is "important to '10' money" and that the collections should be completed by end of March 2013.

124.    Thompson was alarmed that ASLS' initial projections for myBAR revenue was higher than what was occurring in practice and sent an email on May 10, 2013 stating "

Once we get the reconciliation solved, we can work on a process to optimize '10 money' as I believe we are missing opportunities."

125.    Thompson became increasingly concerned with collections efforts and sent an email on May 21, 2013 stating that he may work with Barbri to get students who were still directly enrolled in Barbri's courses into ASLS' myBAR program so that "we can get the '10' money."

126.    Infilaw, the Defendant Schools, and Barbri conspired to manipulate and falsify the Defendant Schools' 90/10 Rule data by entering into an illegal price fixing and anti-competitive arrangement that limited students' ability choose between multiple competing live bar preparation programs, as well as eliminating discounts and other incentives that would typically be offered to students by Barbri and other established programs.

## VIII.  SUBSTANTIAL MISREPRESENTATIONS REGARDING THE NATURE OF DEFENDANT SCHOOLS' EDUCATIONAL PROGRAMS, FINANCIAL CHARGES, AND EMPLOYABILITY OF GRADUATES.

127.    Title IV/HEA prohibits an institution from engaging in "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." 34 C.F.R. § 668.71(b). That prohibition extends to misrepresentations "in all forms, including those made in advertising, promotional materials, or in the marketing or sale of courses or programs of instruction offered by the institution." *Id*. Violation of this prohibition may subject an institution to loss of its eligibility and access to Title IV, HEA funds. As alleged herein, the Defendant Schools repeatedly violated this regulation by publishing materially false and misleading representations about bar passage,

academic, and career prospects, and pushing unsuspecting students into loans that could not be repaid.

### A. ALTERNATIVE ADMISSIONS MODEL FOR LEGAL EDUCATION (AAMPLE)

#### 1. ASLS PUBLISHED ADMISSION STATISTICS AND BAR PASSAGE RATES ON ITS WEBSITE AND OTHER MARKETING MATERIALS.

128. Before her employment and before enrolling at ASLS, Lorona reviewed statistics set forth in marketing materials physically placed throughout the admissions area of the ASLS facility. This marketing material included the annual "Viewbook" which contained favorable statements from previous students about the caliber of the students attending ASLS and the quality of the education they received from ASLS. The "Viewbook" was also available online on ASLS' website.

129. ASLS posted on its website and in its "Viewbook" enrollment statistics, including Law School Admission Test ("LSAT") scores and undergraduate GPAs, of its students. ASLS updated this information at least annually on its website and in the "Viewbook." ASLS also provided this information to the Law School Admission Council ("LSAC"), which similarly posted it on its website for review by students and potential students of ASLS. Lorona reviewed these statistics both online and in the paper copy marketing materials and "Viewbooks" available in the admissions area of ASLS facilities.

130. Lorona also reviewed additional information on ASLS' graduates provided by ASLS in its student application packet. From this information, Lorona was impressed to learn that only two out of 70 students that were actively seeking employment were unemployed. She also learned from the application packet that the median salary for ASLS graduates was $60,000, with a median student loan debt of $101,310.

131.    ASLS' law school application instructions that ASLS provided to Lorona online contained in its Section 10 explicit assurance that: "Phoenix School of Law's [ASLS's] admissions process is governed by the ABA Standards for Approval of Law Schools and Interpretations. In particular, Standard 501 provides that: (a) A law school's admission policies shall be consistent with the objectives of its educational program and the resources available for implementing those objectives. (b) A law school shall not admit applicants who do not appear capable of satisfactorily completing its educational program and being admitted to the bar."

132.    Relator Lorona read and relied upon these assurances in deciding to enroll at ASLS as a law student. ASLS repeated these assurances in its online application page through at least 2012.

133.    Lorona also read on ASLS' website prior to enrolling at ASLS as a student that ASLS' graduates had bar passage rates exceeding 80%.

134.    Based upon all the foregoing information, which ASLS provided to Lorona prior to her enrollment, Lorona decided that ASLS would be a good place for her to work and attend law school.

135.    Specifically, Lorona reasonably believed based upon this information that if she completed ASLS' law school program she had a very good chance of passing the bar examination and would easily be able to find employment at a law firm or even in the public sector making approximately $60,000 per year.

136.    In August 2009, Lorona applied for traditional enrollment at ASLS and was accepted as a traditional evening student.

137.    Throughout the time she was a law student of ASLS, ASLS continued to post on its website and in its "Viewbook" statistics including LSAT scores and grade point averages of ASLS students. ASLS updated the reported statistics at least annually. ASLS also continued to provide those statistics to LSAC, which with ASLS' knowledge and permission, continued to post them on LSAC's website for review by students and potential students of ASLS.

138.    LSAT scores and undergraduate GPAs are commonly accepted indicators of the likelihood of a student's success in law school and ability to pass the bar examination.

139.    Throughout the time Lorona was a student at ASLS she continued to read and rely upon the admission statistics, including LSAT scores and undergraduate GPAs of ASLS students as reported on ASLS' website and marketing materials, including the "Viewbook" and on LSAC's website.

140.    Lorona took comfort in the fact that the reported statistics regarding LSAT scores and undergraduate GPAs of ASLS students remained stable throughout this time, and compared favorably to comparable statistics regarding students enrolled at other law schools.

141.    For example, median LSAT scores and undergraduate GPAs for ASLS students as reported on ASLS website in the "Viewbook" as of Spring 2008 were 153 and 3.18 respectively.

       **2.    ADMISSION OF LARGE NUMBERS OF STUDENTS THROUGH THE AAMPLE PROGRAM MATERIALLY DECREASED THE MEDIAN AND AVERAGE LSAT SCORES AND UNDERGRADUATE GPAS OF ASLS' STUDENT BODY.**

142.    By 2005, ASLS was admitting students to its law school through a program known as Alternative Admissions Model for Legal Education ("AAMPLE").

143.     Admission and enrollment through AAMPLE does not require grade point average or LSAT scores within the range of traditional admissions. AAMPLE students are admitted through alternative means. As such, and unbeknownst to Lorona, LSAT and undergraduate GPA statistics were not included in the admissions statistics ASLS posted on its website, published in its marketing materials, including the "Viewbook" and provided to the LSAC for review by potential and existing ASLS students.

144.     In early 2011, Lorona expressed concern in meetings with Dean Mays, Thompson, the admissions staff, and financial aid staff that the school was deceptively marketing to incoming students, in violation of 34 C.F.R. § 668.6. Lorona also expressed concern that ASLS was also providing misleading data to investors and incoming students regarding potential career success and student financial obligations.

145.     ASLS advertises its AAMPLE program as offering "motivated and determined individuals with lower traditional indicators (i.e. LSAT and/or GPA) the opportunity to earn a seat into the competitive Juris Doctorate program at ASLS." Dean Mays claimed that students matriculating through AAMPLE are just as successful as traditional students, a claim that is belied by all available data. Students entering law school through AAMPLE may *appear* to be successful when the class is largely made up of AAMPLE students because law school grades are curved, resulting in some students being successful despite lack of ability.

146.     Indeed, Lorona told Dean Mays and others that the statements were not true and that the AAMPLE students are not as likely to pass classes, graduate, pass the bar exam, and obtain gainful employment. Lorona's concerns were based on ASLS cumulative data as

well as her own personal observations from the classroom, meeting with AAMPLE students, meeting with traditionally admitted students, downward trending bar passage rates, and discussions with the career placement department regarding AAMPLE student employment.

147.    In response to Lorona's statements, Dean Mays became upset and had the Registrar's Office create reports showing the grade point average of student admitted through alternative admissions programs versus traditional admissions. Such reports were intended to mislead prospective students and current students as to the caliber of students attending ASLS. Due to the grading curve and percentage of AAMPLE students in relation to traditionally admitted students, these reports gave the illusion that the AAMPLE students were performing at the same level as traditional students.

148.    When AAMPLE was created, Thompson stated that the program would go forward because he had been "instructed to put asses in seats." AAMPLE students were initially required to pay $3,500.00 to attend the AAMPLE program, but ASLS eventually reduced that amount to $300.00 to encourage more and more students to enroll and eventually matriculate into ASLS, regardless of their academic standing or prospects.

149.    Additionally, in the beginning, ASLS would offer admission to only the top few students emerging from the AAMPLE program. After realizing the program was a source of enrollment and revenue, ASLS began offering admission to **all** AAMPLE students, even though AAMPLE does not require GPAs or LSAT scores within traditional ranges.

150.    As evidence of Infilaw's commitment to bring any warm body it could find to fill seats, Infilaw developed at least one lead generation website to bring students in to the

Defendant Schools. Infilaw paid for the creation of this separate website, located at www.lawcareernow.com, as a means of recruiting students into the AAMPLE program.

151. The AAMPLE program is advertised on the site as "a 6 - 7 week online program offering two actual law school courses, Fourth Amendment and Negotiable Instruments, that allow prospective law school students to experience the structure and rigor of law school, gain a true understanding of what to expect in the classroom and how to succeed." The site further advertises "Success in the AAMPLE program, will provide you with acceptance at one of the participating law schools." The participating law schools are ASLS, FCSL, and CSL.

152. ASLS typically does not include AAMPLE students in their statistics and data that are publicly reported regarding career placement, bar passage, and financial obligations.

153. The percentage of AAMPLE applicants who were admitted to ASLS increased from 11% in 2005 to 80% in Spring 2011. The number and percentage of AAMPLE students included in ASLS' student body likewise increased substantially and materially during that time period.

154. However, ASLS did not disclose on its website or in marketing materials or the "Viewbook," or in the information it provided to LSAC for posting on its website that the reported admissions statistics, including LSAT scores and undergraduate GPAs, did not include the LSAT scores or undergraduate GPAs of AAMPLE students. As such, the statistics ASLS reported were materially false and misleading.

155. Lorona did not know that the reported LSAT scores and undergraduate grade point averages of ASLS students that she reviewed on ASLS website and marketing

materials, including the "Viewbook," excluded AAMPLE students. This omission was material, and rendered the reported statistics materially false and misleading.

156.    Defendants thus misrepresented their admission requirements and the caliber of students being admitted to ASLS.

157.    Reporting enrollment and success statistics based only on the non-AAMPLE portion of the student population is grossly misleading to incoming and existing students.

158.    The actual impact of the admission of ever-increasing numbers of AAMPLE students was not known to Lorona until ASLS' recent disclosure of abysmal and progressively lower bar examination passage rates, culminating in the July 2015 bar passage rate of 26.4% for first-time and repeat takers.

159.    Actual bar pass rates (combined first-time and repeat takers) of ASLS graduates during Lorona's tenure as a student of ASLS were as follows: February 2012 63.8%; July 2012 73.1%; February 2013 72.9%; July 2013 63.3%; February 2014 48.8%; July 2014 49.5%; and, February 2015 52.6%.

160.    Lorona took the February 2015 bar examination.

161.    The actual bar pass rate of ASLS graduates taking the July 2015 bar examination was 26.4%. The bar pass rate for Arizona State University Sandra Day O'Connor College of law and University of Arizona James E. Rogers College of Law graduates taking the July 2015 bar examination were 81.8% and 77%, respectively.

162.    However, prior to and continuing through the time that Lorona was a student of ASLS, ASLS continued to tout "Ultimate Bar Pass Rate[s]" exceeding 80%. For example, ASLS' "Viewbook" marketing brochure which was used to market to and attract students to

ASLS in at least the years 2013 and 2014 prominently touts an "Ultimate Bar Pass Rate" of 86% for ASLS graduates, and in fine-print purportedly bases this on "[g]raduates who passed the Arizona Bar Exam on the first or subsequent attempts."

163.    In an October 16, 2014 email to ASLS students, including Lorona, Dean Mays reported an "Ultimate pass rate" of 80.8%.

164.    Throughout her tenure as a law student of ASLS Lorona read and relied upon and continued to read and rely upon ASLS's representations of an "Ultimate Bar Pass Rate" exceeding 80%.

165.    Moreover, as the bar pass rate of ASLS graduates continued to decline, enrollment at ASLS appeared to increase substantially during Lorona's tenure. Thus, the "Ultimate" bar pass rates touted by ASLS were extremely misleading at best.

166.    The Bar Examination statistics and pass rates maintained by the Arizona Supreme Court indicate that the passage rate for individuals taking the Arizona Bar Examination for a second time or subsequent times is substantially lower than the passage rate for individuals taking the Arizona Bar Examination for the first-time.

167.    Throughout the time Lorona was a law student of ASLS, Lorona continued to rely on ASLS' representations regarding the success of its graduates in finding employment in in average salary of its graduates. This information could be found in ASLS' marketing materials and website.

168.    ASLS stated on its website from at least 2010 through 2013 that: PSL's [ASLS's] Bar Exam passage rates are high, and the school places 97% of its graduates into jobs within nine months of graduation.

169.    Lorona read and took continuing comfort in this representation, and it gave her assurance and confidence that she would be able to obtain employment with her ASLS degree.

### 3.    DEFENDANTS KNEW BUT FAILED TO DISCLOSE THAT THE PERCENTAGE OF ITS STUDENTS LIKELY TO PASS THE BAR EXAM WAS DECLINING RAPIDLY AND MATERIALLY

170.    Infilaw and ASLS studied bar passage rates for its students and developed a formula to predict bar exam failure. The failure predictor formula includes LSAT scores, undergraduate GPA, and law school GPA, among the factors. This data is used by Infilaw's statisticians to generate Excel spreadsheets that depict the failure chance of each student including using students' sex and race as quantitative factors to identify students at risk of failing the bar in the statistical "models" employed by the Defendant Schools.

171.    The test used by virtually every ABA-accredited law school is the LSAT. Prospective law students that take the LSAT are given a score that ranges from 120 to 180 and scores from each test administration are curved to account for test-to-test variation in difficulty. The median LSAT score is between a 151 and 152, meaning that 50% of students scored 152 and above while approximately 50% score 151 or below. An LSAT score of 140 corresponds to the 13.4 percentile, meaning that only 13.4% of test takers scored 140 or below. An LSAT score of 135 corresponds to approximately the bottom 5th percentile.

172.    The LSAC has also commissioned a study into correlation between bar passage rates, on the one hand, and LSAT scores, undergraduate GPA, and law school GPA, on the other hand. LSAC found that LSAT scores correlate to bar passage at a .30 correlation, and law school GPA held a .38 correlation.

173.    The Defendant Schools' median LSAT scores have fallen precipitously over the last 5 years. For example, the ASLS median LSAT score was 150 in 2010, but fell to 144 by Fall 2014. CSL's median LSAT score was 149 in 2010, but fell to 142 by Fall 2014. And FCSL's median LSAT score was 149 in 2010, but fell to 143 by Fall 2014. This means 25% of FCSL's starting class, 106 students, was in the bottom 13.7% of all LSAT takers. The median undergraduate GPA for FCSL's 2014 starting class was 2.93.

174.    In 2014, ASLS and FCSL had twenty-five percent (25%) of its entering class score a 140 or below on the LSAT. CSL had twenty-five percent (25%) of its entering class score 138 or below on the LSAT for the same year. The number of students in the 2014 starting classes for the Defendant Schools was two hundred sixty-two (262) at ASLS, four hundred twenty-four (424) at FCSL, and four hundred forty-six (446) at CSL. Based on their admission of students with lower LSAT scores, this means that the Defendant Schools enrolled more than two hundred eighty-three (283) students that did not score better than the bottom 13.7% of all LSAT takers. At least twenty-five percent (25%) of CSL's entering class were in the bottom ten percent (10%) of LSAT scores. Additionally, more than fifty percent (50%) of the one thousand one hundred thirty-two (1,132) students that Infilaw enrolled in 2014 had an undergraduate GPA of less than 2.94.

175.    Knowing that LSAT correlation is a strong indicator of bar passage success, the Defendant Schools should have and must have known that a large percentage of their newly admitted students were not likely to pass the bar.

176.    Both ASLS and Infilaw thus knew, but failed to disclose, that the percentage of its students who were likely to ever pass the bar examination was declining substantially

and rapidly throughout the time of Lorona's legal education at ASLS. This omission was material. For example, in an email dated December 23, 2014 from Ann Woodley, ASLS's Associate Dean for Bar Pass and Student Success to certain ASLS students and graduates stated that, "[t]he ASLS grads planning to take the bar exam in February have a predicted pass rate of 47%, compared to an expected state average of greater than 70%. This is based on our statistical analysis of how our students have performed on the last few bar exams (and is primarily focused on law school grade point averages and LSAT scores)." This number includes predicted bar passage rates for all students graduating in August 2014 and January 2015, including those who participated in AAMPLE.

177. Defendants also knew, but failed to disclose, that the substantial decline in likely bar pass rates was due to the admission of ever-increasing numbers of students through the AAMPLE program. This omission was likewise material.

178. To make matters worse, Infilaw attempts to keep all students enrolled in the Defendant Schools even after it becomes apparent that the students are unlikely to pass the bar or be able benefit from a legal education. For example, students that have less than a 2.5 law school GPA, or even students with less than a 2.0 GPA, are allowed to continue taking courses—even though the Defendant Schools own internal grading systems indicate the students are poor-performing and likely to fail the bar. This insures that Infilaw can continue collecting Title IV money for these students. At the same time, the Defendant Schools have implemented policies designed to undermine high performing students' attempts to transfer to better law schools.

179.   The ASLS bar examination preparation coach to whom Lorona was assigned told Lorona frankly that the School is concerned that it may lose accreditation and access to Title IV Federal Funding due to drastically low performance numbers.

180.   Rather than disclosing this substantial and material decline in their students' abilities to pass the bar exam and in expected bar passage rates, Defendants have attempted to manipulate reported bar pass rates.

### B.   BAR DEFERMENTS AND PAYMENTS TO POTENTIAL TEST TAKERS.

181.   Knowing they were facing a mounting problem, and in an attempt to compensate for the admission of students who do not meet ABA admission standards, the Defendant Schools began paying students not to take the bar exam upon graduation based on these calculated failure predictors. The misnomer selected for this scheme was the Unlock Potential ("UP") program. The UP program is an outright attempt to deceive the ABA accrediting board, DOE, incoming students, existing students, and graduating students by attempting to fallaciously increase bar passage percentages.

182.   Beginning in May 2014, ASLS along with its Infilaw sister schools Florida Coastal School of Law and Charlotte School of Law actually began to pay substantial and material numbers of their graduates to defer or forego taking the bar exam upon graduation based on these calculated failure predictors.

183.   This is an attempt to deceive the ABA accrediting board, and Department of Education, potential and existing students, and the general public by artificially increasing bar passage percentages.

184.    At least 39 otherwise first-time bar exam takers were paid by ASLS to defer the July 2014 bar exam.

185.    ASLS students who were predicted to fail the February 2015 bar exam according to Infilaw's failure predictor formula were offered $5,000 and other benefits such as bi-weekly payments, to defer taking the bar exam.

186.    ASLS and Infilaw representatives held meetings on January 16 and 17, 2015, to discuss first-time bar exam takers who were predicted to fail the February 2015 bar exam. Those students were offered $5,000.00 and other benefits, such as bi-weekly payments, to defer taking the bar exam. Moreover, ASLS students who were unable to afford bar preparation courses, but did not fall within Infilaw's failure predictor formula, were denied financial assistance to prepare for the February 2015 bar exam.

187.    Additionally, upon information and belief, ASLS counted students they paid under the UP program as full-time employees for purposes of reporting to the ABA and DOE. To create a paper trail, ASLS provided 1099s to the students in the UP program.

188.    Lorona has personally felt the brunt of Defendants' tactics. On or about February 11, 2015, Lorona received a phone call from a representative of ASLS or Infilaw stating she was on a list of students not likely to pass the February bar exam. Lorona's school assigned bar coach also told Lorona that ASLS is concerned that it may lose accreditation and access to Title IV/HEA funding due to drastically low performance numbers.

189.    ASLS, through its representative, then offered to pay Lorona $5,000 to defer the bar exam until July 2015 with an additional monthly stipend in an attempt to inflate the passage numbers. The ASLS representative informed Lorona that many students have

already taken advantage of the "incentives" meant to deceive regulatory agencies, previous, current, and potential students. Lorona declined to participate in the program or defer taking the bar examination. Other students sitting for subsequent bar exams were offered an increased amount of $10,000 in personal phone calls made by Dean Mays. Mays told media outlets that she was not asking people to not take the exam, but merely advising them they could enroll in the UP program.

190.    The effect of Defendants' actions was to prevent students who Defendants predicted would fail the bar exam from taking the bar exam and thereby manipulating, misrepresenting, and gaming the bar exam passage rates in order to retain accreditation and receive other benefits, such as retaining Title IV/HEA eligibility.

191.    These actions are directly contradictory to Defendants' public marketing strategies, which are intended to induce students to enroll at Defendant Schools and apply for and receive institutional and federally-backed student loans in order to pay tuition.

192.    ASLS and Infilaw misrepresented the career prospects and preparation available to its students. A large percentage of students admitted to Defendant Schools with low LSAT scores and low undergraduate GPAs either fail to graduate or fail the bar exam. Even fewer become licensed attorneys with jobs that require a law license. Infilaw knows these students are more likely than not to fail at completing their legal education and passing a bar exam. Yet, instead of not admitting these students, which would decrease Infilaw's revenue, the Defendant Schools, at the direction of Infilaw, have instead opted to continue admitting unqualified students and engage in a widespread campaign to manipulate and conceal the negative data that would otherwise be generated by these unqualified students.

Without this manipulation, the Defendant Schools would not be able to maintain ABA accreditation and Title IV eligibility.

193.    ASLS also misleads students by enrolling and then giving "credit" to those ineligible for federal financial aid, purportedly to "giv[e] students time to fix their credit to receive loans," despite knowing that the DOE does not lend to students with credit blemishes for specified time periods.

## C. DEFENDANTS MISLEAD PROSPECTIVE STUDENTS REGARDING FINANCIAL OBLIGATIONS

194.    Defendants misrepresented what incoming students should expect to pay for their education. For example, ASLS's website represented that tuition and fees for the J.D. program during the 2010-11 academic year was $101,310.00, with books and supplies an additional $2,184.00. ASLS also represented that the median cumulative program debt for graduates between July 1, 2009 and June 30, 2010 was $93,142.51 for federal student loan debt and $5,000.00 for private student loan debt.

195.    However, ASLS' most recent Gainful Employment Disclosure lists the median loan debt as **$187,792** for Federal loans *alone*. Additionally, FCSL's median loan debt is $174,844 and CSL's is $159,208. The amounts do not include private or undergraduate student loans.

196.    To add insult to injury, overall, only thirty-five percent (35%) of Infilaw's 2013 graduates found permanent full-time jobs that required a law license.

197.    Despite notice provided by Lorona, ASLS continued its marketing by creating deceptive documents and statistics designed to increase non-traditional enrollment and publicly stating the same.

## IX.  CIRCUMVENTING ABA ACCREDITATION REQUIREMENTS

198.  Title IV/HEA requires that an institution meet the requirements established by accrediting agencies or association. 34 C.F.R. § 668.14(b)(23). Under 34 C.F.R. § 602.1 *et seq.*, the Council and the Accreditation Committee of the ABA Section of Legal Education and Admissions to the Bar is the accrediting agency for law schools in the United States. Failure to meet these requirements may subject an institution to loss of eligibility to receive Title IV, HEA program funds.

199.  Under ABA Standard 501(b), "A law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

200.  Nevertheless, Defendant Schools continue to admit applicants who do not appear capable of completing their legal education and being admitted to the bar, as evidence by median LSAT and GPA of matriculating students, the growing proportion of AAMPLE students, and the poor bar passage rates of the Defendant Schools.

201.  Without a satisfactory bar passage rate, the ABA can and will remove accreditation from a law school. The Defendant Schools know this and have continued to game these statistics as discussed herein.

202.  ASLS created reports showing the grade point average of students admitted through alternative admissions programs versus traditional admissions. Such reports were intended to mislead prospective students in violation of ABA Standards. Upon information and belief, similar reports were generated by the other Defendant Schools.

203.    Defendants have deceived the ABA and circumvented its accreditation requirements, thereby failing to comply with Title IV/HEA regulations requiring compliance with accrediting agency requirements.

204.    ABA accreditation documents were prepared by the General Counsel of ASLS. Due to her initial position as executive assistant to the General Counsel, Lorona witnessed the accreditation process, giving her unparalleled access to the preparation and submission of such documents. In that manner, she possesses inherent indicia of reliability that such accreditation documents, with errors and misrepresentations, were submitted to the ABA, in violation of federal regulations.

205.    Upon information and belief, similar accreditation documents were prepared by the other Defendant Schools, as overseen by Infilaw, under similarly misrepresentative schemes.

## X.    CLAIMS FOR RELIEF

### Count I
### Violations of the False Claims Act – 31 U.S.C. § 3729(a)(1)(A)
### Presenting or Causing to Be Presented False Claims
### (*Against ASLS, CSL, and FCSL*)

206.    Relators re-allege and incorporate the allegations contained in paragraphs 22 through 205 as though fully set forth herein.

207.    The False Claims Act prohibits any person from knowingly presenting, or causing to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

208.    ASLS, CSL, and FCSL knowingly presented or caused to be presented, and continues to present or cause to be presented, false or fraudulent claims for payment or

approval, directly or indirectly, to officers, employees, or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

209.    For example, and without limitation, ASLS, CSL, and FCSL presented to DOE executed PPAs, which falsely certified compliance with all mandatory regulations under Title IV. Absent such false certification, DOE would not have distributed Title IV/HEA funds to the Defendant Schools.

210.    These PPAs were falsely certified because, among other reasons and without limitation, ASLS, CSL, and FCSL sought funding for students who would not normally be admitted to any law school under ABA accreditation policies; ASLS, CSL, and FCSL failed to comply with ABA accreditation policies; Defendant Schools failed to comply with and fraudulently circumvented the 90/10 Rule.

211.    Accordingly, during such periods that falsely certified PPAs were submitted to the federal government, all claims for federal Title IV/HEA funds were false or fraudulent.

212.    ASLS, CSL, and FCSL also made false statements or misrepresentations to the ABA, as the accrediting agency for law schools in the United States. The statements made were essential to the ASLS, CSL, and FCSL maintaining and receiving their accreditation, including statements as to the actual and potential bar passages rates, the caliber of students admitted, and the financial obligations of those students.

213.    Accordingly, during such periods as ASLS, CSL, and FCSL made false statements or misrepresentations to the ABA, all claims for federal Title IV/HEA funds were false or fraudulent.

214.    Lorona possesses a unique and unparalleled position to acquire knowledge regarding the actions of ASLS, CSL, and FCSL and the submission of false claims. Lorona has direct and independent knowledge of the allegations in this Third Amended Complaint. Due to her positions within the General Counsel's office and the office of financial aid, she witnessed and was aware of the submission of false claims and the receipt of improperly solicited federal funds, which were then distributed to students, who then used those funds to pay the exorbitant tuition required by ASLS, FCSL, and CSL. Lorona therefore possesses unique indicia of reliability as to the submission of false claims.

215.    For those false or fraudulent claims submitted by ASLS, FCSL, and CSL, it was foreseeable and in fact the intended result that those claims would be submitted to the federal Government. In that vein, ASLS, FCSL, and CSL acted with the requisite scienter to violate the False Claims Act.

216.    The amounts of the false or fraudulent claims made to the United States were material. The United States, unaware of the falsity of the claims and statements made by ASLS, FCSL, and CSL and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

217.    As a result of ASLS', FCSL's, and CSL's violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

## Count II
### Violations of the False Claims Act – 31 U.S.C. § 3729(a)(1)(B)
### Creation or Use of False Statements or Records Material to a False Claim
### (*Against ASLS, CSL, and FCSL*)

218.     Relators re-allege and incorporate the allegations contained in paragraphs 22 through 205 as though fully set forth herein.

219.     The False Claims Act prohibits any person from knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

220.     ASLS, CSL, and FCSL knowingly made, used, or caused to be made or used, false records and statements material to the false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(A).

221.     For example, and without limitation, ASLS, CSL, and FCSL presented to the DOE executed PPAs, which falsely certified compliance with all mandatory regulations under Title IV. These PPAs contained false records and statements. Among the false statements and records submitted, but without limitation, were statements to the ABA material to accreditation; statements regarding revenue received, in relation to the 90/10 Rule; statements as to bar passage and career success rates; and statements as to financial obligations of students. Absent such false certification, the DOE would not have distributed Title IV/HEA funds to the ASLS, CSL, and FCSL.

222.     By making the false records and statements and engaging in fraudulent practices, ASLS, CSL, and FCSL violated the ABA accreditation guidelines, in violation of 34 C.F.R. § 668.1 *et seq.* Material violations of the guidelines led to the submission of claims for Title IV/HEA funds, which were false, as ASLS, CSL, and FCSL were ineligible for

reimbursement, yet received it only due to false records and statements made, which were material to the false claims made.

223.    For those records and/or statements made or used or caused to be made or used, it was foreseeable and in fact the intended result that those statements and/or records would result in the payment of false claims.

224.    ASLS, CSL, and FCSL acted with the requisite scienter to cause violations of the False Claims Act in the following ways: ASLS, CSL, and FCSL knowingly presented to the DOE executed PPAs, which falsely certified compliance with all mandatory regulations under Title IV; they made false statements and submitted false records to the ABA material to accreditation; they provided false statements regarding revenue received, to circumvent the 90/10 Rule; they provided false statements as to bar passage and career success rates; and they provided false statements as to the financial obligations of students.

225.    Accordingly, during such periods that falsely certified PPAs were submitted to the federal government by ASLS, CSL, and FCSL, all claims for federal Title IV/HEA funds were false or fraudulent.

226.    Lorona and Potter possessed a unique and unparalleled position to acquire knowledge regarding the actions of ASLS, CSL, and FCSL, the making and use of false records and statements, and the submission of false claims. Lorona and Potter together have direct and independent knowledge of the allegations in this Third Amended Complaint. Due to their positions within the General Counsel's office, academic success office, bar preparation programs, and the office of financial aid, they witnessed and were aware of

Defendants' making and use of false records or statements to cause false claims to be submitted to, and approved by, the federal Government.

227.    The amounts of the false or fraudulent claims made to the United States as a result of false records or statements were material. The United States, unaware of the falsity of the claims and statements made by ASLS, CSL, and FCSL and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

228.    As a result of ASLS', CSL's, and FCSL's violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

### Count III
### Violations of the Federal False Claims Act – 31 U.S.C. § 3729(a)(1)(C)
### Conspiracy
### (*Against* Infilaw, Barbri ASLS, CSL, and FCSL)

229.    Relators re-allege and incorporates the allegations contained in paragraphs 22 through 205 as though fully set forth herein.

230.    The False Claims Act provides that any person who conspires to commit a violation of sections 3729(a)(1)(A) and 3729(a)(1)(B) is liable to the United States Government for a penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains. 31 U.S.C. § 3729(a)(1)(C).

231.    Infilaw, Barbri ASLS, CSL, and FCSL conspired among themselves and with others to defraud the United States by submitting false and fraudulent claims and making,

using, or causing to be made or used, false records or statements material to fraudulent claims.

232.    Infilaw, Barbri ASLS, CSL, and FCSL took actions in furtherance of their conspiracies, including but not limited to the payment of substantial sums of monies and weekly meetings to encourage the submission of false claims and the creation of false records and statements material to the submission of false claims. Indeed, Infilaw, Barbri ASLS, CSL, and FCSL conspired to defraud the DOE by accepting students who otherwise could not attend law school; by submitting falsified revenue data to feign compliance with the 90/10 Rule; and by fabricating bar passage and career prospect statistics. This is without limitation, and Infilaw, Barbri ASLS, CSL, and FCSL committed other overt acts in furtherance of the conspiracy, all of which were in violation of the False Claims Act and which caused damage to the United States.

233.    Specifically, Infilaw and the ASLS, CSL, and FCSL entered into agreements with Barbri to manipulate and misstate the Defendant Schools' 90/10 Revenue and bar passage rates. Barbri entered into these agreements knowing that the purpose and effect of the agreements would violate 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

234.    Infilaw, Barbri ASLS, CSL, and FCSL knowingly, recklessly, or with deliberate indifference agreed to perpetuate a fraudulent scheme to obtain and retain ineligible Title IV funding in violation of 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

235.    Lorona and Potter possess a unique and unparalleled position to acquire knowledge regarding the actions of Infilaw, Barbri ASLS, CSL, and FCSL, the making and use of false records and statements, the submission of false claims, and the conspiracy in furtherance thereof. Lorona and Potter together have direct and independent knowledge of the allegations in this Third Amended Complaint. Due to Lorona's and Potter's positions within the General Counsel's office, academic success office, bar preparation programs, and the office of financial aid, they witnessed and were aware of Infilaw's, Barbri's ASLS', CSL's, and FCSL's overt acts in furtherance of the conspiracy.

236.    The amounts of the false or fraudulent claims made to the United States as a result of false records or statements were material. The United States, unaware of the falsity of the claims and statements made by Infilaw's, Barbri's ASLS', CSL's, and FCSL's and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

237.    Defendants Infilaw, Barbri, ASLS, CSL, and FCSL are jointly and severally liable for every violation of the False Claims Act identified herein because these violations were committed in furtherance of a scheme to violate the False Claims Act, which was undertaken with the mutual agreement of each Defendant and knowledge of, or reckless indifference toward, the scheme's illegality.

238.    As a result of Infilaw's, Barbri's ASLS', CSL's, and FCSL's violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be

determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Infilaw, Barbri, ASLS, CSL, and FCSL.

<strong>Count IV</strong>
<strong>Violations of the Federal False Claims Act – 31 U.S.C. § 3729(a)(1)(B)</strong><br><strong>False Certification of Compliance with Title IV/HEA Guidelines via PPAs</strong><br>(<em><strong>Against ASLS, CSL, and FCSL</strong></em>)

239.    Relators re-alleges and incorporates the allegations contained in paragraphs 22 through 205 as through fully set forth herein.

240.    The False Claims Act prohibits any person from knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

241.    The PPA is a prerequisite for an institution to request and receive Title IV/HEA funding. ASLS, CSL, and FCSL knowingly made, used, or caused to be made or used, false records and statements material to false or fraudulent claims by falsely certifying compliance with the applicable regulations, statutes, and accreditation guidelines.

242.    ASLS, CSL, and FCSL knew such certification to be false, and knew that such certifications would induce the federal Government to pay Title IV/HEA funds to the Defendants Schools when they were not entitled to make such claims.

243.    Lorona possesses a unique and unparalleled position to acquire knowledge regarding the actions of Defendants, the making and use of false records and statements, the submission of false claims, and false certification of the PPAs. Lorona has direct and independent knowledge of the allegations in this Third Amended Complaint. Due to her positions within the General Counsel's office and the office of financial aid, she witnessed and was aware of ASLS, CSL, and FCSL falsely certifying PPAs and making or using false

56

records or statements to cause false claims to be submitted to, and approved by, the federal Government.

244. The amounts of the false or fraudulent claims made to the United States as a result of false records or statements were material. The United States, unaware of the falsity of the claims and statements made by ASLS, CSL, and FCSL and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

245. As a result of ASLS', CSL's, and FCSL's violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by ASLS, CSL, and FCSL.

**Count V**
**Violations of the Federal False Claims Act – 31 U.S.C. § 3729(a)(1)(G)**
**Retention of Overpayments**
***(Against Infilaw, ASLS, FCSL, and CSL)***

246. Relators re-alleges and incorporates the allegations contained in paragraph 22 through 205 as though fully set forth herein.

247. Infilaw, ASLS, FCSL, and CSL have knowingly concealed and/or knowingly and improperly avoided an obligation to transmit money to the federal government. Specifically, Infilaw, ASLS, FCSL, and CSL knew or should have known that they received millions of dollars in payments for claims they were not entitled to. The False Claims Act prohibits any person from knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

248. Once known, even if the improper payments were not fixed or clearly defined,

Infilaw, ASLS, FCSL, and CSL had an obligation to remit or report such funds to the government within sixty (60) days. Infilaw, ASLS, FCSL, and CSL have not reported or returned the improper payments described herein.

249.    By knowingly concealing and/or knowingly and improperly avoiding its obligation to transmit money recovered to the federal government, Infilaw, ASLS, FCSL, and CSL have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), to the damage of the treasury of the United States of America, by causing the United States to be deprived of funds that rightfully belong to the government.

250.    As a direct and proximate result of Infilaw's, ASLS', FCSL's, and CSL's fraudulent and/or illegal actions and fraudulent conduct, the United States has been deprived of funds to which it is lawfully entitled and which were improperly paid to Infilaw, ASLS, FCSL, and CSL.

251.    As a result of Infilaw's, ASLS', FCSL's, and CSL's violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Infilaw, ASLS, FCSL, and CSL.

**XI.    JURY DEMAND**

252.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs/Relators Paula C. Lorona, Reid Potter, and the United States of America hereby demand a trial by jury.

## XII. PRAYER FOR RELIEF

WHEREFORE Plaintiffs/Relators Paula C. Lorona, Reid Potter, and the United States of America pray for judgment in their favor, and:

a.　　　That Defendants cease and desist from violating 31 U.S.C. §3729 *et seq.*;

b.　　　That this Court enter judgment in Plaintiff/Relator's favor and against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.　　　That Plaintiffs be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.　　　That Plaintiffs be awarded all costs of this action, including attorneys' fees and expenses; and

e.　　　That Plaintiffs recover such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED **this 18th day of May 2018**.

*/s/ Sean A. Woods*　　　　　
Sean A. Woods*
Arizona Bar No. 028930
docket@millsandwoods.com
Robert T. Mills*
Arizona Bar No. 018853
docket@millsandwoods.com
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone (480) 999-4556
Facsimile (480) 999-4750
*Admitted Pro Hac Vice / Attorneys for Relator
Paula C. Lorona and Reid Potter*

-and-

Jesse L. Hoyer
jlhoyer@jameshoyer.com
FL Bar No.: 076934
JAMES HOYER, P.A.
2801 West Busch Boulevard
Suite 200
Tampa, Florida 33618
Tel.: (813) 375-3700
Fax: (813) 375-3710
*Attorneys for Relator Paula C. Lorona and Reid Potter*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2018, a copy of the foregoing was e-filed with the Clerk, U.S. District Court.

*/s/ Jesse L. Hoyer*
Jesse L. Hoyer

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA ex rel.
PAULA C. LORONA and REID POTTER,

        Plaintiffs-Relators,

                                 Case No. 3:15-cv-959-J-34PDB

vs.

INFILAW CORPORATION, et al.,

        Defendants.

_____/

**O R D E R**

**THIS CAUSE** is before the Court on two motions. On September 21, 2018,
Defendant Barbri, Inc. filed a motion to dismiss Count III of the Third Amended Complaint
(Doc. 36) pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure (Rule(s)). See
Defendant Barbri, Inc.'s Dispositive Motion to Dismiss and Memorandum in Support (Doc.
44; Barbri Motion). In addition, on October 22, 2018, Defendants Infilaw Corporation,
Arizona Summit Law School, LLC (ASLS), Florida Coastal School of Law (FCSL), and
Charlotte School of Law (CSL) (collectively, Infilaw Defendants) filed a motion to dismiss
this action in its entirety pursuant to Rules 12(b)(1) and 12(b)(6). See Defendants Infilaw
Corporation, Arizona Summit Law School, LLC, Florida Coastal School of Law, and
Charlotte School of Law, LLC's Omnibus Motion to Dismiss Third Amended Complaint and
Supporting Memorandum of Law (Doc. 56; Infilaw Motion). Plaintiffs/Relators Paula C.
Lorona and Reid Potter (Relators) filed a response to the Barbri Motion on October 12,
2018, and to the Infilaw Motion on December 17, 2018. See Plaintiffs' Response to
Defendant Barbri, Inc.'s Dispositive Motion to Dismiss (Doc. 54; Response to Barbri);

Relators' Response to Defendants Infilaw Corporation, Arizona Summit Law School, LLC, Florida Coastal School of Law, and Charlotte School of Law, LLC's Omnibus Motion to Dismiss (Doc. 65; Response to Infilaw).  In addition, with leave of Court, the Infilaw Defendants filed a reply in support of their Motion on January 17, 2019.  <u>See</u> Reply in Support of Defendants Infilaw Corporation, Arizona Summit Law School, LLC, Florida Coastal School of Law, and Charlotte School of Law, LLC's Motion to Dismiss the Third Amended Complaint (Doc. 71; Reply).  Accordingly, this matter is ripe for review.

## I.    Procedural History

Plaintiff/Relator Paula C. Lorona initiated this action on August 5, 2015, by filing, under seal, a four-count complaint pursuant to the False Claims Act, 31 U.S.C. § 3729 <u>et seq</u>.  <u>See</u> Complaint of Qui Tam Plaintiff Paula C. Lorona Filed Under Seal Pursuant to 31 U.S.C. §§ 3729 <u>et seq.</u> (Doc. 1; Original Complaint).  On August 6, 2015, the Court entered an Order (Doc. 5) striking the Original Complaint as an impermissible shotgun pleading, observing that "each subsequent count of the four counts in the Complaint incorporates by reference all of the allegations of the preceding counts."  <u>See</u> August 6, 2015 Order at 1-2.  In accordance with the Court's Order, Lorona filed an amended complaint on August 31, 2015.  <u>See</u> First Amended Complaint of Qui Tam Plaintiff Paula C. Lorona (Doc. 8; Amended Complaint).  Thereafter, on March 10, 2016, with leave of Court, Lorona filed a second amended complaint, joining the additional Plaintiff/Relator Reid Potter, and adding a fifth count.  <u>See</u> Second Amended Complaint of Qui Tam Plaintiffs Paula C. Lorona and Reid Potter (Doc. 14; Second Amended Complaint); <u>see</u> <u>also</u> Order (Doc. 13) (granting leave to amend).

2

Following multiple extensions of time, on February 16, 2018, the United States filed a notice of its decision not to intervene in this action. See United States' Notice of Election to Decline Intervention (Doc. 30). Accordingly, on April 24, 2018, the Magistrate Judge entered an In Camera Order directing the Clerk of the Court to unseal the pleadings in this matter. See In Camera Order (Doc 33.). Upon review of the Second Amended Complaint, the Court found that Relators had once again employed a shotgun manner of pleading. See Order (Doc. 35) at 1-2, filed April 26, 2018 ("Given the lack of any specification, Plaintiffs appear to be invoking all factual allegations as well as all allegations of each of the proceeding counts and leaving it to the Court to sift out irrelevancies and decide for itself which facts are relevant to the particular causes of action asserted."). As such, the Court struck the Second Amended Complaint and directed Relators to file a third amended complaint. See id. at 3. The Court cautioned Relators to "carefully review the Eleventh Circuit authority on this issue and ensure that the third amended complaint is fully compliant with the letter and spirit of the shotgun pleading rule." See id. at 3 n.1. On May 18, 2018, Relators filed the Third Amended Complaint of Qui Tam Plaintiffs Paula C. Lorona and Reid Potter (Doc. 36; Third Amended Complaint),[1] the operative pleading in this action.

## II. Factual Background[2]

### A. Overview of Claims

Defendants ASLS, CSL, and FCSL (the Law Schools) are private, for-profit law schools, controlled by their parent company, Defendant Infilaw. See TAC ¶¶ 4-10.

---

[1] For brevity, in citations the Court will refer to the Third Amended Complaint as "TAC."

[2] In considering the Motions to Dismiss, the Court must accept all factual allegations in the Third Amended Complaint as true, consider the allegations in the light most favorable to Relators, and accept all reasonable inferences that can be drawn from such allegations. Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Jackson v. Okaloosa Cnty., Fla., 21 F.3d 1531, 1534 (11th Cir. 1994). As such, the facts recited here are drawn from the Third Amended Complaint and may well differ from those that ultimately can be proved.

Relators allege that the Infilaw Defendants violated the False Claims Act (FCA) in connection with their receipt of federal funds from the student financial assistance programs authorized by Title IV of the Higher Education Act of 1965 (HEA).  To be eligible to receive Title IV funds, institutions such as ASLS, CSL, and FCSL must enter a program participation agreement (PPA) with the Secretary of the Department of Education (DOE) which conditions "the initial and continued participation" of the institution on its compliance with certain requirements.  See 34 C.F.R. § 668.14(a)(1).  By entering a PPA, an institution agrees in pertinent part that:

> It will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program.

34 C.F.R. § 668.14(b)(1).  Relators allege that the Law Schools executed PPAs and submitted them to the federal government "despite full knowledge" that the regulations and requirements were "regularly being violated . . . ."  TAC ¶¶ 32-34.  Specifically, Relators allege that the Law Schools were violating the following three DOE regulations: (1) the "90/10 Rule" set forth in § 668.14(b)(16),[3] (2) the prohibition on "substantial misrepresentations" set forth in § 668.71(b),[4] and (3) the accreditation requirement set forth

---

[3] "By entering into a program participation agreement, an institution agrees that— . . . (16) For a proprietary institution, the institution will derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV, HEA program funds . . . ."  See 34 C.F.R. § 668.14(b)(16).

[4] Pursuant to § 668.71, the Secretary is authorized to initiate a suspension or termination proceeding against an institution where the institution or its representatives make "a substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates."  See 34 C.F.R. § 668.71(a)-(b).  The regulation prohibits misrepresentations "in all forms, including those made in

in § 668.14(b)(23).[5]  In light of these violations, Relators maintain that the submission of the falsely certified PPAs "caused the federal government to distribute Title IV/HEA funds" to the Law Schools, "in violation of the False Claims Act."  Id. ¶¶ 33-34.  Relators also allege that the Law Schools made false statements to the American Bar Association (ABA) essential to the Law Schools' accreditation, which caused the government to pay Title IV funds to the Law Schools for which the Law Schools were ineligible.  See id. ¶¶ 203-05, 212-13, 222, 224.

In the Third Amended Complaint, Relators set forth five separate claims under the False Claims Act.  In Counts I, II and IV, Relators assert that the Law Schools knowingly presented false claims for payment to the federal government in violation of § 3729(a)(1)(A), and knowingly made or used false records or statements material to the false claims in violation of § 3729(a)(1)(B).  See TAC ¶¶ 206-28, 239-45.  In Count III, Relators allege that the Law Schools and Infilaw, conspired with Defendant Barbri, a corporation which provides "preparation courses and materials for individuals taking state bar exams," to violate the FCA.  See TAC ¶¶ 12, 229-38.  Last, in Count V, Relators allege that the Law Schools and Infilaw knowingly avoided their obligation to transmit money to the federal government, in violation of 31 U.S.C. § 3729(a)(1)(G), by failing to return to the federal government the "millions of dollars in payments for claims they were not entitled to."  See TAC ¶¶ 247-49.

---

any advertising, promotional materials, or in the marketing or sale of courses or programs of instruction offered by the institution."  Id. § 668.71(b).

[5] "By entering into a program participation agreement, an institution agrees that— . . . (23) It will meet the requirements established pursuant to part H of Title IV of the HEA by the Secretary and nationally recognized accrediting agencies."  See 34 C.F.R. § 668.14(b)(23).

## B. The Relators

Lorona enrolled at ASLS as an evening student in August 2009.  Id. ¶ 136.  Lorona also "decided to work at ASLS because it would help her attend law school."  Id. ¶ 25.  ASLS hired Lorona in November of 2009 as "an administrative assistant to the General Counsel of ASLS."  See TAC ¶ 22.  In 2010, she was promoted to "financial aid representative," and in 2011, she received promotions to "assistant director of financial aid," and "student accounts/accounting manager."  Id.  As an employee, "Lorona was given a full tuition waiver and a pro rata early tuition waiver to attend ASLS."  Id. ¶ 25.  "Lorona's responsibilities as an employee of ASLS included submission of requests for federal funds, through the Common Origination and Disbursement System (COD), used by the DOE to create, deliver, and report Federal Pell Grants, TEACH Grants, and Federal Direct Loans."  Id. ¶ 23.  Following Lorona's submission of a COD request, the DOE would disburse the Title IV funds to ASLS, and Lorona would facilitate the distribution of the funds to the students.  Id. ¶ 24.  According to Relators, Lorona also "observed and participated in ASLS'[s] application for accreditation from the American Bar Association and the financial inner-workings of ASLS and Infilaw, including student loan disbursement, the application for and receipt of Title IV funds, and the certification of compliance with all DOE and Title IV regulations and requirements."  Id. ¶ 23.  Lorona alleges that ASLS President Scott Thompson executed the PPAs, "but they were prepared by other employees within the President's Office and financial aid department," such that she had "unparalleled access to the documents and the process under which they were certified."  Id. ¶ 32.[6]  However,

---

[6] While Relator Lorona alleges that she has personal knowledge of the PPAs executed and submitted by ASLS, her contention that CSL and FCSL "prepared, executed and submitted similar PPAs, in conjunction with Infilaw," is based only on "information and belief."  See TAC ¶ 34.

Lorona does not describe this process or describe her role, if any, in the preparation of the PPAs.

Potter attended law school at ASLS as well. Id. ¶ 26. Following his graduation, ASLS hired Potter in 2011, where he worked in the Academic Services department until September of 2014. Id. Potter's job at ASLS involved "guiding students through their bar exam preparation," as well as collecting bar exam preparation fees. Id. ¶¶ 27, 29. Potter also attended "meetings with ASLS and Infilaw officials regarding academic success programs," including ASLS's bar exam preparation programs, and the "use of those programs to secure and maintain federal funds . . . ." Id. ¶ 28. Potter was also involved in "discussions with representatives of Infilaw, ASLS and Barbri" regarding the check exchange program described below, and its alleged purpose as a means "to disguise funds ASLS received from federal student loan programs so that ASLS could continue to receive such funds." Id. ¶ 29.

### C. The 90/10 Rule

An institution's participation in most Title IV student financial assistance programs[7] is conditioned on its entry into a PPA with the Secretary of the DOE. By entering a PPA, an institution agrees to comply with numerous statutory and regulatory rules and requirements. See 34 C.F.R. § 668.14(b). One such regulation is known as the "90/10 Rule" which demands as follows: "For a proprietary institution,[8] the institution will derive

---

[7] For a list of Title IV, HEA programs, see 34 C.F.R. 668.1(c)(1)-(12). Participation in the Leveraging Educational Assistance Partnership (LEAP) program and National Early Intervention Scholarship and Partnership (NEISP) programs is not conditioned on the PPA requirement. See 34 C.F.R. § 668.14(a)(1).

[8] The term proprietary institution is defined at 34 C.F.R. § 600.5. Generally, the term refers to for-profit institutions of higher education which meet certain requirements. See § 600.5(a)(1). The parties do not dispute that the Law Schools are proprietary institutions subject to the 90/10 Rule.

at least 10 percent of its revenue for each fiscal year from sources other than Title IV, HEA program funds, as provided in § 668.28(a) and (b), or be subject to sanctions described in § 668.28(c)." See 34 C.F.R. § 668.14(b)(16). Pursuant to § 668.28(c), "[i]f an institution does not derive at least 10 percent of its revenue from sources other than Title IV, HEA program funds—(1) For two consecutive fiscal years, it loses its eligibility to participate in the Title IV, HEA programs for at least two fiscal years."

According to Relators, "[i]n or about early 2010, Defendants became concerned that they would not satisfy the 90/10 Rule because a large proportion of the students attending ASLS, FCSL, and CSL were receiving substantial Title IV/HEA funding through loans." See TAC ¶ 39. Relators allege that in 2009-2010, both ASLS and FCSL reported that over 82% of their revenue came from Title IV/HEA funding. Id. ¶ 40. Public data shows that in the 2012-2013 funding year, all three Law Schools reported over 86% of their revenue from Title IV/HEA sources. Id. ¶ 41. And, for the 2013-2014 funding year, both ASLS and CSL reported revenue from Title IV/HEA sources in excess of 87%, while FCSL's reported Title IV/HEA revenue had declined to just under 85%. Id. ¶ 42. Relators allege that, to address this "90/10 Problem," the Law Schools manipulated their revenue streams in the following three ways: 1) offering institutional loans, 2) creating internal bar preparation programs, and 3) engaging in a "check exchange" with Barbri.

### 1. Institutional Loans

Lorona asserts that she participated in weekly meetings from 2010 through 2013, where representatives and employees of the Law Schools and Infilaw discussed "how to create the appearance that Defendants were complying with the 90/10 Rule." See TAC ¶ 44. In 2011, Scott Thompson, the ASLS President and former Chief Financial Officer of

Infilaw, proposed "the concept of offering Institutional Loans ('ILs') to students as a solution to the 90/10 Rule." Id. ¶ 45. According to Lorona, "Thompson stated that from Infilaw's perspective the sole reason to offer ILs was to give the appearance that the Defendant [Law] Schools were in compliance with the 90/10 Rule." Id.

Relators allege that Infilaw and the Law Schools began offering institutional loans for the fall 2011-spring 2012 financial aid year. Id. ¶ 48. Although the Law Schools, under Infilaw's direction, initially solicited only students with top credit scores to sign up for institutional loans, once those efforts were exhausted, the Law Schools began offering institutional loans "to almost any student without regard to creditworthiness or ability to repay, including students with bankruptcies and foreclosures." Id. ¶¶ 48-50. By virtue of her position at ASLS, Lorona asserts that she has knowledge of the mechanics of the institutional loan program as she was "instructed to complete the financial transactions necessary to fund" institutional loans. Id. ¶ 57. As set forth in the Third Amended Complaint,

> Once a student was convinced to sign up for an [institutional loan], the Defendant [Law] Schools would 'refund' the Title IV/HEA funds previously received from DOE and replace those loan funds with [institutional loan] funds from the institution, most of which was previously received Title IV/HEA funds from other students' financial aid submissions. This allowed the Defendant [Law] Schools to transfer funds from the 90% side to the 10% side in a dollar-for-dollar manner, making it appear they were complying with the 90/10 Rule.

Id. ¶ 57. Nonetheless, Relators do not allege any particular examples of students who received such loans, the repayment terms of the loans, or the number of such loans each Law School issued.

Significantly, DOE regulations permit institutions to count revenue generated from institutional aid as non-Title IV revenue subject to certain requirements:

(i)     For loans made to students and credited in full to the students' accounts at the institution on or after July 1, 2008 and prior to July 1, 2012, include as revenue the net present value of the loans made to students during the fiscal year, as calculated under paragraph (b) of this section, if the loans—

    (A)   Are bona fide as evidenced by standalone repayment agreements between the students and the institution that are enforceable promissory notes;
    (B)   Are issued at intervals related to the institution's enrollment periods;
    (C)   Are subject to regular loan repayments and collections by the institution; and
    (D)   Are separate from the enrollment contracts signed by the students.

(ii)    For loans made to students before July 1, 2008, include as revenue only the amounts of payments made on those loans that the institution received during the fiscal year.

(iii)   For loans made to students on or after July 1, 2012, include as revenue only the amount of payments made on those loans that the institution received during the fiscal year.

34 C.F.R. § 668.28(a)(5).  Nonetheless, Relators contend that the Law Schools could not properly count the receivables from these institutional loans as non-Title IV income because the loans were not "subject to regular loan repayments and collections by" the Law Schools as required to constitute non-Title IV revenue under the regulation.  See TAC ¶¶ 46, 51-55; see also 34 C.F.R. § 668.28(a)(5)(i)(C).  According to Relators, the Law Schools and Infilaw knew that the institutional loans extended to low-credit students were uncollectible and never "made any serious attempts to collect" on those loans.  See TAC ¶¶ 52-54.  Indeed, Relators assert that "Defendants" knew that "most of the students receiving [institutional loans] could not and would not repay the loans," and that "Defendants" purposefully did not attempt to collect these loans "in order to avoid calling attention to the fact that the loans were not in fact collectible . . . ."  Id. ¶ 53.  Based on

"information and belief," Relators allege that "certain students" never made any payments on their institutional loans. Id. ¶ 54. Lorona maintains that Thompson "forced" her to allow these students to continue attending school so the receivables would count as non-Title IV money. Id. Based on "information and belief," Relators allege that the institutional loan default rate in the 2013 fiscal reporting year (presumably, at ASLS, although it is unclear) exceeded 40%. Id.[9]

According to Relators, "[a]fter a year of funding" institutional loans to low-credit students, the Law Schools reported the "amount of the corresponding receivables" to the DOE as non-Title IV income. Id. ¶ 51. Relators do not allege the amount of the institutional loan receivables reported to the DOE or more precisely, the amount of such receivables derived from loans to low-credit students that were not actually subject to repayment and collections. Indeed, Relators do not allege any information about the Title IV and non-Title IV revenues reported to the DOE for the 2011-2012 fiscal year. Id. ¶¶ 40-42. Instead,

---

[9] Relators also appear to suggest that the Law Schools' practice of counting the net value from these loans, as opposed to cash received, violates the cash basis of accounting. See id. ¶ 55; Response to Infilaw at 20. However, the applicable regulation specifically provides that institutions must use the cash basis of accounting in calculating the revenue percentage, "[e]xcept for institutional loans made to students under paragraph (a)(5)(i) of this section . . . ." See 34 C.F.R. § 668.28(a)(2) (emphasis added). As noted above, the applicable paragraph provides that for loans made after July 1, 2008, and before July 1, 2012, institutions may include as revenue the "net present value of the loans made to students during the fiscal year," according to a specific calculation, so long as the loans are, inter alia, "subject to regular loan repayments and collections by the institutions . . . ." See 34 C.F.R. § 668.28(a)(5)(i)(C). Relators do not specifically allege when the challenged institutional loans were issued, but the loans appear to pertain to the "Fall 2011-Spring 2012 financial aid year," TAC ¶ 48, and thus, fall within the statutory period permitting a net present value calculation. Thus, Relators' only discernible theory for why the Law Schools could not properly count the institutional loans as revenue is that the loans were not actually subject to repayment and collection.

Relators also include allegations suggesting that these institutional loans were not in the best interests of the students. For example, according to Relators, the institutional loans, unlike federally funded loans, "are not deferrable by students after graduation, nor may students apply for financial hardships or forbearances" of the institutional loans. Id. ¶ 47. Relators also allege that the Law Schools "nefariously" withdrew future institutional loan support from low-credit students who the Law Schools assessed as having a low chance of passing the bar exam, "thereby destroying their ability to continue to attend school" despite having already "accrued tremendous amounts of debt . . . ." Id. ¶ 52. Relators emphasize that the Law Schools' only reason for offering the institutional loans to students was to appear to be in compliance with the 90/10 Rule. TAC ¶¶ 45, 59. However, Relators fail to explain how the Law Schools' motives, while troubling, are relevant to whether they were in compliance with DOE regulations.

Relators allege that Lorona viewed non-public, "internal calculations of revenue" related to the 90/10 Rule, "most of which" showed that ASLS was "consistently in violation of the 90/10 Rule." Id. ¶ 58. The dates and details of these internal calculations are not alleged, and Relators offer only their "information and belief" that these same documents exist at CSL and FCSL. Id. In addition, an unidentified person at an unidentified time is alleged to have provided Lorona with unidentified documents "demonstrating a violation of the 90/10 Rule," of unspecified date and magnitude, and instructed her to "convert some Title IV/HEA loans into [institutional loans] for the sole purpose of converting revenue to create the appearance of compliance with the 90/10 Rule." Id. ¶ 58. Whether or how Lorona accomplished this conversion is not alleged. It is unclear from the allegations whether the Law Schools' practice of providing institutional loans to low-credit students continued after the first year. Id. ¶ 60. Notably, for loans issued after July 1, 2012, only the payments actually received by the institution may be counted as revenue. See 34 C.F.R. § 668.28(a)(5)(iii). Relators do not allege any specific facts showing a violation of this provision.

### 2. The myBAR Program

On approximately September 15, 2011, the Dean of ASLS, Shirley Mays, sent an email stating that after "an insightful 90/10 meeting," the development of an internal bar exam preparation course "'has bubbled to the top as a real solution for 90/10.'" TAC ¶ 61. According to Relators, Infilaw tasked the Law Schools, beginning with ASLS, "with creating and implementing their own bar exam preparation programs to compete with established programs from Barbri and other providers." Id. ASLS then instructed the Director of the Critical Legal Skills Program (DCLSP) to implement a bar preparation program. Id. ¶ 62.

The DCLSP was not receptive to the idea of creating and implementing a new program in less than three months, sufficient to prepare December 2011 graduates for a February 2012 bar exam.  Id. ¶ 62.  Nonetheless, Dean Mays insisted that ASLS pursue implementation of its own bar preparation course, and at some point ASLS "formalized its new program" named "myBAR," for "Multi-Year Bar Advanced Review."  Id. ¶¶ 63, 66. Relators allege on "information and belief" that the Law Schools "counted myBAR program fees as non-Title IV/HEA revenue toward satisfying the 90/10 Rule."  Id. ¶ 68.

In late 2011, Dean Mays informed the DCLSP that the $50,000 fund previously offered to students in need of financial assistance to enroll in established bar preparation courses was no longer available.  Id. ¶ 64.  An Infilaw employee, Penny Willrich, suggested that ASLS "force its students to take its bar preparation program, provide no bar preparation materials to the students unless they sign up for ASLS bar preparation program, and even charge students parking fees during the bar preparation program to count toward non-Title IV/HEA funds."  Id. ¶ 65.  Relators do not allege when those suggestions were made, to whom they were made, whether they were ever implemented, or how much, if any, revenue they generated.  However, Relators go on to allege that at an unspecified time, in unspecified amounts, ASLS began "paying students who participated in myBAR thousands of dollars as 'bonuses' for completing mini-courses called modules, thus effectively refunding the students' myBAR fees."  Id. ¶ 67.  According to Relators, this arrangement "allowed ASLS to claim tuition received from myBAR fees as

non-Title IV/HEA revenue, while hiding the fact that the revenue was refunded Title IV/HEA funds." Id.[10]

Pursuant to 34 C.F.R. § 668.28(a)(3), institutions may only consider funds generated from certain sources as non-Title IV revenue.[11] As relevant here, § 668.28(a)(3)(iii) permits an institution to count funds "paid by a student, or on behalf of a student by a party other than the institution" for an "education or training program" that "prepares students to take an examination for an industry-recognized credential or certification issued by an independent third party . . . ." Relators contend that the Law

---

[10] Relators do not allege that this arrangement actually violated any specific DOE regulation, and do not rely on this allegation in their Response to Infilaw to support their claim that the myBAR program violated the 90/10 Rule. See Response to Infilaw at 18.

[11] In full, 34 C.F.R. § 668.28(3) provides as follows:

(3) Revenue generated from programs and activities. The institution must consider as revenue only those funds it generates from—

(i)  Tuition, fees, and other institutional charges for students enrolled in eligible programs as defined in § 668.8;

(ii)  Activities conducted by the institution that are necessary for the education and training of its students provided those activities are—
(A) Conducted on campus or at a facility under the institution's control;
(B) Performed under the supervision of a member of the institution's faculty; and
(C) Required to be performed by all students in a specific educational program at the institution; and

(iii)  Funds paid by a student, or on behalf of a student by a party other than the institution, for an education or training program that is not eligible under § 668.8 if the program—
(A) Is approved or licensed by the appropriate State agency;
(B) Is accredited by an accrediting agency recognized by the Secretary under 34 CFR part 602;
(C) Provides an industry-recognized credential or certification, or prepares students to take an examination for an industry-recognized credential or certification issued by an independent third party;
(D) Provides training needed for students to maintain State licensing requirements; or
(E) Provides training needed for students to meet additional licensing requirements for specialized training for practitioners that already meet the general licensing requirements in that field.

Schools could not properly count the income from the myBAR program as non-Title IV revenue because it is not income "from school activities necessary and required for students enrolled in their programs, nor do the programs actually prepare their students properly to take an examination for an industry-recognized credential or certification issued by an independent third party." TAC ¶ 70. Indeed, according to Relators, the myBAR program was "woefully inadequate as a bar preparation course . . . ." Id. ¶ 69. In support, Relators assert that in an email dated December 23, 2014, "ASLS admitted . . . that the anticipated bar passage rate for an ASLS student on the February 2015 bar exam was 47% compared to a state average of 70%." Id. ¶ 69. Relators further allege that for the July 2015 Arizona bar exam the "actual pass rate for ASLS graduates" was 26.4%. Id. ¶ 75. Notably, in a separate section of the Third Amended Complaint, Relators state that 63.8% of ASLS graduates taking the bar exam in February 2012 (including repeat and first-time takers) passed the exam. Id. ¶ 159. In July of 2012, 73.1% of ASLS graduates passed the bar exam, and 72.9% of its graduates passed in February 2013. Id. While ASLS's bar passage rates do drastically decline in subsequent years, Relators provide no allegations linking this decline to the myBAR program. Indeed, there are no allegations regarding what percentage of ASLS students who enrolled in the myBAR program passed the bar exam as compared to students who utilized other programs. Moreover, Relators offer no information allowing one to assess the caliber of the internal bar exam preparation programs at CSL or FCSL.

### 3. The Check Exchange

Barbri "provides preparation courses and materials for individuals taking state bar exams, most of whom are recent law school graduates." Id. ¶ 12. These courses "include

15

a series of live or recorded lectures, study materials, and practice exams," and much of the cost is "attributable to Barbri's copyrighted bar preparation books, outlines, and practice exams, which are tailored to each state's bar exam." Id. ¶ 77. On July 2, 2012, Infilaw and Barbri entered into an agreement whereby Infilaw paid $12 million to have Barbri provide all the materials for the Law Schools' internal bar review programs over a three-year term, from July 2, 2012, until July 31, 2015. Id. ¶ 84. Pursuant to the agreement, Barbri stopped offering its own courses at the Law Schools, and was prohibited from soliciting students, setting up recruiting tables, or offering discounts to students at the Law Schools. Id. ¶¶ 81-82. This agreement "fixed the price of the 'live' bar preparation courses offered to . . . students, eliminated any competition by Barbri, and resulted in large payments from Infilaw to Barbri to ensure that the Defendant [Law] Schools' in-house bar review courses were the only option available to the Infilaw students." Id. ¶ 88. According to Relators, all three Law Schools implemented internal bar preparation programs utilizing the "written materials and lectures developed by Barbri for their bar exam preparation courses." Id. ¶ 79. Although touted as an attempt to increase bar passage rates, Relators allege that the reason Infilaw created these internal bar preparation programs was "to inflate the portion of revenue at the Law Schools that could be counted as non-Title IV or '10' revenue." Id. ¶ 89.

Significantly, Barbri typically begins soliciting students to sign up for its courses during their first year of law school. Id. ¶ 76. To enroll, students pay a deposit to Barbri to lock-in a lower price "as the cost increases each year a student waits to pay the deposit." Id. Thus, at the time Barbri and Infilaw entered their agreement, students taking the bar review course in the summer of 2012 had "already paid or contracted directly with Barbri

16

to take Barbri's bar review course and the Barbri course was already half over." Id. ¶ 86.
Nevertheless, Infilaw, the Law Schools and Barbri required "students who had already paid
deposits and contracted with Barbri [to] switch their enrollment to the Infilaw bar preparation
programs for the July 2012 through July 2013 bar exams." Id. ¶ 90. In addition, Infilaw,
the Law Schools, and Barbri devised a "check exchange" program so that Infilaw and the
Law Schools could immediately recognize the full amount of these funds as non-Title IV
revenue. Id. ¶¶ 90-92. Relators describe this program as follows: "Barbri agreed to refund
each student's past payments by sending the checks directly to the Defendant [Law]
Schools. The Defendant [Law] Schools would then distribute the checks to the students in
exchange for the student writing a personal check payable to the school for the same
amount." Id. ¶ 91. Students who had already made payments to Barbri for the summer
2012 course, or submitted deposits for future courses, were required to engage in this
"check exchange" program. Id. Indeed, Barbri sent refund checks to ASLS for the check
exchange even for students preparing for the July 2012 bar exam, who had already paid
Barbri, attended Barbri classes, and had nearly completed the Barbri program. Id. ¶ 92.
As such, despite having never provided any services for the money, ASLS was able to
count these funds as non-Title IV revenue. Id. ¶ 92. Specifically, Relators allege that "[f]or
the summer 2012 bar review course, ASLS received checks for approximately 70
graduates representing approximately $184,000. This was income that was owed and had
already been paid to Barbri based on the students' agreements with Barbri." Id. ¶ 110.
According to Relators, ASLS "illegally counted a large and material amount of this money
as non-Title IV income in its 2012 annual audit submitted to the DOE." Id.

According to Relators, ASLS also sought to engage in a check exchange with students after the summer 2013 bar exam, when the students had already completed the preparation course and bar exam. Id. ¶ 112. "ASLS contacted these students, attempted to make them cash a 'refund' check from Barbri, and then immediately write a check in the same amount to ASLS for its myBAR program." Id. If a student refused to comply, ASLS would threaten to withhold their character and fitness certification necessary for bar admission. Id. Relators allege that Barbri sent refund checks for "approximately 63 former students to ASLS and ASLS was successful in convincing many of these students to participate in the check exchange process." Id. The Relators do not allege the amount of funds generated from these efforts but assert that the income generated was "reported by Infilaw as non-Title IV revenue on its 2013 annual audit submitted to the DOE." Id.

Potter asserts that he participated in "multiple conversations with representatives of CSL and FCSL," in which he was told that the check exchange program was designed to address "ASLS's 90/10 problem." Id. ¶ 93. Potter also received an email from ASLS President Thompson explaining that the funds from the check exchange needed to be deposited by July 31st for the 90/10 calculation. Id. ¶ 94. In spring of 2013, Thompson sent several emails stating his concerns about the status of collections for the internal bar review program and emphasizing that these funds were a "'very important piece of 10 money.'" See id. ¶¶ 122-125. Potter alleges that he was present "during discussions with Barbri employees where this purpose (and its potential illegality) was discussed." Id. ¶¶ 96-97. For example, Barbri employee Mary Goza sent an email to ASLS employees on January 18, 2013 explaining the check exchange process and including instructions on how to "ensure compliance with 90/10 . . . ." Id. ¶ 108.

Indeed, in order to ensure that the funds received for the internal bar preparation program would be counted as non-Title IV revenue, ASLS would not allow students to pay their myBAR fees prior to graduation. Id. ¶¶ 99-105. ASLS either refused to accept a deposit for the myBAR program entirely, id. ¶¶ 99-104, or accepted a deposit but refunded the money upon graduation and then required the student to pay the fee in full after graduation, id. ¶ 105. It appears ASLS also waited to engage in the check exchange process until after the targeted students had graduated. Id. ¶ 107. Relators allege that the Infilaw Defendants pressured students in a variety of ways to participate in the check exchange program. Id. ¶¶ 113-14, 119-21, 125. According to Relators, the check exchange program was an "illegal price fixing and anti-competitive arrangement," which operated to the detriment of the students. Id. ¶ 126.[12]

### D. Substantial Misrepresentations

By entering into a PPA, institutions also agree to comply with the regulatory prohibition on substantial misrepresentations set forth in 34 C.F.R. § 668.71. Pursuant to this regulation, the Secretary of the DOE may initiate proceedings to fine an institution or limit, suspend or terminate the institution's participation in a Title IV, HEA program if the

---

[12] In the Third Amended Complaint, Relators also include an allegation that the revenue generated from the internal bar preparation course from 2011 through 2013 was a "sham" as ASLS simply attached its name to the Barbri materials. Id. ¶ 116. According to Relators, "the $2500 each student paid to ASLS for the myBAR program was entirely for the use of the same Barbri materials and lectures that were used for Barbri courses offered at the other law schools in Arizona." Id. Because "the entire amount of the internal bar preparation course fees paid to the [Law] Schools was really for 'books and materials' provided by Barbri," Relators contend that the Law Schools were "prohibited from counting this money as non-Title IV 90/10 revenue since this amount was not included or disclosed as tuition, fees, or other institutional charges." See id. ¶ 117 (citing 34 C.F.R. § 668.28(a)(7)(v)). The cited regulation prohibits an institution from counting as revenue "[t]he amount the student is charged for books, supplies, and equipment unless the institution includes that amount as tuition, fees, or other institutional charges." See 34 C.F.R. § 668.28(a)(7)(v). However, it is unclear whether this regulation would apply to the books, materials, and recorded lectures that make-up the voluntary bar exam preparation program. Relators do not further develop this legal argument, nor do they rely on it in their Response to Infilaw as a basis for finding a violation of the 90/10 Rule.

19

Secretary determines that the institution has engaged in substantial misrepresentation. See 34 C.F.R. § 668.71(a)(4). According to the regulation, "[a]n eligible institution is deemed to have engaged in a substantial misrepresentation when the institution . . . makes a substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates." Id. § 668.71(b). Such misrepresentations "are prohibited in all forms, including those made in any advertising, promotional materials, or in the marketing or sale of courses of programs of instruction offered by the institution." Id. A misrepresentation includes statements that are false, erroneous or have "the likelihood or tendency to mislead under the circumstances." Id. § 668.71(c). Such a statement is substantial if "the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment" on the statement. Id. Relators allege that the Law Schools "repeatedly violated this regulation by publishing materially false and misleading representations about bar passage, academic, and career prospects, and pushing unsuspecting students into loans that could not be repaid." See TAC ¶ 127.

### 1. AAMPLE

Relators allege that ASLS advertised statistics and data regarding the caliber of its students that were materially false and misleading. Specifically, Lorona contends that ASLS failed to include the LSAT scores and GPAs of students admitted through an alternative admissions process, known as the Alternative Admissions Model for Legal Education (AAMPLE), in its advertised statistics. See TAC ¶¶ 142 -144, 154. Because "[a]dmission and enrollment through AAMPLE does not require grade point average or LSAT scores within the range of traditional admissions," the failure to include the admissions data from the AAMPLE students in the admissions statistics posted on the

ASLS website, in Relators' view, rendered the reported information materially false and misleading.  Id. ¶¶ 143, 154.  Relators do not identify the specific statements that Lorona contends were misleading, nor what the statistics would have been with the AAMPLE students included.  Lorona also contends that ASLS also knew but failed to disclose that the percentage of its students likely to pass the bar exam was declining due to the admission of increasing numbers of AAMPLE students.  Id. ¶¶ 176-77.

### 2.  The Unlock Potential program

Relators allege that in May 2014, ASLS, as well as FCSL and CSL, began paying certain students to defer or forego taking the bar exam upon graduation based upon the Law Schools' determination that these students were likely to fail the exam.  Id. ¶ 182.  Relators allege that this "Unlock Potential" program artificially increased bar passage percentages, thus deceiving the ABA, the DOE, and the public.  Id. ¶¶ 181-83, 190-91.  According to Relators, "[a]t least 39 otherwise first-time bar exam takers were paid by ASLS to defer the July 2014 bar exam."  Id. ¶ 184.  Indeed, Lorona herself was approached on February 11, 2015, from a representative of "ASLS or Inflaw," who informed her that she was not likely to pass the February bar exam.  Id. ¶ 188.  The representative offered to pay Lorona $5,000, with an additional monthly stipend, to defer the bar exam until July 2015.  Id. ¶ 189.  Relators allege that in later years the Dean of ASLS contacted students with an offer of $10,000 to defer sitting for the bar exam.  Id.  According to Lorona, the bar coach assigned to her by ASLS told her that "ASLS is concerned that it may lose accreditation and access to Title IV/HEA funding due to drastically low performance numbers."  Id. ¶ 188.  Relators conclude "upon information and belief" that ASLS counted the students who

21

participated in the Unlock Potential program as "full-time employees for purposes of reporting to the ABA and DOE." Id. ¶ 187.

### 3. Financial Obligations

Relators further allege that "Defendants misrepresented what incoming students should expect to pay for their education." Id. ¶ 194. Relators assert that the ASLS website represented that the tuition and fees for the "JD program during the 2010-11 academic year was $101,310.00," with an additional $2,184.00 in costs for books and supplies. Id. According to Relators, ASLS also represented that "the median cumulative program debt for graduates between July 1, 2009 and June 30, 2010 was $93,142.51 for federal student loan debt and $5,000.00 for private student loan debt." Id. Relators appear to contend that this information was misleading because ASLS's "most recent" disclosures identify the median federal student loan debt as $187,792. Id. ¶ 195.[13] Relators allege that "[d]espite notice provided by Lorona, ASLS continued its marketing by creating deceptive documents and statistics designed to increase non-traditional enrollment and publicly stating the same." Id. ¶ 197. Relators do not identify these documents, or the particular statements or statistics that were allegedly misleading.

### E. ABA Accreditation

Last, Relators allege that the Law Schools and Infilaw violated 34 C.F.R. § 668.14(b)(23) which requires an institution to "meet the requirements established pursuant

---

[13] Relators also assert without elaboration that ASLS misleads students by "enrolling and then giving 'credit' to students ineligible for federal financial aid, "purportedly to 'giv[e] students time to fix their credit to receive loans." Id. ¶ 193. Relators contend that this is misleading because "DOE does not lend to students with credit blemishes for specified time periods." Id. This one allegation, devoid of any particular details regarding the statements made, to whom they were made, when they were made, who made them, how frequently this occurred, or how Relators are aware of it, entirely fails to satisfy the requirements of Rule 9(b). Indeed, Relators' discussion of the substantial misrepresentations in their Response makes no mention of this allegation. See Response to Infilaw at 25.

to part H of Title IV of the HEA by the Secretary and nationally recognized accrediting agencies." <u>See</u> 34 C.F.R. § 668.14(b)(23). Relators assert that the Council and the Accreditation Committee of the ABA Section of Legal Education and Admissions to the Bar (ABA Accreditation Board) is the accrediting agency for law schools in the United States. <u>See</u> TAC ¶ 198. Relators contend that the Law Schools are engaging in practices which violate the requirements of the ABA Accreditation Board. <u>Id.</u> ¶¶ 199-205. Specifically, Relators assert that contrary to ABA standards, the Law Schools "continue to admit applicants who do not appear capable of completing their legal education and being admitted to the bar." <u>Id.</u> ¶ 200. According to Relators, an institution may lose accreditation if it does not have a satisfactory bar passage rate, and as such, the Law Schools continue to "game these statistics" through the Unlock Potential program described above. <u>Id.</u> ¶ 201. In addition, Relators allege that ASLS misled prospective students in violation of ABA standards by creating "reports showing the grade point average of students admitted through alternative admissions programs versus traditional admissions." <u>Id.</u> ¶ 202. Lorona maintains that due to her "initial position as executive assistant to the General Counsel," she "witnessed the accreditation process" and thus can reliably report that "such accreditation documents, with errors and misrepresentations, were submitted to the ABA, in violation of federal regulations." <u>Id.</u> ¶ 204. Relators conclude "upon information and belief," that the other Law Schools prepared "similar accreditation documents," overseen by Infilaw, "under similarly misrepresentative schemes." <u>Id.</u> ¶ 205.

### III. Standard of Review – Rules 8 and 9(b)

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009);

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." See Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face[.]'" <u>Id.</u> at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).

In addition to the minimal pleading requirements outlined above, claims under the False Claims Act must be "stated with particularity pursuant to Rule 9(b)." <u>See</u> <u>United States ex rel. Atkins v. McInteer</u>, 470 F.3d 1350, 1357 (11th Cir. 2006); <u>see</u> <u>also</u> Rule 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" <u>Durham v. Bus. Mgmt. Assocs.</u>, 847 F.2d 1505, 1511 (11th Cir. 1988) (quotation omitted). Thus, Rule 9(b) "'ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . [and] protects defendants from harm to their goodwill and reputation.'" <u>Wagner v. First Horizon Pharm. Corp.</u>, 464 F.3d 1273, 1277 (11th Cir. 2006) (quotation omitted) (alterations in <u>Wagner</u>). Although "'alternative means are also available[,]'" the requirements of Rule 9(b) may be satisfied by specific allegations as to "'date, time or place.'" <u>See</u> <u>Tello v. Dean Witter Reynolds, Inc.</u>, 494 F.3d 956, 972-73 (11th Cir. 2007) (quoting <u>Durham</u>, 847 F.2d at 1511). As such, a complaint satisfies Rule 9(b) if it

> sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

<u>Id.</u> at 972 (quoting <u>Ziemba v. Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1202 (11th Cir. 2001)); <u>see</u> <u>also</u> <u>Atkins</u>, 470 F.3d at 1357 ("Particularity means that 'a plaintiff must plead facts as

to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them.'" (quoting United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1310 (11th Cir. 2002))). Nonetheless, "Rule 9(b) does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements were made[,]" and thus, for purposes of Rule 9(b), "it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008).

## IV.  Public Disclosure Bar[14]

As an initial matter, the Infilaw Defendants assert that many of Relators' claims are precluded by the public disclosure bar.[15]  Pursuant to 31 U.S.C. § 3730, absent the government's opposition, a court must dismiss a qui tam action "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed— . . . (iii) from the news media . . . ."  See 31 U.S.C. § 3730(e)(4)(A).  The public disclosure bar

---

[14] To the extent the Infilaw Defendants contend that Lorona's claims are barred because she signed a release pursuant to a settlement of a separate lawsuit against Infilaw and ASLS, this argument is unavailing. See Infilaw Motion at 44.  Lorona executed the release on May 24, 2017, while this action was pending.  See Stemetzki Decl., Ex. 1: Settlement Agreement and Release at 5.  "Federal courts across the country have held that general releases that are entered into after the filing of a qui tam action are unenforceable."  See United States ex rel. Keeler v. Eisai, Inc., No. 09-22302-CIV-UNGARO, 2011 WL 13099033, at *3 (S.D. Fla. June 21, 2011) (collecting cases); see also 31 U.S.C. § 3730(b)(1) ("The [qui tam] action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.").  The Court is not persuaded by the Infilaw Defendants' argument to the contrary because the case on which they primarily rely did not specifically address the impact of 31 U.S.C. § 3730(b)(1) on a post-filing release.  See United States ex rel. Litwinczuk v. Palm Beach Cardiovascular Clinic, L.C., No. 07-80323-CIV, 2009 WL 10667702 (S.D. Fla. Mar. 24, 2009).

[15] The Infilaw Defendants do not contend that Relators' claims related to the 90/10 Rule or premised on the Unlock Potential program are subject to the public disclosure bar.  See Infilaw Motion at 12 n.7 (conceding that the "allegations concerning the bar preparation program, bar exam deferral programs, and institutional loans" are not subject to the public disclosure bar).

does not apply, however, if "the person bringing the action is an original source of the information." Id. An "original source" is:

> an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transaction, and who has voluntarily provided the information to the Government before filing an action under this section.

See 31 U.S.C. § 3730(e)(4)(B). To determine if the public disclosure bar applies, the Eleventh Circuit Court of Appeals applies a three-part test: (1) "'have the allegations made by the plaintiff been publicly disclosed;'" (2) if so, are the allegations in the complaint substantially the same as the allegations or transactions contained in public disclosures, and (3) "'if yes, is the plaintiff an original source of that information.'" See United States ex rel. Osheroff v. Humana Inc., 776 F.3d 805, 812 (11th Cir. 2015) (quoting Cooper v. Blue Cross Blue Shield of Fla., Inc., 19 F.3d 562, 565 n.4 (11th Cir. 1994) but updating the second prong of the standard based on 2010 amendments to the statute); see also United States ex rel. Bernier v. InfiLaw Corp., 311 F. Supp. 3d 1288, 1292 (M.D. Fla. 2018). The Eleventh Circuit describes the second prong of this test as "'a quick trigger to get to the more exacting original source inquiry.'" See Osheroff, 776 F.3d at 814 (quoting Cooper, 19 F.3d at 568 n.10). Although previously a jurisdictional bar, Congress amended the statute in 2010, to provide that the public disclosure bar presents grounds for dismissal based on failure to state a claim, rather than lack of jurisdiction. Id. at 810-11.

The Infilaw Defendants contend that Relators' allegations concerning the purportedly substantial misrepresentations, see supra Part II.D., and failure to comply with ABA accreditation standards, see supra Part II.E, are substantially similar to allegations

27

previously disclosed in the news media.[16]  In support, the Infilaw Defendants submit eleven news articles and blog posts which they contend disclose wrongdoing substantially similar to that set forth in the Third Amended Complaint.  <u>See</u> Declaration of Scott Stemetzki in Support of Defendants' Motion to Dismiss Relators' Third Amended Complaint (Doc. 56-1; Stemetzki Decl.), Exs. 2-12 (the Public Disclosures).[17]  In their Response, Relators argue that the public disclosure bar does not apply to their claims because they are original sources.  <u>See</u> Response to Infilaw at 9.  Relators also contend that even if they are not original sources, the Public Disclosures "do not make material allegations or disclose transactions that are substantially the same as the TAC."  <u>See</u> <u>id.</u> at 12-13.

### 1. Public Disclosures[18]

In relevant part, Relators assert that the Infilaw Defendants: 1) "misrepresented their admission requirements and the caliber of students being admitted to ASLS" by failing to include AAMPLE students in their data, <u>see</u> TAC ¶¶ 155-56, 2) made statements regarding the "enrollment and success statistics" of ASLS students that were misleading for failure to include the AAMPLE students, <u>id.</u> ¶ 157, 3) made statements about ASLS's

---

[16] However, to the extent Relators allege that the Unlock Potential program misled students and the ABA Accreditation Board about the Law Schools' bar passage rates, the Infilaw Defendants do not contend that this program was publicly disclosed.  Thus, the Court's analysis in this section does not address the Unlock Potential program.

[17] Relators do not object to the Court's consideration of these documents, and the Court finds it appropriate to consider the exhibits at this stage in the proceedings "for 'the limited purpose of determining which statements the documents contain,' not for their truth."  <u>See</u> <u>Bernier</u>, 311 F. Supp. 3d at 1292 (quoting <u>Osheroff</u>, 776 F.3d at 811-12 & n.4).

[18] Relators do not assert that the cited Public Disclosures fail to fall within "the statute's enumerated categories of sources that are considered public."  <u>See</u> <u>Osheroff</u>, 776 F.3d at 812-14; <u>see</u> <u>also</u> 31 C.F.R. § 3730(e)(4)(A).  As such, the Court accepts that these articles and blog posts, which are publicly available on the internet, are "public disclosures" within the meaning of the statute.  <u>See</u> <u>Osheroff</u>, 776 F.3d at 813-14 ("District courts in the Eleventh Circuit and in other circuits have determined that the term includes publicly available websites.").  Accordingly, the Court turns to whether the allegations in the Third Amended Complaint are substantially the same as the allegations contained in the Public Disclosures.

"ultimate" bar exam passage rates that were misleading as compared to "actual" passage rates, id. ¶ 165, 4) failed to disclose that the percentage of students likely to pass the bar exam was declining due to the increasing numbers of unqualified students admitted to ASLS, id. ¶¶ 176-77, and 5) misled students about the cost of their education, id. ¶ 194. In addition, Relators assert that the Infilaw Defendants failed to meet the ABA's accreditation requirements by continuing "to admit applicants who [did] not appear capable of completing their legal education and being admitted to the bar, as evidence[d] by [the] median LSAT and GPA of matriculating students, the growing proportion of AAMPLE students, and the poor bar passage rates of the Defendant Schools." Id. ¶ 200. Relators also contend that the Infilaw Defendants violated accreditation standards by misleading prospective students about the success of students in the AAMPLE program. Id. ¶ 202. According to Lorona, she "witnessed" the accreditation process and contends that "accreditation documents" were submitted to the ABA with "errors and misrepresentations." Id. ¶ 204.

Similarly, the Public Disclosures discuss at length the Infilaw Defendants' alleged practice of admitting increasingly unqualified law students who were unlikely to pass the bar exam and would graduate saddled with immense student loan debt and few employment prospects. Notably, two of the articles describe the Law Schools' use of the AAMPLE program as the means through which the Infilaw Defendants admitted students with low LSAT scores. See Stemetzki Decl., Ex. 2 at 9; id., Ex. 7 at 4. The Public Disclosures also address the immense debt and poor employment prospects for Infilaw graduates. See, e.g., id., Ex. 12 (discussing the "atrocious employment statistics, sky high tuition, enormous class sizes, and graduates with massive debt loads" at the Law Schools and characterizing the schools as "a straight-up educational ripoff"). One article even notes

29

that the employment statistics released to the public are likely overstated because the Law Schools created temporary jobs to employ some graduates in an attempt to "produce deceptive employment rates that will entice potential future students to enroll." Compare Stemetzki Decl., Ex. 2 at 5 with TAC ¶ 135, 187.

In addition, the Public Disclosures discuss the correlation between a student's LSAT score and the probability that the student will pass the bar exam, including the observation that by admitting so many students who were unlikely to pass the bar exam, the Law Schools were jeopardizing their ABA accreditation. See, e.g., id., Exs 2, 5. Indeed, an August 18, 2014 blog post noted that this practice of admitting students with extremely low LSAT scores, who were therefore unlikely to pass the bar exam, was "unfair, ethically questionable, and a potential violation of ABA standards . . . ." Id., Ex. 3 at 6.[19] A later blog post, dated December 18, 2014, called for an investigation of Infilaw, not only by the ABA but also by the DOE, based on the Law Schools' practice of admitting students with extremely low LSAT scores who were likely incapable of passing the bar exam. Id., Ex. 6 at 3; see also id., Ex. 5 at 5 (arguing that "it is highly ethically questionable to try to keep a law school afloat on the backs of students who have demonstrated poor aptitude for the study of law," and "even more ethically dubious when a law school is admitting large numbers of extremely high-risk students for the purpose of making a profit," and calling for the ABA to "put a stop to it"). This same author asserted that "InfiLaw is making huge profits off of totally unqualified students," and suggested that Infilaw's management likely knows that these students "have little chance of graduating (unless they also significantly lower their performance standards) and passing the bar." Id., Ex. 6.

---

[19] This blog post also noted that FCSL's mandatory grading curve may be unsuitable for the caliber of students admitted and result in grade inflation. Compare Stemetzki Decl., Ex. 3 at 6-7 with TAC ¶ 145.

Based on the foregoing, the Court finds that the allegations contained in the Public Disclosures are substantially similar to the allegations and transactions giving rise to the challenged FCA claims. Indeed, Relators concede that both the Public Disclosures and the Third Amended Complaint "discuss Infilaw Defendants' practice of admitting students who were not academically qualified for law school and unlikely to pass the bar exam." See Response to Infilaw at 12. Nonetheless, Relators contend that their allegations are sufficiently distinct from the matters discussed in these articles because the Public Disclosures do not specifically accuse the Infilaw Defendants of fraud on the federal government. See id. at 12-13.[20] This argument is not well-taken. The Eleventh Circuit has previously rejected a relator's attempt to distinguish his pleadings from similar public disclosures merely "because the disclosures do not contain any allegations of wrongdoing." See Osheroff, 776 F.3d at 814. The Osheroff Court explained that the public disclosure test set forth in Cooper "does not require each source to contain an allegation of wrongdoing," and observed that the statute itself "requires only disclosures of 'allegations or transactions,' suggesting that allegations of wrongdoing are not required." Id. (quoting 31 U.S.C. § 3730(e)(4)(2012)). Thus, while the Public Disclosures do not reference specific DOE regulations, the "transaction" at the heart of Relators' claims—the intentional admission of underqualified students to the Law Schools, who are likely incapable of

---

[20] Relators also point to their allegations regarding the 90/10 Rule and the myBAR program, see Response to Infilaw at 10-11, 13, but their reliance on these allegations is misplaced. As stated above, the Infilaw Defendants do not contend that Relators' claims premised on those allegations are subject to the public disclosure bar. Significantly, "just because a relator is an original source with respect to some claim," does not convey this status to his claims in gross. Rockwell Int'l Corp. v. United States, 549 U.S. 457, 476 (2007). Indeed, "§ 3730(e)(4) does not permit such claim smuggling." Id. As such, the Court must consider application of the public disclosure bar on a claim-by-claim basis. Id.; see also John T. Boese, Civil False Claims and Qui Tam Actions § 4.02[D][1] (4th ed. & Supp. 2019) ("Because the [Rockwell] Court's finding that original source assessments are made on a claim-by-claim basis was not dependent upon the elements in the 1986 knowledge standard, this ruling holds true regardless of whether the 2010 or 1986 bar is applied.").

passing the bar exam, in violation of ABA standards and in order to capitalize on federal student loan funds—is substantially similar to the practices described in the Public Disclosures.

Moreover, contrary to Relators' arguments, the Public Disclosures are sufficient to raise the inference of fraud in connection with the federal student loan program. Several articles allege that the Infilaw Defendants' reduced their admissions standards, to the detriment of the debt-laden students graduating with law degrees they are unable to use, in order to take advantage of all available federal student loan funds and thereby increase their profits. See Stemetzki Decl., Ex. 2 ("[S]chools accredited by the [ABA] admit large numbers of severely underqualified students; these students in turn take out hundreds of millions of dollars in loans annually, much of which they will never be able to repay. Eventually, federal taxpayers will be stuck with the tab, even as the schools themselves continue to reap enormous profits."). The Public Disclosures further note that this practice likely violates ABA accreditation standards and will result (and did result) in the collapse of the Law Schools' bar passage rates. One blog post even goes so far as to call for an investigation by the ABA and DOE. See id., Ex. 6 at 3. The Public Disclosures accuse the Law Schools of "scamming" law students to capitalize on federal student loan funds and likely violating ABA standards in the process. See id., Exs., 2, 10, 12. Because "the second prong is a 'quick trigger,'" to the original source inquiry, this "significant overlap between [Relators'] allegations and the [P]ublic [D]isclosures is sufficient to show that the disclosed information . . . is substantially similar to the allegations in the [Third Amended Complaint]." See Osheroff, 776 F.3d at 814; see also Bernier, 311 F. Supp. 3d at 1293-97.

## 2. Original Source

Relators also contend that the public disclosure bar does not apply to their claims because they are original sources. <u>See</u> Response to Infilaw at 9-10. Pursuant to § 3730(e)(4)(B), Relators can qualify as original sources if they voluntarily disclosed to the government the information on which the allegations or transactions in their claims are based prior to the Public Disclosures. Relators contend that they satisfied this requirement because "Potter's disclosure to the government predates all but one of the articles Infilaw Defendants provided as exhibits to their MTD," and this article includes only "vague allegations against ASLS, then Phoenix Law School." <u>See</u> Response to Infilaw at 10 (citing Stemetzki Decl., Ex. 10). Indeed, according to the Third Amended Complaint, "Potter provided information regarding this Third Amended Complaint to the United States Department of Justice ('DOJ') on or about July 31, 2012." <u>See</u> TAC ¶ 15. Potter also provided "documentation relating to this Third Amended Complaint to the United States Department of Education" on December 12, 2012. <u>Id.</u> ¶ 16. Relators do not elaborate on what "information" or "documentation" Potter allegedly provided to the government in 2012.

Upon review of the Third Amended Complaint, it is apparent that the only allegations premised on Potter's knowledge are those related to the myBAR program and Barbri check exchange. Specifically, Part V of the Third Amended Complaint describes the basis of Potter's knowledge as his time working in the Academic Services Department at ASLS. <u>Id.</u> ¶ 26. According to the Third Amended Complaint, Potter "guid[ed] students through their bar exam preparation," and attended meetings where the use of bar exam preparation programs "to secure and maintain federal funds" was discussed. <u>Id.</u> ¶ 28. Potter was also involved in facilitating the check exchange with students and participated in discussions

with Infilaw, ASLS, and Barbri representatives about this process and its purpose.  Id. ¶ 29.  Indeed, in the Third Amended Complaint, Relators rely heavily on Potter's knowledge and experiences at ASLS in describing the check exchange process, see TAC ¶¶ 76-126, but do not otherwise reference Potter in the remainder of their pleading.  Rather, Relators' other factual allegations all stem from Lorona's knowledge and experiences at ASLS.  It is Lorona who is alleged to have "reviewed materials, statistics, and bar passage rates published by ASLS," id. ¶ 25, complained about misleading data and deceptive marketing, id. ¶ 144, and witnessed the accreditation process, id. ¶ 204.  Thus, the only reasonable interpretation of the allegation that Potter provided "information regarding this Third Amended Complaint" to the government on July 31, 2012, is that he disclosed the information in his possession related to the ASLS bar exam preparation program and check exchange with Barbri.  Because the Infilaw Defendants do not contend that the check exchange program is subject to the public disclosure bar, Relators' reliance on Potter's disclosures to the government to invoke the original source exception is misplaced.

Instead, as it is Lorona who is alleged to have knowledge of the challenged claims, the Court must determine whether Lorona qualifies as an original source as to those allegations.  According to the Third Amended Complaint, Lorona "provided documentation relating to this Third Amended Complaint" to the DOE on June 3, 2015, id. ¶ 17, and met with an Assistant United States Attorney to discuss her allegations on July 17, 2015, id. ¶ 18.  Lorona's disclosures occurred after publication of the Public Disclosures identified by the Infilaw Defendants, the latest of which was January 16, 2015.  See Stemetzki Decl. ¶¶ 5-15.  Thus, to qualify as an original source, Lorona must have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transaction."

<u>See</u> 31 U.S.C. § 3730(e)(4)(B).[21]   Assuming arguendo that Lorona has independent knowledge of the matters alleged in the Third Amended Complaint, she fails to qualify as an original source because her allegations do not "materially add" to the Public Disclosures.

In their Response, Relators contend that the Third Amended Complaint "materially adds" to the publicly disclosed allegations by explaining "in detail how the Infilaw Defendants fraudulently attempted to satisfy the 90/10 Rule by creating and implementing their own bar exam preparation courses."   <u>See</u> Response to Infilaw at 10-11.   This argument misses the mark given that the Infilaw Defendants do not contend that the Relators' 90/10 claims are subject to the public disclosure bar.   Rather, the appropriate focus of the materiality analysis is whether Lorona provides any details which materially add to the publicly disclosed information regarding the Infilaw Defendants' deceptive admissions practices and violations of accreditation standards.   On this subject, Relators do not cite to a single, specific allegation that they contend represents materially new information.

Relators contend that the Law Schools were defrauding the federal government of student loan funds because they were engaged in conduct which rendered them ineligible to participate in the federal student loan programs.   However, the Public Disclosures exposed the very conduct which Relators' contend was disqualifying, namely, the Law Schools' practice of admitting unqualified students, the likely inability of those students to pass the bar exam, the high cost of the Infilaw education, and the implications of Infilaw's admissions practices with respect to the Law Schools' bar passage rates and accreditation.

---

[21] The statute also requires an original source to voluntarily provide the information to the government before filing her FCA lawsuit, <u>see</u> 31 U.S.C. § 3730(e)(4)(B), which Lorona did.  <u>See</u> Original Complaint (Doc. 1), filed on August 5, 2015.

Moreover, as in <u>Bernier</u>, the Public Disclosures link this conduct to the Infilaw Defendants' "overriding goal of squeezing as much money as possible from the federal government." <u>See</u> <u>Bernier</u>, 311 F. Supp. 3d at 1297-98. Thus, the Court finds that the Public Disclosures "'were already sufficient to give rise to an inference'" that the Infilaw Defendants were defrauding the government of federal student loan funds. <u>See</u> <u>id.</u> at 1297 (quoting <u>Osheroff</u>, 776 F.3d at 815). Relators' allegations do no more than repackage what was already publicly known about the Infilaw Defendants' practices into the framework of the FCA, this is insufficient to satisfy the materiality standard.[22]

Accordingly, aside from the Unlock Potential program, to the extent Relators assert that the Infilaw Defendants violated the FCA by making substantial misrepresentations and violating accreditation standards, those claims are barred. As such, Relators' remaining claims are those premised on: 1) the Infilaw Defendants' violations of the 90/10 Rule, and 2) the Infilaw Defendants' use of the "Unlock Potential" program to mislead the public and the ABA Accreditation Board about the Law Schools' bar passage rates. As to these claims, the Court will next determine whether Relators have adequately alleged each violation of the FCA under Rules 8 and 9(b).

## V.     The False Claims Act

Pursuant to the FCA, a private person, called a "relator," may "bring a <u>qui</u> <u>tam</u> action in the name of the United States against anyone who files a claim proscribed by the FCA."

---

[22] Notably, as discussed below, Relators' allegations regarding the preparation and execution of the PPAs, the submission of student loan requests, and the preparation and submission of the accreditation documents to the ABA Accreditation Board are largely vague and conclusory. Thus, the type of internal, insider information that <u>could</u> have materially added to what was publicly known about the Infilaw Defendants' practices is missing from the Third Amended Complaint.

See Atkins, 470 F.3d at 1354 n.4 (internal citation omitted) (citing Clausen, 290 F.3d at 1308).  As relevant here, the False Claims Act imposes civil liability on any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [the presentment provision];
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim [the false record provision];
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) [the conspiracy provision]; or
>
> (G) . . . knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . [the reverse-false-claim provision].

See 31 U.S.C. § 3729(a)(1).  "A 'claim' includes direct requests for government payment as well as reimbursement requests made under a federal benefits program."  See United States ex rel. Chase v. HPC Healthcare, Inc., 723 F. App'x 783, 788 (11th Cir. 2018); see also 31 U.S.C. § 3729(b)(2) (defining claim in pertinent part to mean "any request or demand, whether under a contract or otherwise, for money or property . . . that—(i) is presented to an officer, employee, or agent of the United States . . .").  In addition, the FCA defines the term knowingly to mean "that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information . . . ."  See 31 U.S.C. § 3729(b)(1)(A).  As such, the term knowingly "require[s] no proof of specific intent to defraud."  See 31 U.S.C. § 3729(b)(1)(B).

Although Relators accuse the Law Schools of numerous violations of DOE regulations, regulatory violations alone do not give rise to a  cause of action under the FCA.  Indeed, the FCA is not "'an all-purpose antifraud statute,' or a vehicle for punishing garden-

variety breaches of contract or regulatory violations." See Universal Health Servs., Inc. v. United States ex rel. Escobar (Escobar), 136 S. Ct. 1989, 2003 (2016) (internal citation omitted) (quoting Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 672 (2008)).  "'Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies.'"  Chase, 723 F. App'x at 788 (quoting Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005)); see also Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1045 (11th Cir. 2015); see also Hopper v. Solvay Pharms., Inc., 588 F.3d 1318, 1328 (11th Cir. 2009) ("Improper practices standing alone are insufficient to state a claim under [the presentment provision or the false record provision] absent allegations that a specific fraudulent claim was in fact submitted to the government.").  "Simply put, the 'sine qua non of a False Claims Act violation' is the submission of a false claim to the government." Urquilla-Diaz, 780 F.3d at 1045 (quoting Corsello, 428 F.3d at 1012).

## VI.    Counts I, II and IV – Presentment and False Record Claims

In Count I of the Third Amended Complaint, Relators assert a presentment claim premised on § 3729(a)(1)(A).  The elements of a presentment claim are as follows: 1) a false or fraudulent claim, 2) the presentment of the claim, and 3) knowledge that the claim was false.  See 31 U.S.C. § 3729(a)(1)(A).  In Counts II and IV of the Third Amended Complaint, Relators assert false record claims premised on § 3729(a)(1)(B).  To establish a false record claim under the FCA, Relators must allege that the Law Schools: "(1) made, used, or caused to be made or used, a false record or statement; (2) that is material to a false or fraudulent claim; and (3) with the knowledge the statement was false."  See Rutledge v. Aveda, No. 2:14-cv-145-AKK, 2015 WL 2238786, at *5 (N.D. Ala. May 12,

2015).   In their Response, Relators do not distinguish between their various claims in Counts I, II, and IV, and it is difficult to discern the precise legal theories on which they rely. Nonetheless, all three counts are premised on the central contention that the student loan funding requests are "false or fraudulent" claims for payment.[23]  Relators offer two reasons why these claims are false: (1) because the Law Schools made false certifications of compliance in the PPAs, and (2) because the Law Schools made material false statements to the ABA Accreditation Board.  These arguments implicate two potential legal theories: false certification and fraudulent inducement.

To adequately allege a false certification claim, Relators must set forth facts that, if true, would show: "'(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.'"  See Urquilla-Diaz, 780 F.3d at 1052 (quoting United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1174 (9th Cir. 2006)).[24]  Notably, false certifications can be express or implied.  Express false certification occurs where a defendant expressly and falsely certifies compliance with a law, rule or regulation in connection with a claim for payment.  See United States ex rel. Keeler v. Eisai, Inc., 568 F. App'x 783, 798-99 (11th

---

[23] At times, Relators appear to contend that the PPAs constitute false claims.  However, PPAs are not, themselves, requests for funds.  Rather, it is the student loan disbursement requests that constitute "claims."  See United States ex rel. Brooks v. Stevens-Henager College, 305 F. Supp. 3d 1279, 1296 n.6 (D. Utah Mar. 30, 2018).

[24] In Urquilla-Diaz, the Eleventh Circuit applied a prior version of the False Claims Act which imposed liability under the false record provision where a person "knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government."  See 31 U.S.C. § 3729(a)(2) (2006) (emphasis added).  Congress amended this statute via the Fraud Enforcement Recovery Act of 2009 (FERA), removing the underlined language and replacing it with "material to a false or fraudulent claim."  See 31 U.S.C. § 3729(a)(1)(B) (2009).  The Urquilla-Diaz Court declined to consider whether the amendments to the statute might alter the Hendow elements for post-amendment claims.  See Urquilla, 780 F.3d at 1045.  Nonetheless, the changes to the statute are not material to the issues addressed in this order.

Cir. 2014); see also United States ex rel. Medrano v. Diabetic Care Rx, LLC, No. 15-cv-62617-BLOOM/Valle, 2019 WL 1054125, at *4 (S.D. Fla. Mar. 6, 2019) ("'Express certification mean that the supplier has certified compliance with applicable laws and regulations as part of the claims submission process.'" (quoting United States ex rel. Phalp v. Lincare Holdings, Inc., 116 F. Supp. 3d 1326, 1345 (S.D. Fla. 2015) aff'd as modified 857 F.3d 1148 (11th Cir. 2017))); United States ex rel. Ortolano v. Amin Radiology, No. 5:10-cv-583-Oc-PRL, 2015 WL 403221, at *6 (M.D. Fla. Jan. 28, 2015) ("[A]n express certification occurs when the defendant actually signs or otherwise certifies compliance with some law or regulation that is identified on the face of the claim submitted."); John T. Boese, Civil False Claims and Qui Tam Actions § 2.03[G][1] (4th ed. & Supp. 2019) ("Express false certification theory, as its name suggests, requires a claim that expressly and falsely certifies compliance with a particular requirement . . . .").

In contrast, "[a] claim for payment is impliedly false when it impliedly certifies compliance with [an] underlying legal requirement when, in fact, the claimant is not in compliance." See United States ex rel. Brooks v. Stevens-Henager College, 305 F. Supp. 3d 1279, 1296 (D. Utah 2018). The Supreme Court recently confirmed that "the implied false certification theory can, at least in some circumstances, provide a basis for liability." See Escobar, 136 S. Ct. at 1999. Relying on the well-recognized concept of misrepresentation by omission in common-law fraud, the Escobar Court held that:

> the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

40

*Escobar*, 136 S. Ct. at 2001.  Notably, the Supreme Court specifically declined to determine "whether all claims for payment implicitly represent that the billing party is legally entitled to payment."  See *Escobar*, 136 S. Ct. at 2000 (emphasis added).  Nonetheless, as to both express and implied certifications, the materiality prong is critical.  Id. at 2001- 04 ("[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act.").  The Supreme Court describes the materiality standard as both "rigorous" and "demanding," and instructs that particularized facts supporting materiality must be pled in the complaint.  Id. at 2002-04 & n.6.

Additionally, the Eleventh Circuit recognizes a fraud in the inducement theory of liability under the FCA.  See *United States ex rel. Marsteller v. Tilton*, 880 F.3d 1302, 1314- 15 (11th Cir. 2018).  Under this theory, "liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct."  See *Hendow*, 461 F.3d at 1173.  The "subsequent claims are false 'because of an original fraud (whether a certification or otherwise).'"  See *Marsteller*, 880 F.3d at 1314 (quoting *Hendow*, 461 F.3d at 1173).  Significantly, for fraud in the inducement to be actionable under the False Claims Act, "'the promise must be false when made,'" and "material to the government's decision to pay out moneys to the claimant."  *Hendow*, 461 F.3d at 1174.

Here, Relators contend that the Law Schools made express certifications of compliance with DOE regulations in the PPAs that were false, causing the government to distribute Title IV funds for which the Law Schools were ineligible.  See Response to Infilaw

at 18, 27.[25]    In addition, Relators contend that the Law Schools made material misrepresentations to the ABA Accreditation Board regarding the Law Schools' bar passage rates in order to maintain their accreditation.  See id. at 27.  Relators' theory is that these material misrepresentations, essential to accreditation, caused the government to provide student loan funds to the Law Schools for which they were ineligible.  The Court considers each theory in turn.

## A. The PPAs

It is unclear whether Relators are proceeding on the theory that the PPAs represent express false certifications—the certifications of compliance in the PPAs were made in connection with the student loan claims and were false when made, or promissory fraud—the Law Schools certified that they would comply with the provisions in the PPA, without

---

[25] In their briefs, Relators do not raise the implied false certification theory of relief and they make no effort to plead the Escobar elements in the Third Amended Complaint.  Specifically, Relators do not include any allegations describing the statements or certifications made in connection with the student loan requests, and as such, have not shown that these requests "[do] not merely request payment, but also make[] specific representations about the goods or services provided . . . ."  See Escobar, 136 S. Ct. at 2001.  The Court recognizes that following Escobar, courts have split on whether such representations are necessary to state a claim for implied false certification.  Compare United States ex rel. Rose v. Stephens Institute, 909 F.3d 1012, 1017-18 (9th Cir. 2018) (concluding that the court was bound by prior panels who had construed Escobar's requirements as mandatory); United States v. Sanford-Brown, Ltd., 840 F.3d 445, 447-48 (7th Cir. 2016) (rejecting implied false certification claim where relator failed to meet either condition in Escobar) with United States v. Triple Canopy, Inc., 857 F.3d 174, 178 n.3 (4th Cir. 2017) (appearing to indicate that all claims for payment implicitly represent that the billing party is legally entitled to payment); United States v. DynCorp Int'l, LLC, 253 F. Supp. 3d 89, 99-100 (D.D.C. 2017) (explaining that in the D.C. Circuit, specific representations are not necessary to state an implied false certification claim and that this remains good law after Escobar); see also United States ex rel. Medrano v. Diabetic Care Rx, LLC, No. 15-cv-62617-BLOOM/Valle, 2019 WL 1054125, at *5 (S.D. Fla. Mar. 6, 2019) (describing the Escobar elements as mandatory and rejecting argument that "specific representations are not required").  Regardless, the Court need not decide the issue here.  In the Third Amended Complaint, Relators rely solely on allegations of expressly false statements in the PPAs and accreditation documents.  Relators, who have twice amended their claims, do not allege that the Law Schools made any implicit certifications in the requests for student loan funds, nor do Relators rely on this theory in their Response to Inflaw.  Indeed, Relators include virtually no allegations detailing the actual loan requests themselves.  As such, the implied certification theory of relief is not before the Court in this case.  See United States ex rel. Barrett v. Beauty Basics, Inc., No. 2:13-CV-1989-SLB, 2015 WL 3650960, at *4 (N.D. Ala. June 11, 2015) (rejecting implied certification theory in part because "plaintiffs have not stated with particularity the facts surrounding any loan applications"); Brooks, 305 F. Supp. 3d at 1298 & n.9 (rejecting implied certification theory because it was not pled in the complaint and explaining that "[a]t a minimum, the Government needs to allege what [the institution] impliedly represented when it requested Title IV funds").

the intention to do so, in order to induce the government to provide student loan funding. Under either theory, Relators must allege facts from which one could plausibly infer that the certifications of compliance or promises to comply in the PPAs were both false when made and material. See Urquilla-Diaz, 780 F.3d at 1052; Hendow, 461 F.3d at 1171-72 ("[T]o succeed on a false certification theory, some falsity must be alleged. . . . [A] palpably false statement, known to be a lie when it is made, is required for a party to be found liable under the False Claims Act."); Marsteller, 880 F.3d at 1314-15; see also United States v. Sanford-Brown, Ltd., 788 F.3d 696, 708-09 (7th Cir. 2015) ("[P]romises of future performance do not become false due to subsequent non-compliance.") reinstated in pertinent part by 840 F.3d 445, 447 (7th Cir. 2016); United States ex rel. Miller v. Weston Educ., Inc., 840 F.3d 494, 500 (8th Cir. 2016) ("To demonstrate this promise was false, it is not enough to show that [defendant] did not comply with the PPA; Relators must show that [defendant], when signing the PPA, knew accurate grade and attendance records were required, and that [defendants] intended not to maintain those records."); United States ex rel. Main v. Oakland City Univ., 426 F.3d 914, 917 (7th Cir. 2005); Hendow, 461 F.3d at 1174 ("[F]or promissory fraud to be actionable under the False Claims Act, 'the promise must be false when made.'" (internal quotation omitted)). Relying instead on vague and conclusory statements, Relators fail to meet their burden.[26]

---

[26] Notably, unlike similar PPA cases, Relators do not allege that the Law Schools annually re-certified the PPAs, or that the actual claims, i.e., the loan applications, included certifications of the Law Schools' compliance with DOE regulations or eligibility for the funds. Compare Jallali v. Nova Se. Univ., Inc., 486 F. App'x 765, 766 (11th Cir. 2012) (alleging that the institution certified compliance "each time it request[ed] federal student aid payments"); Urquilla-Diaz, 780 F.3d at 1046 (addressing allegations that institution "falsely assert[ed] in a yearly letter that it was in compliance with the ban on recruitment-based incentive compensation"); United State ex rel. Bernier v. Infilaw Corp. (Bernier II), 347 F. Supp. 3d 1075, 1080 (M.D. Fla. 2018) (summarizing allegations that an institution's "entry into the PPA and annual recertification of compliance amounts to presenting a false claim and submitting a false record"). Here, as alleged in the Third Amended Complaint, Relators rely solely on PPAs of unspecified date and number to establish falsity.

As to the PPAs executed at FCSL and CSL, Relators do not allege when they were signed, who prepared them, what they said, or who signed them. Relators also provide no allegations to suggest that they have or had any first-hand knowledge about the PPA certification process at either of those schools. Indeed, Relators rely merely on "information and belief" to contend that FCSL and CSL executed PPAs that were similar to those of ASLS. See TAC ¶ 34. Perhaps even more troublesome is the fact that despite Lorona's "unparalleled access" to the PPAs at ASLS, the allegations in the Third Amended Complaint regarding those documents are similarly vague. While Relators do identify ASLS President Scott Thompson as the signer of the PPAs, they still fail to allege who prepared them, what the documents said, or when they were signed. See TAC ¶ 32. Relators broadly maintain that "ASLS and Infilaw leadership and staff" had "full knowledge" that the regulations and requirements of the PPA were "regularly being violated" but fail to identify the persons to whom they are referring, or explain when or how these unidentified individuals acquired this knowledge. Id. ¶ 33.

Critically, because the Court has no information about when the PPAs were signed, the Court cannot determine whether the alleged regulatory violations began before or after the Law Schools entered those agreements. Thus, there are no facts to support the inference that at the time ASLS executed any PPA it was not complying, or intended not to comply, with DOE regulations. The Third Amended Complaint is devoid of any particularized allegations from which to plausibly infer that at the time the PPAs were signed, whenever that was, the persons who prepared and signed the PPAs, whoever they were, made certifications of compliance (or promises to comply) that were false at the time they were made. See United States ex rel. Brooks v. Stevens-Henager College, 305 F.

44

Supp. 3d 1279, 1312 (D. Utah 2018) ("But Relators do not identify the dates on which any of these schools executed their PPAs. Without more, the court has no basis to determine whether any of the promises these schools made in their PPAs were 'false when made.'"); United States ex rel. Barrett v. Beauty Basics, Inc., No. 2:13-CV-1989-SLB, 2015 WL 3650960, at *3 (N.D. Ala. June 11, 2015); see also Jallali v. Nova Se. Univ., Inc., 486 F. App'x 765, 767 (11th Cir. 2012); United States ex rel. Pilecki-Simko v. Chubb Inst., 443 F. App'x 754, 760-61 (3d Cir. 2011). Because Relators have not pled with any particularity the purported false certifications of compliance, their allegations of mere regulatory violations are not sufficient to state a claim under the FCA. See Urquilla-Diaz, 780 F.3d at 1052 ("'[M]ere regulatory violations do not give rise to a viable FCA action'; instead '[i]t is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit.'" (emphasis and second alteration in original) (quoting Hendow, 461 F.3d at 1171)).

Nevertheless, Relators contend that they need not satisfy the particularity standard because they have "insider status" that provides sufficient "indicia of reliability" to satisfy Rule 9(b). See Response to Infilaw at 7-9. Indeed, the Eleventh Circuit recognizes that "a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims." United States ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 F. App'x 693, 704 (11th Cir. 2014); Chase, 723 F. App'x at 788. In contrast, relators "without first-hand knowledge of the defendants' billing practices" and corporate outsiders are unlikely to have a sufficient basis for their allegations. Id. Regardless, "[a]t a minimum, a plaintiff-relator must explain the basis for

her assertion that fraudulent claims were actually submitted." <u>Mastej</u>, 591 F. App'x at 704; <u>Chase</u>, 723 F. App'x at 789 (explaining that "the basis of [the relator's] direct knowledge must be pled with particularity"). "It is not enough for the plaintiff-relator to state baldly that he was aware of the defendants' billing practices, to base his knowledge on rumors, or to offer only conjecture about the source of his knowledge." <u>Mastej</u>, 591 F. App'x at 704-05 (internal citations omitted); <u>United States ex rel. Sanchez v. Lymphatx, Inc.</u>, 596 F.3d 1300, 1302-03 n.4 (11th Cir. 2010) (finding insufficient indicia of reliability where office manager alleged that she "'found [unspecified] documentation' and 'discovered' or 'learned' that the defendants had submitted false claims").

Lorona maintains that she has personal knowledge to support her allegations that false PPAs were submitted to the government based on her positions as an administrative assistant to the general counsel in 2009, financial aid representative in 2010, assistant director of financial aid in 2011, and accounting manager in 2011. <u>See</u> TAC ¶ 22. However, Lorona fails to allege the basis of her knowledge with particularity. Lorona's knowledge of the PPAs is premised solely on the following allegation: "PPAs were completed and executed in the financial aid department and the President's Office, giving Relator Lorona unparalleled access to the documents and the process under which they were certified." <u>Id.</u> ¶ 32. However, allegations regarding what this process was, whether Lorona had any direct involvement in it, or whether she spoke to anyone who did are noticeably absent. Significantly, these are details which, given her "unparalleled access," should have been known to Lorona and as such, their absence from the Third Amended Complaint is particularly concerning. <u>See</u> <u>Keeler</u>, 568 F. App'x at 802 ("Most concerning, however, is that many of the details that were required to have been pleaded and should

have been known to Relator are absent from the Complaint."). Indeed, because Relators do not allege when the PPAs were prepared and signed, it is not even apparent whether Lorona was working for ASLS during the relevant time period. Here, Lorona has done no more than state baldly that she was aware of ASLS's PPA certification process. This is not enough. See Mastej, 591 F. App'x at 704-05; Sanchez, 596 F.3d at 1303 n.4. "Consequently, in light of the paucity of details, the Court has no basis to find that Relator's claims are more likely to be reliable rather than purely speculative or as the court in Clausen warned, spurious." Keeler, 568 F. App'x at 802 (citing Clausen, 290 F.3d at 1313 n.24). Accordingly, Relators' claims premised on the PPAs are due to be dismissed for failure to adequately allege the requisite falsity under the standards of Rule 9(b).

In addition, for the reasons that follow, even if Relators' general allegations about the PPAs were sufficient, Relators also fail to allege the underlying violations with the requisite particularity. See id. at 793 ("'Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the circumstances constituting fraud or mistake that must be pled with particularity pursuant to Rule 9(b).'" (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004))). Specifically, Relators fail to allege factual allegations supporting an inference that the Law Schools actually violated the 90/10 Rule, made substantial misrepresentations in violation of 34 C.F.R. § 668.71, or made misleading statements to the ABA Accreditation Board. Absent allegations showing a violation of any of these regulations, the Court cannot infer that the certifications of compliance in the PPAs were false

47

### 1. The 90/10 Rule

To show that the Law Schools' certifications of compliance with the 90/10 Rule were false, Relators must "allege with particularity that [the Law Schools] received more than 90 percent of [their] revenue from Title IV funds or that [they] received less than 10 percent of [their] revenue from non-Title IV funds." See Urquilla-Diaz, 780 F.3d at 1056. Relators fail to do so. In the Third Amended Complaint, Relators describe three ways in which the Law Schools attempted to manipulate their Title IV and non-Title IV revenues—institutional loans, the myBAR program, and the check exchange. Relators' allegations describing these purported schemes lack adequate detail or other indicia of reliability. Nevertheless, even accepting the allegations as true, "absent allegations about [each Law Schools'] total revenue," the fact that the Law Schools attempted to manipulate their revenues alone "does not make it plausible (as opposed to merely possible) that the school[s] violated the 90/10 rule." See id. at 1056; see also Brooks, 305 F. Supp. 3d at 1312-13.

As to the institutional loan scheme, Relators allege that the Law Schools offered loans to low-credit students. According to Relators, the Law Schools made no serious attempts to collect those loans, and as such, it was improper for the Law Schools to count the net value of those loans as non-Title IV revenue. However, Relators' general allegations as to the existence of this institutional loan scheme are unsupported by any particularized facts about the students with low-credit who received such loans and were not subject to collections, the dates such loans were issued, the amounts of any of these loans, or the number of such loans each Law School issued. Critically, Relators also fail to allege the total amount of allegedly improper non-Title IV revenue derived from these loans or the proportional relationship of this revenue to the total amount of the Law Schools'

revenues overall. Indeed, Relators include data on the Law Schools' reported 90/10 percentages for the 2009-2010, 2012-2013, and 2013-2014 funding years, but omit this information as to 2011-2012, the year the Law Schools allegedly used the institutional loan scheme to manipulate their revenue. See TAC ¶¶ 40-42, 48, 51. Relators allege that the Law Schools reported the receivables from these institutional loans to the DOE as non-Title IV income and that this "created the illusion that the [Law Schools] derived a much higher percentage of their income from non-Title IV sources so that the [Law Schools] appeared to be well in compliance with the 90/10 Rule." Id. ¶ 51. But Relators do not provide any particularized allegations as to what the reported percentages were, or critically, what those percentages would or should have been without the institutional loan scheme. See Brooks, 305 F. Supp. 3d at 1312 n.23.

Instead, Relators allege in a broad and conclusory manner that "Lorona was aware of and viewed internal calculations of revenue under the 90/10 Rule (as opposed to the publicly reported data), most of which demonstrated that ASLS was consistently in violation of the 90/10 Rule." See TAC ¶ 58. This allegation is entirely too vague and conclusory to satisfy ordinary pleading requirements much less the specificity required by Rule 9(b). What were these documents? When did she see them and to what time periods did they pertain? How did she obtain them? Were these finalized numbers or merely projections? If "most" showed violations but not all, what was the difference? Lorona further alleges that she was "provided documents demonstrating a violation of the 90/10 Rule and instructed to convert some Title IV/HEA loans into [institutional loans] for the sole purpose of converting revenue to create the appearance of compliance with the 90/10 Rule," but does not describe the details of the purported violation, when this incident happened, who

it was that gave her this directive, or whether she complied with it.  Id. ¶ 58.  And, most egregiously, Relators allege only "upon information and belief" that "the same documents existed at the other [Law] Schools."  Id.  The mere allegation that Lorona saw unspecified documents "most of which" she contends demonstrated a violation of the 90/10 Rule as to ASLS, which she believes exist at FCSL and CSL, does not provide sufficient indicia of reliability to satisfy the standards of Rule 9(b) with respect to any of the Law Schools.  See Sanchez, 596 F.3d at 1303 n.4.  Accordingly, the Court finds that Relators have not alleged with particularity that the institutional loan scheme actually resulted in violations of the 90/10 Rule.  See Urquilla-Diaz, 780 F.3d at 1056; Brooks, 305 F. Supp. 3d at 1312.

Relators' allegations as to the myBAR program are similarly insufficient.  Relators assert that ASLS created the myBAR program just prior to the February 2012 bar exam as a potential solution to the 90/10 problem.  According to Relators, ASLS could not properly count the myBAR fees as non-Title IV revenue because the program was inadequate to prepare students for the bar exam.  See TAC ¶¶ 69-70.  However, Relators offer only "information and belief" that any of the Law Schools actually counted the myBAR fees as non-Title IV revenue.  Id. ¶ 68.  Moreover, Relators provide no specific allegations as to the amount of revenue the Law Schools earned as a result of this program, the relevant time periods during which each Law School reported this income, or the amount or percentage of total revenues derived from myBAR program fees.  Thus, as with the institutional loans, Relators fail to allege particularized facts supporting even an inference that the Law Schools actually violated the 90/10 Rule.[27]

---

[27] Moreover, Relators' allegations that the myBAR program was so inadequate as to render it outside the scope of 34 C.F.R. § 668.28(a)(3)(iii) are exceedingly thin.  Notably, Relators' allegations focus on the hurried way ASLS implemented the program less than three months prior to the February 2012 bar exam.  See TAC ¶¶ 62-64.  Yet, 63.8% of ASLS graduates passed this exam, and 73.1% passed in July 2012.

Relators' allegations regarding the Barbri check exchange program are slightly more detailed, but again fall short of alleging an actual violation of the 90/10 Rule.  Specifically, Relators allege that ASLS "received checks for approximately 70 graduates representing approximately $184,000," and that "ASLS illegally counted a large and material amount of this money as non-Title IV income in its 2012 annual audit submitted to the DOE."  See TAC ¶ 110.  Significantly, however, Relators do not allege ASLS's total revenues in 2012, the specific data reported in the 2012 annual audit, or the proportion of ASLS's overall revenues encompassed by the check exchange.  Thus, while it is possible that ASLS would have been in violation of the 90/10 Rule absent the inclusion of funds from the check exchange and other programs, one cannot plausibly infer such a violation from the non-conclusory factual allegations contained in the Third Amended Complaint.  See Urquilla-Diaz, 780 F.3d at 1056.  Likewise, ASLS alleges that in 2013, "Barbri sent refund checks for approximately 63 former students to ASLS and ASLS was successful in convincing many of these students to participate in the check exchange process.  These checks from these students were falsely reported by Infilaw as non-Title IV revenue on its 2013 annual audit submitted to the DOE."  Id. ¶ 112.  Relators do not allege the amount of funds garnered from these approximately 63 students, but presumably, it is some amount less than the $184,000 generated in 2012.  In the Third Amended Complaint Relators do provide some information regarding ASLS's revenues during the 2012-2013 funding year, specifically that "ASLS reported an 87.70%/12.30% split with Title IV/HEA revenue of

---

Relators do not allege the overall state averages for those years, nor do they allege what percentage of myBAR students passed the bar exam as compared to students enrolled in other bar preparation courses.  Instead, Relators' sole factual support for their contention that the myBAR program was inadequate are internal statistics about ASLS's predicted bar passage rate for the July 2015 bar exam.  Id. ¶ 69.  Relators' reliance on data from 2015 is puzzling given that by that point ASLS was using "the same Barbri materials and lectures that were used for Barbri courses offered at the other law schools in Arizona."  Id. ¶¶ 84, 116.

$60,030,378.00." Id. ¶ 41. Thus, the revenue collected and reported from the check exchange program in 2013 was less than .27% of ASLS's total revenues, and as such, less than the amount necessary to demonstrate a violation of the 90/10 Rule based on the numbers alleged in the Third Amended Complaint.[28] Moreover, Relators include no allegations regarding the check exchange process, if any, at CSL and FCSL, nor the amount of any revenues generated from this program at those schools.

Accordingly, Relators have failed to allege sufficient particularized facts to make a plausible showing that absent the purportedly improper accounting schemes, the Law Schools would have violated the 90/10 Rule. Thus, Relators allegations are insufficient to raise the inference that the Law Schools' certifications of compliance with that Rule were false. Accordingly, to the extent Relators' claims are premised on false certifications of compliance, or promises to comply, with the 90/10 Rule in the PPAs, those claims fail. See Brooks, 305 F. Supp. 3d at 1312-13.[29]

---

[28] If $60,030,378.00 represents 87.70% of ASLS's total revenue, then ASLS's total revenue was $68,449,689.90, and the Court calculates that $184,000 represents 0.268% of that amount.

[29] To the extent Relators premise their claim on allegedly false statements in the 2012 and 2013 annual audits submitted to the DOE, this theory is also unavailing. See Response to Infilaw at 22; see also TAC ¶¶ 110, 112. In their Response, Relators attempt to distinguish their claims from Urquilla-Diaz and Brooks by arguing that the annual audits constitute "false claims to the United States, in violation of the FCA." See Response to Infilaw at 22. Of course, the audits are not themselves requests for funds, and therefore, like the PPAs, are not "claims" within the meaning of the FCA. To the extent Relators' theory is that these audits constitute false records material to false claims, their allegations are still insufficient. Relators do not identify who performed the audits, the specific false statements contained in them, or the basis for Relators' knowledge of their contents. And regardless, Relators fail to allege facts demonstrating that the purportedly false statements were "material" to the government's decision to issue the student loan funds. See 31 U.S.C. § 3729(a)(1)(B). Indeed, as stated above, Relators have not shown that absent the purportedly improper activity, the audits would have shown a violation of the 90/10 Rule rendering the Law Schools ineligible for federal financial aid. Stated another way, Relators do not explain how the false statements in the audits render the subsequent student loan requests "false," and false statements alone, absent the existence of a false claim, do not violate the FCA. See Brooks, 305 F. Supp. 3d at 1314 (rejecting theory that would "impose liability for any claims for payment submitted after the Colleges made any false statement, whether in a contract or otherwise"); see also Urquilla-Diaz, 780 F.3d at 1056 (explaining that while lying is reprehensible, "it violates the False Claims Act only if the 'false statements ultimately led the government to pay amounts it did not owe'" (internal quotation omitted)); Bernier, 347 F. Supp. 3d at 1087 (finding that the second amended

52

## 2. The Unlock Potential program

Relators also allege that the Law Schools violated the DOE regulation which prohibits institutions from making substantial misrepresentations. See 34 C.F.R. § 668.71. Specifically, Relators allege that the Law Schools substantially misrepresented their bar passage rates by paying students to defer taking the bar exam through the Unlock Potential program. Based on these allegations, Relators maintain that the Law Schools falsely certified compliance with this DOE regulation in the PPAs.

Relators maintain that the Unlock Potential program "is an outright attempt to deceive the ABA accrediting board, DOE, incoming students, existing students, and graduating students by attempting to fallaciously increase bar passage percentages." TAC ¶ 181. However, Relators fail to allege with any particularity what false statements were made, when they were made, or who made them. Relators imply that ASLS paid students to defer taking the July 2014 and February 2015 bar exams, as well as "subsequent bar exams" in order to manipulate its bar passage rates. See id. ¶¶ 184-86, 189. Relators appear to contend that as a result of this program, the Law Schools' statements about their bar passage rates were misleading, but Relators fail to identify any particular statement that they contend was misleading. Based on Relators' own allegations, it does not appear that the Law Schools were concealing the existence of this Unlock Potential program from the public. See id. ¶ 189 (alleging that ASLS Dean Mays told media outlets that she was not asking students not to take the bar exam, but "merely advising them that they could enroll in the [Unlock Potential] program"). And, even if the Unlock Potential program did constitute an improper attempt to manipulate bar passage statistics, Relators point to no

---

complaint "as a whole fails to plead with particularity facts to provide a plausible connection between these three alleged PPA violations and DOE's decision to award [the institution] federal funding-again").

allegations suggesting that the existence of this program actually had a material impact on bar passage rates. Whether the Law Schools published substantially misleading information regarding its bar passage rates depends entirely on what was said, when it was said, in what context, what was or was not disclosed about the Unlock Potential program, and the impact the program did or did not have on the bar passage statistics. None of this information is alleged in the Third Amended Complaint. Therefore, Relators' conclusory allegations are insufficient to show that the Law Schools made any substantial misrepresentations regarding their bar passage rates, and therefore Relators have not shown that the certifications of compliance in the PPAs with this regulation were false.[30] Accordingly, Relators' claims premised on violations of 34 C.F.R. § 668.71 are due to be dismissed.

## B. Accreditation

Relators also contend that as a result of the Unlock Potential program, the Law Schools misrepresented their bar passage rates to the ABA Accreditation Board. As the Eleventh Circuit recognized in Urquilla-Diaz, "[m]aking false statements to an accreditation agency could lead to a False Claims Act violation because whether a school is accredited is material to the government's decision to disburse Title IV funds to the school (or its students)." See Urquilla-Diaz, 780 F.3d at 1056. However, "[m]aking false statements to

---

[30] Significantly, Relators have also failed to meet their burden of alleging that the Law Schools' purported false certifications of compliance with 34 C.F.R. § 668.71 were material to the government's decision to continue providing financial aid. See Escobar, 136 S. Ct. at 2002 ("[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."); Rutledge v. Aveda, No. 2:14-cv-00145-AKK, 2015 WL 2238786, at *9 (N.D. Ala. May 12, 2015) ("Here, [Relator] alleges the [institute] certified its compliance with the program, but she never specifically alleges how and why noncompliance with the regulations allegedly violated would prevent payment by the government."). Indeed, the Supreme Court specifically recognized that plaintiffs in FCA cases must "plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by . . . pleading facts to support allegations of materiality." Escobar, 136 S. Ct. at 2004 n.6. This, the Relators have not done as to this claim.

an accreditation agency does not expose a school to liability under [the false records provision] unless the statements were essential to the school having received (or maintained) its accreditation." Id.

Here, Relators fail to allege with Rule 9(b) particularity any material false statements to the ABA Accreditation Board. Instead, Relators vaguely allege that:

> ABA accreditation documents were prepared by the General Counsel of ASLS. Due to her initial position as executive assistant to the General Counsel, Lorona witnessed the accreditation process, giving her unparalleled access to the preparation and submission of such documents. In that manner, she possesses inherent indicia of reliability that such accreditation documents, with errors and misrepresentations, were submitted to the ABA, in violation of federal regulations.

See TAC ¶ 204. Despite this "unparalleled access," Lorona fails to include any specific factual information about the contents of these documents, the specific errors and misrepresentations purportedly contained within them, or when the documents were prepared and submitted to the ABA. Id. Notably, Lorona alleges that she "witnessed the accreditation process" due to her "initial position as executive assistant to the General Counsel." Id. However, Lorona only served in that role from November 2009 to some point in 2010. Id. ¶ 22. According to the Third Amended Complaint, the Law Schools' efforts to "game" the bar exam statistics through the Unlock Potential program did not begin until May 2014. Id. ¶ 182. Thus, Relators provide no "indicia of reliability" to support their contention that the accreditation documents contained misrepresentations about the Unlock Potential program. Indeed, as there are no allegations as to when the accreditation process during which the Law Schools allegedly made false representations took place, it is entirely unclear whether Lorona worked in the General Counsel's office during the relevant time period.

Moreover, while Relators allege in a conclusory manner that the Law Schools "[g]amed" the bar passage statistics, they do not allege what statistics were reported to the ABA, when they were reported (whether before or after implementation of the Unlock Potential program), what the "actual" statistics would have shown, and whether the ABA would have denied accreditation had it known the true facts. Thus, Relators have failed to plead "particular facts that provide a plausible connection between [ASLS's] allegedly false statements to the [ABA Accreditation Board] and the agency's decision to accredit" the Law Schools. See Urquilla-Diaz, 780 F.3d at 1056. As such, Relators have not alleged sufficient information to show that Relators' false statements were material to the accreditation decision and "'ultimately led the government to pay amounts it did not owe.'" See id. (quoting Hopper, 588 F.3d at 1329). Accordingly, Relators' claims premised on purported misrepresentations to the ABA Accreditation Board are also due to be dismissed.

As to Counts I, II, and IV, the Court finds that Relators have failed to allege the requisite "'facts as to time, place, and substance of the defendant's alleged fraud, [and] the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" See Corsello, 428 F.3d at 1012 (alteration in original) (quoting Clausen, 290 F.3d at 1310). As explained above, Relators fail to allege these details both as to the specific false statements or certifications at issue, and as to the underlying regulatory violations.[31] Moreover, the Relators have failed to plead with particularity sufficient indicia

---

[31] The Court further notes that, as to the presentment claim, Relators fail to include any particularized facts as to the actual presentment of the purported false claims—the student loan requests—to the government, as is required to state a presentment claim in the Eleventh Circuit. See Jallali, 486 F. App'x at 767 ("[Relator's] complaint does not allege facts identifying the time, place, or substance of the allegedly fraudulent claims for payment."); Rutledge, 2015 WL 2238786, at *10-12; Beauty Basics, 2015 WL 3650960, at *2, *4 ("[P]laintiffs have not stated with particularity the facts surrounding any loan applications."); compare Urquilla-Diaz, 780 F.3d at 1055 n.13 (referencing "specific allegations about three students who applied for and received Title IV funds to attend classes" at the institution). Nonetheless, because Relators' claims fail for the reasons set forth above, the Court has assumed, without deciding, that Relators' allegations regarding

of reliability to support their claims. Accordingly, the Court will dismiss Counts I, II, and IV of the Third Amended Complaint for failure to comply with Rule 9(b).

## VII.    Count III (Conspiracy) and Count V (Reverse False Claim)

Because Relators fail to adequately allege the submission and payment of false claims in Counts I, II and IV, their reverse-false claim cause of action fails as well "because it is based on false claims having been paid that Defendants failed to repay." See Mastej, 591 F. App'x at 706 n.20. In like fashion, because the Relators fail to adequately allege a viable FCA claim under the presentment or false record provisions, their claim that the Infilaw Defendants conspired with Barbri to violate the FCA necessarily fails. See United States ex rel. Chase v. LifePath Hospice, Inc., Case No. 8:10-cv-1061-T-30TGW, 2016 WL 5239863, at *9 (M.D. Fla. Sept. 22, 2016); United States ex rel. Potra v. Jacobson Cos., Inc., No. 1:12-cv-01600-WSD, 2014 WL 1275501, at *4 (N.D. Ga. Mar. 27, 2014) (citing Vigil v. Nelnet, Inc., 639 F.3d 791, 801 (8th Cir. 2011) ("Because the Complaint fails to state claims under [the presentment and false record provisions], it likewise fails to state an actionable conspiracy claim . . . .")); see also John T. Boese, Civil False Claims and Qui Tam Actions § 2.01[E][4] (4th ed. & Supp. 2019) ("Where an underlying FCA allegation has been found to be without merit or otherwise not viable, a Section 3729(a)(3) conspiracy claim based on that underlying conduct must also be dismissed."). Thus, Relators' conspiracy claim is also due to be dismissed. Accordingly, the Court concludes that the Barbri and Infilaw Motions are due to be granted in their entirety. In light of the foregoing, it is

---

Lorona's involvement in the submission of COD requests, see TAC ¶¶ 23-24, as well as the allegations describing the Law Schools' reported Title IV revenue, see TAC ¶¶ 40-42, provide sufficient indicia of reliability that the Law Schools' submitted, or caused to be submitted, requests for federal student loan funds under Title IV/HEA programs during the relevant time period.

**ORDERED**:

1. Defendant Barbri, Inc.'s Dispositive Motion to Dismiss and Memorandum in Support (Doc. 44) is **GRANTED**.

2. Defendants Infilaw Corporation, Arizona Summit Law School, LLC, Florida Coastal School of Law, and Charlotte School of Law, LLC's Omnibus Motion to Dismiss Third Amended Complaint and Supporting Memorandum of Law (Doc. 56) is **GRANTED**.

3. The Clerk of the Court is **directed** to enter judgment in favor of Defendants Infilaw Corporation, Arizona Summit Law School, LLC, Florida Coastal School of Law, Charlotte School of Law, and Barbri Inc. and against Plaintiffs Paula C. Lorona and Reid Potter.

4. The Clerk of the Court is further **directed** to terminate all pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 12th day of August, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:
Counsel of Record

58